## Case No. 8,136.

### LAWRENCE v. DANA et al.

[4 Cliff. 1; [1] 2 Am. Law T. Rep. (N. S.) 402; 7 O. G. 81.]

Circuit Court, D. Massachusetts. Sept. 20, 1869.

COPYRIGHT—MEMORANDUM OF AGREEMENT—CONTRACT — FRAUD — PROPRIETORS NOT AUTHORS—EDITOR OF WORK — NOTES — SUBSEQUENT EDITION—EXPERT EVIDENCE OF IDENTITY—COINCIDENCE OF ERRORS—LITERARY LABOR.

1. If parties make a memorandum of an agreement, not at that time regarded as a contract, but afterwards adopt the memorandum as a contract, and understandingly execute it as such, their rights under it must be ascertained from the language employed, as applied, in view of the surrounding circumstances, to the subject-matter of the negotiation.

2. The stipulations contained in the memorandum in this case were held to constitute a perfected agreement, and not a mere proposal.

3. Mere proposals may in general be withdrawn before they are accepted; and ordinary contracts, executory on both sides, may in certain cases be regarded as forfeited where the reciprocal stipulations are dependent, and where the party seeking to enforce performance has omitted to do something required to be performed by him as a condition precedent to his right of action.

4. A party may be estopped from setting up a particular contract, where he has agreed, in due form of law, for a valuable consideration to relinquish its benefits or not to enforce its provisions; or where he has designedly caused the

other party to believe that the contract has been discharged, or would not be enforced, and thus induced such other party to act on that belief to his pecuniary prejudice.

5. Contracts executed on one side and unperformed on the other are under the operation of a very different principle from those where nothing has been done by either, so far as they relate to the party who has fulfilled his obligation. Rights and obligations secured or imposed under such circumstances have become vested and absolute.

6. If the delinquent party seeks to avoid the obligation imposed on him, he must allege and prove a new contract, amounting to a release; or, that the other party is estopped to enforce the obligation by virtue of some operative agreement to relinquish the benefits of the same; or, he must allege and prove that he has been designedly misled by the admissions and representations of the other party.

7. None of the elements of estoppel exist in this branch of this case, because the complainant did not agree that he would discharge the memorandum.

8. A certain memorandum had been drawn and agreed to. After this the complainant stated in writing, "On reflection, I have determined to decline accepting any paper whatever from Mrs. W——, and therefore return the enclosed,"—meaning an amended draft for the formal agreement. Held, this should be construed in view of what had preceded it in the negotiations, and of the subject-matter to which it related; that the statement was not inconsistent with the memorandum or a relinquishment of it.

9. Expressions of a doubtful character are not sufficient to support a defence to a contract executed on the part of the complainant.

10. Estoppels are allowed to shut out the truth only when it is necessary to protect a party setting up such a defence against an injury to which he is exposed without his own fault, in consequence of having trusted to the representations designedly made by the other party in order to expose him to such injury, which representations were of such character that a man of ordinary prudence would take them as true, and believe that he should act upon them as exhibiting the true state of the case.

11. These representations must be proved, and they will not by implication be extended beyond their plain import.

12. Although abundant evidence existed to show that the defendant was willing to concede the complainant's claim to a certain part of the matter in dispute, still, as the complainant elected to stand on the original memorandum of agreement, and such part was not included therein, it was held he had relinquished such part.

13. When fraud is set up as a defence to a contract, the burden is on the party setting it up; and it must be satisfactorily proved.

14. Inferences sought to be drawn from correspondence of parties are not sufficient to substantiate the defence of fraud in the making of a contract otherwise legal and binding.

15. Under the copyright act now in force, copyright may be granted to the author of any book within the classes described in section 1, if the author is a citizen of the United States.

16. Executors, administrators, and legal assigns of the author are also included within the purview of that section.

17. Where the author is the owner, he is entitled to the copyright; but if he has parted with the ownership, the requirement of the law is that the clerk of the district court shall give a copy of the title, under seal, to the proprietor.

18. Proprietors of such books, though not authors, are entitled to the benefits of the act under a provision of section 4.

[Cited in Carte v. Evans, 27 Fed. 863.]

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

19. Legal proprietors, although not authors, may recover of persons who print or publish any manuscript, owned by such proprietors, without their consent, all damages occasioned by such injury.

20. Where services in editing and preparing a certain work for publication were, by agreement, gratuitous as to two editions thereof, it was *held* that the contributions of the editor became the property of the proprietor of the work just as effectually as if the editor had been paid for his work on those editions, and the title to the same vested in the proprietor of the original work, as the labor was done, to the extent of the gift, subject to the trust in favor of the donor as necessarily implied by the terms of the arrangement.

21. Delivery was made as the work was performed, and the proprietor of the book needed no other muniment of title than what was acquired when the agreement was executed.

22. The proprietor needed no assignment from the contributor, because the contributor had no title to the contributions, nor any inchoate right of copyright in the editions of the work.

23. In order to the obtaining of a copyright, deposit must be made before publication, if the subject-matter is a book, of a copy of such book in the clerk's office of the district court, and the applicant must give information of copyright being secured, by causing to be inserted, in the several copies of each and every edition published, during the term secured, on the title-page, or page succeeding, the following words: "Entered according to the act of congress, in the year ——, by A. B., in the clerk's office of the district court of" (as the case may be).

24. Omission to comply with these requirements renders the copyright invalid.

25. Section 5 of the act does not require that the same notice be inserted in the several copies of each and every edition published during the term secured, so that the second and every subsequent edition may correctly specify the date of the original entry.

26. Acts of congress are construed by the rules of the common law, and the construction should be such as to carry into effect the true intent and meaning of the legislature; but the province of construction can never extend beyond the language employed as applied to the subject-matter and the surrounding circumstances.

27. Change of date in the notice required in case of successive editions of the same book is not required by section 5, but the meaning of the provision is, that a new notice in the same prescribed form shall be given in every improved edition published during the term.

28. When the original edition is published, compliance with that requirement is protection for that edition, but not for a second edition with notes, or any succeeding edition with improvements.

29. Copyrights to editions of a work other than the original one are granted for additions to or emendations of the work, and every copyright should bear date of the day when secured.

30. Subsequent editions without change or addition should have the same entry as the first; subsequent editions with notes or improvements are new books within the meaning of the copyright acts.

31. Copyrights, like patents, afford no protection to what was not in existence at the time they were granted.

32. Protection is afforded by virtue of a copyright of a book, if duly granted, to all the matter the book contained when the printed copy of the same was deposited in the office of the clerk of the district court.

33. Whenever a renewal is obtained under section 2 of the copyright act, the requirement is, that the title of the work so secured shall be a second time recorded, but there is nothing to show that the date of the original entry shall be specified in each successive edition.

34. The agreement in this case was that Mrs. Wheaton, who held the legal title of the copyrights, should make no use of the notes in a new edition without the written consent of the complainant, and that she would give him the right to make any use of the same he might see fit, which was in all respects equivalent to a contract to transfer and assign to him the legal title to the copyrights.

35. Equity would have compelled the execution of the formal instrument therein stipulated, if the right to demand it had not been waived by the complainant.

36. In this case, Mrs. Wheaton, by virtue of the agreement with the complainant, became the absolute owner of the notes as they were prepared, so far as respects the editions in question; and she also acquired therewith the right to copyright the same for the protection of the property; but she did not acquire thereby any right or title, legal or equitable, to use the notes in a third edition of the annotated work without the consent of the complainant.

37. Literary property, even when secured by copyright, differs in many respects from property in personal chattels, and the tenure of the property is governed by somewhat different rules; but the nature and tenure of copyright property is still more unlike the tenure of other property, before the copyright is taken out, and while the right to that protection is inchoate.

38. Title to the notes or improvements prepared for a new edition of a book previously copyrighted may, in certain cases, be acquired by the proprietor of a book from an employé by virtue of a contract of employment, and without any written assignment.

[Cited in Black v. Henry G. Allen Co., 42 Fed. 625.]

39. But such cannot be held to be a mere license, when, as in this case, the contract was that the proprietor of the book should take the exclusive right to the contributions for two successive editions, together with the right to copyright the same for the protection of the property.

40. The inchoate right of the copyright passed to the proprietor of the book by the same arrangement.

41. The inchoate right is incapable of any other limitation than that prescribed by the copyright act, so that the proprietor of the book in this case took out the copyright in the usual form. She took it out for her own protection and for that of the complainant, when her property in the notes should cease.

42. In this case it was *held* that the complainant, in the view of a court of equity, was the equitable owner of the notes, including the arrangement of the same, and the mode in which they are therein combined and connected with the text, and of the copyrights taken out by the proprietor of the book for the protection of the property.

43. Whatever puts a party upon inquiry is in equity sufficient notice.

44. Ordinary prudence is required of every person dealing with trust property. If he fails to investigate when put upon inquiry, he is chargeable with all the knowledge it is reasonable to suppose he would have acquired if he had performed his duty.

45. Constructive notice is *held* sufficient upon the ground that when a party is about to perform an act by which he has reason to believe that the rights of third persons may be affected, an inquiry as to the state of facts is a moral duty, and diligence an act of justice.

46. If a person dealing with trust property omits to inquire, he is then chargeable with all the knowledge of the facts that by proper inquiry he might have learned.

47. Inquiry is a moral duty whenever the circumstances are such that a person of ordinary prudence would refuse to act. If a party under such circumstances shuts his eyes to the means of knowledge which he knows is at hand, he then forfeits every pretence of defence, as such conduct is equivalent to actual notice of all the facts he might have ascertained by a performance of his duty.

48. Expert testimony was put into the case upon a comparison of two editions of a book, upon the point, whether the two editions were or were not of the same character. *Held,* that though admissible in such a case, the opinions of the experts were in the nature of secondary evidence.

49. The court found it necessary to examine the comparisons itself in order to come to a satisfactory conclusion, although much aid was derived from the comparisons made by the experts.

50. In this case it was *held* that the question of fact was, what use did the respondent, who edited the edition in question, make of the complainant's notes?

51. The question of law was, was the use which it was admitted he did make of those notes a lawful use, or did it infringe the complainant's rights?

52. Although it may be difficult to make proof, still the complainant is not entitled to any decree, unless he proves infringement as alleged, to the satisfaction of the court, because the burden is on the party making the charge. In a case of this character the parties are compelled to rely chiefly upon a comparison of the contents of the respective books upon the question of infringement.

53. Great latitude is given in the reception of circumstantial evidence, the aid of which is constantly required in the administration of justice.

54. Whenever the necessity for the use of such evidence arises, either from the nature of the inquiry, or the failure of direct proof, objections to the relevancy of evidence are not favored, for the reason that the force and effect of circumstantial facts usually and almost always depend upon their connection with each other.

55. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially if corroborated by moral coincidences, be sufficient to constitute full and conclusive proof.

56. In cases for infringement of copyright, the strongest proof of copying may sometimes be derived from the coincidence of errors in two works.
[Cited in List Pub. Co. v. Keller, 30 Fed. 774.]

57. Coincidence of citation is another evidence of copying; so, also, is identity of plan and arrangement.

58. Copyright may be justly claimed by an author of a book who has taken existing materials from sources common to all writers, and arranged and combined them in a new form, and given them an application unknown before, because skill and discretion were exercised in making the selections, arrangement, and combination, and something new and useful has been achieved.
[Cited in Hanson v. Jaccard Jewelry Co., 32 Fed. 203.]

59. The author of such a work has as much right in his plan, method, and arrangement, as he has in his thoughts, reflections, or opinions.

60. Others may use the old materials for a different purpose, but they cannot copy his plan, arrangement, or combination of those materials.

61. A person could take the old materials, as found in the sources from which they were drawn, and use them as he pleased in illustration of new and original propositions, or for any other purpose not substantially the same as that to which they were applied in works protected by a copyright on some particular plan or combination.

62. One cannot, however, use the materials as collected and furnished in the copyrighted work, or the plan and arrangement therein, beyond the extent falling within the definition of fair use, which rule is applicable only to the materials and not to the plan and arrangement.

63. In this case respondent had used the facts, citations, and authorities as collected, arranged, and combined by the complainant, and the work occupied the same field, and was made and composed for the same general purpose.

64. The sole right and liberty of printing, reprinting, publishing, and vending a book, secured by the copyright law, means the exclusive right of multiplying copies for the benefit of the author or his assigns.
[Cited in Henry Bill Pub. Co. v. Smythe, 27 Fed. 921.]

65. An abridgment of an original work, where intellectual labor and judgment are involved, made and condensed by another person, without the consent of the author, is not an infringement of a copyright on the original.

66. What constitutes a fair and bona fide abridgment is a very difficult question for judicial decision. In this case the book of the respondent was not an abridgment.

67. Copying is not confined to literal repetition, but includes also the various modes in which the matter of any publication may be adopted, imitated, or transferred, with more or less colorable variations to disguise the source from which the material was derived.

68. It is not necessary that the whole, or the larger part, of a work should be copied in order to constitute an invasion of a copyright.

69. Some use may be made, by a subsequent writer, of a book antecedently made, composed, and copyrighted by another, whether such former book were wholly or partly original.

70. Copyrights differ in this respect from patents, which admit of no use of the patented thing without consent of the patentee.

71. The recomposition of the same book, without copying, though not likely to occur, would not be an infringement.

72. Identity of contents, arrangement, and combination is strong evidence that the second book was borrowed from the first, because it is highly improbable that two authors would express their thoughts and sentiments in the same language, or adopt the same method and arrangement.

73. Absence of intent, alone, to copy a copyrighted work would not free a person from the charge of copying; the court looks at the result, and not the intention in the man's mind at the time of doing the act complained of.

74. Evidence of intent might have some bearing on the question of fair use, but it is not a defence where the party setting it up has invaded the copyright of the complaining party.

75. If so much is taken from a copyrighted work that its value is sensibly diminished, or the labors of the original author, to an injurious extent, appropriated by another, it is sufficient to constitute infringement.

76. In a review of a work, sufficient may be taken to give a correct view of the whole, but the privilege of making extracts is limited to those objects, and cannot be exercised so that the review may become a substitute for the work reviewed.

77. Equity will not interfere, by injunction, to prevent further use of a copyrighted book, when the amount copied is small and of little value,

if there is no proof of bad motive, or where there is a well-founded doubt as to the legal title, or where there has been long acquiescence in the infringement, or culpable negligence in seeking redress, especially if the delay has misled the respondent.

78. New materials are the subjects of copyright; so also are old materials arranged according to a new plan. Damages are recovered in the one case for the use of the new materials, in the other for the use of the old materials, according to the new arrangement, combination, or plan.

79. Where the two works are complex, as in this case, the case is referred to a master to state the facts, and his opinion as to the similarity of the same, for the consideration of the court. Cases may arise where the court would not order the reference.

80. A book may in one part infringe the copyright of another, and in other parts be original. In such case the remedy is not to be extended beyond the injury.

[Cited in West Pub. Co. v. Lawyer's Co-operative Pub. Co., 64 Fed. 364.]

81. If the borrowed matter is so involved with that which is original, in a subsequent book, then he who made the improper use of borrowed materials must suffer the consequences of so doing.

82. In such case, if the injunction prevents the use, on the part of the copyist, of his original materials in any particular book, he only is to blame for such commingling of the materials.

83. No man is entitled to avail himself of the previous literary labors of another, which have been copyrighted, for the purpose of conveying to the public the same information, even though he may append additional information to that already published.

84. Equity suits for infringement of copyright are usually referred to a master, before final hearing, to ascertain whether the charge is proved; and if so, for a report as to the nature and extent of the infringement.

85. In such cases the rule is, that the complainant is entitled to an injunction, if at all, at the time the decretal order is entered, to restrain the defendant from any further violation of his rights, as the whole case is then before the court.

86. Even when the case is heard before any such reference and report, if the charges of infringement are few and of a character easily determined, without reference to a master, and if the case is one where injunction is the proper remedy, the court will order it at the time the decision on the merits is announced.

87. When the case comes to a final hearing, without any report, if the charges of infringement are numerous, and such as require extended examination, the court will ordinarily send the case to a master for report on the matters not previously settled by it.

88. In such cases the general rule is, that the injunction will not be granted until the nature and extent of the infringement are fully ascertained, because its operation might work great injustice. Such a course was pursued in this case.

89. Where the arguments in a case in equity have been finally closed, there can be no further argument unless the court should reach some point where they desire reargument, and request the same of the counsel.

Bill in equity [by William B. Lawrence against Richard H. Dana, Jr., Charles C. Little, Augustus Flagg, John Bartlett, Henry J. Miles, and Martha B. Wheaton], praying for an account, and for an injunction for the violation of an alleged copyright to a certain edition, with notes, of Wheaton's Elements of International Law. The complainant alleged in substance and effect that Catharine Wheaton, deceased, widow of the late Henry Wheaton, in the year 1853, then in full life, requested him to prepare a new edition of Wheaton's Elements of International Law, and that he, in pursuance of that request, prepared such notes for that purpose as seemed to him fit, and also an appendix and introductory remarks, with a full and careful memoir of the life of the deceased author, that, so far as the edition contained matters not previously published in this country, it was duly copyrighted by the said Catharine as proprietor thereof; that the same was subsequently published by the firm of Little, Brown, & Company, and that all the profits arising out of the contract with the publishers were enjoyed by the said Catharine as the complainant intended they should be when he undertook to prepare the edition; that he afterwards, in pursuance of a similar request from the same source, prepared other annotations of the same work, which were also copyrighted by the same person, and that they were published in 1863 by the same publishers; that he was advised and believed that the transactions as recited, in respect to those two editions, operated to convey to the said Catharine no other beneficial interest in the said annotations and additions to the work, than the right to use the same in those editions; that in fact it was always understood and agreed by and between them that the beneficial interest in the same, except as aforesaid, belonged to the complainant, and that the copyrights were taken out and held in trust by the said Catharine in accordance with that understanding and agreement. Prior to that period, the author, as the complainant alleged, had caused four several editions of the work to be published, two at Philadelphia, one at London, and one in 1848 at Leipzig, in two volumes, by F. A. Brockhaüs, in the French language; that in the edition of 1848 the author inserted and published, both in the text and notes, many new matters never before published by him in the English language; that the author died in 1848; that the French edition was reprinted by the said Brockhaüs in 1853, and that the complainant, in 1860, ascertained that the said Brockhaüs had published another edition of the work in French, without the knowledge or consent of the representatives of the author, and that he contemplated publishing further editions of the same without paying any thing to those representatives for copyright; that in view of these circumstances, and at the request of the said Catharine, he commenced negotiations with the said Brockhaüs upon the subject, the result of which was, that the parties came to an agreement that the complainant should revise and translate his annotations, and adapt the same for a work to be sold in Europe, making such additions thereto as should render the work as complete as pos-

sible down to the time of publication; that the representatives of the deceased author should give up all claim on the said Brockhaüs in respect to the editions published and to be published; and that in consideration thereof the said Brockhaüs agreed to pay to the said Catharine, if the complainant so directed, the sum of 6,000 francs, together with the sum of $450, to be paid to the complainant to defray in part the expenses to be incurred in preparing the translations; that the complainant, before the agreement was completed, stated to the said Catharine or her agent, Martha B. Wheaton, that he would do no more work on any book over which he did not possess exclusive control; that he would only undertake the work required of him in the proposed arrangement, on the condition that the entire copyright should be assigned to him; that the said Catharine, manifesting a great desire to retain the legal title to the copyrights of the book, requested him to confer with Professor Parsons in her behalf, in order that some arrangement might be made which should substantially secure to the complainant what he desired, and be at the same time acceptable to the said Catharine; and the complainant alleged that he assented to that proposition, that he had one or more interviews with Mr. Parsons, and made an agreement with him as to the title to the copyrights and other matters, as expressed in the memoradum set forth in the bill of complaint, as follows:—"Memorandum: Mr. Lawrence will write to Mr. Brockhaüs in terms to bring to Mrs. Wheaton the right to draw on Mr. Brockhaüs at once for 6,000 francs. He will also endeavor to get from Mr. Brockhaüs as much as he can towards the actual expense of having the translation into French made here, and so much of that expense as he fails to get from Brockhaüs, Mrs. Wheaton will pay from the proceeds of the draft on Brockhaüs. Mrs. Wheaton will, on the payment of her draft on Brockhaüs, agree formally to make no use of Mr. Lawrence's notes in a new edition without his written consent, and Mrs. Wheaton will give to Mr. Lawrence the right to make any use he wishes to of his own notes;" that the said Parsons, for the purpose of being more certain that the memorandum would be approved by the said Catharine, wrote on the same sheet of paper to the respondent, Martha B. Wheaton, that he and the complainant had come to a perfectly amicable result, as expressed generally in the memorandum, and suggested to her that she should make a copy of the same for herself, if the result was satisfactory; and the complainant also alleged that the said Martha afterwards, in behalf of her mother and herself, and to signify their approval of the result, signed the said memorandum, and wrote the date, "June 14, 1863," thereon, and caused the same to be delivered to the complainant.

Additions were subsequently made to the agreement, and the terms of it were in some respects varied, as appeared by the correspondence between the parties; but the complainant alleged that he was advised and believed that the amendments to the same did not vary any such parts of the same as related to the copyrights in this country; and he also alleged that the consideration of the agreement of the said Brockhaüs to pay said amount to the said Catharine was the promise of the complainant to furnish new and additional notes for the future editions of the work, as was well known and understood by the parties; that he, the complainant wrote to said Brockhaüs, as agreed; that the letter was approved by the other parties, and was by the said Martha and Catharine sent to the said Brockhaüs, and that the said Catharine, on the 17th of June, 1863, drew a bill of exchange on him for the amount specified in the memorandum; and that the same, in consequence of said letter and of the promises and undertakings of the complainant, was duly honored and paid.

The theory of the complainant was, and he accordingly alleged, that there was not, on the 1st of January, 1865, any valid subsisting copyrights of the editions published respectively in 1836 and 1846; that the copyrights of the editions published in 1855 and 1863 secured the exclusive right to the same only so far as those editions differed from the aforesaid antecedent editions; that it was a part of the agreement made through the agency of the said Parsons, that the said Catharine should execute and deliver to the complainant a formal instrument, securing to him all his rights in the premises, of such a nature as to admit of being recorded, as required by the acts of congress relating to copyrights; and he averred that the other respondents had full notice and knowledge of the agreement, and that he, in a court of equity, by virtue of that agreement, is taken and deemed to be the owner and proprietor of the last-mentioned copyrights, in and as to all matters contributed by him as aforesaid; and that, by reason thereof, the respondents were bound not to make any use of any such matters so contributed by him to either of the said editions of the said work. Based upon these and other allegations, the claim of the complainant was, that he was in equity the exclusive owner and proprietor of the copyrights for all the matters which he contributed to those two editions; and he charged that the said firm of Little, Brown, & Company procured and induced the said Martha, in her own behalf and that of her mother, to consent and agree that the said publishing firm of Little, Brown, & Company should publish an edition of that work, and procure the same to be edited and notes to be prepared for the same by some person other than the complainant; that thereupon the said firm procured and em-

ployed Richard H. Dana, Jr., one of the respondents, to edit the proposed edition, and to prepare the notes as aforesaid; and the complainant further showed that the respondents, without his consent, had caused the proposed edition to be printed, published, and publicly sold. Reference was also made to certain alleged pretences set up by the respondents; and the complainant prayed for an account and for an injunction, and that the respondents might be decreed to surrender and deliver up all copies of the book on hand, and to make and deliver to the complainant a good and sufficient deed of the copyrights of 1853 and 1863 in accordance with his equitable title.

J. J. Storrow. (Mr. Storrow stated very fully the relations between the complainant and Mr. Wheaton and his family from 1822 to the time of filing the bill, and the relations of some of the respondents with each other and the complainant, reading from the correspondence printed in the record.)

The negotiations with Mr. Brockhaüs were begun in 1860; his first definite proposition was not made until he had seen the advance sheets of the second edition in 1863. These negotiations were all by correspondence, which was communicated to the Wheatons and to Mr. Little, and is now before the court, together with the correspondence between the parties on the subject. It is true, and was known to the Wheatons at the time, that Brockhaüs was induced to make the offer in order to obtain from Mr. Little and the Wheatons the exclusive right to print in French, on the continent, Mr. Lawrence's annotations, with emendations to be made by that gentleman. Thereupon, after a negotiation with Professor Parsons, of the Dane Law School, who represented the Wheatons, the agreement stated in the bill was made, Mr. Lawrence gave the required promise to Mr. Brockhaüs, and the Wheatons thereupon received the money. This contract was negotiated and drawn by skilful counsel, representing the Wheatons; it secured for them 6,000 francs due to Mr. Lawrence's labors; it imposed on him a serious burden of work and expense; it at most on... gave him the formal title to that which they confess fairly belonged to him; up to the time of this suit they have always declared it to be entirely satisfactory: to avoid it on the ground of fraud, the respondents must show clearly that the complainant misrepresented to Mr. Parsons, or designedly concealed from him some fact, or some means of knowledge, and that this misrepresentation or concealment was the inducement which in fact led the Wheatons to make the agreement. 1 Story, Eq. Jur. § 200 et seq.; Attwood v. Small, 6 Clark & F. 447; Park v. Johnson, 4 Allen, 266; Jennings v. Broughton, 5 De Gex, M. & G. 130; Veazie v. Williams [Case No. 16,907]; Campbell v. Fleming, 1 Adol. & E. 40. The correspond-

ence clearly disproves all this. From the time the Wheatons received the 6,000 francs, Mr. Lawrence, in the view of a court of equity, was the absolute owner of the notes. Fletcher v. Morey [Case No. 4,864]; Parker v. Muggridge [Id. 10,743]; Clarke v. Southwick [Id. 2,863]; Collyer v. Fallon, Turn. & R. 469; Rerick v. Kern, 14 Serg. & R. 271; Simms v. Marryat, 7 Eng. Law & Eq. 337. The correspondence shows that the parties understood that the memorandum had this effect and they cannot take advantage of their refusal to execute the further assurance which the memorandum called for. Browne, Frauds, §§ 444–446. Similar agreements have been held sufficient in copyright cases to sustain a bill and an injunction for piracy both as against a party to the contract and as against publishers claiming under such party, though without actual notice. Curt. Copyr. 315; Mawman v. Tegg, 2 Russ. 385; Sweet v. Shaw, 3 Jur. 217; Colburn v. Duncombe, 9 Sim. 155; Sweet v. Cater, 5 Jur. 68, 11 Sim. 572; Longman v. Oxberry (1820), cited in Gods. Pat. 314. The evidence, and particularly the correspondence of the parties, shows that this memorandum contained the whole and true agreement of the parties, clearly and explicitly stated.

The next defence is that after the complainant had (as they alleged) practised a fraud to obtain the control of his own property, he voluntarily gave it back again. Rights conferred or secured, or obligations imposed by an executed agreement, where the consideration has passed by full performance on one side and enjoyment on the other, cannot be returned or transferred back by an agreement not under seal without a new and valuable consideration. 1 Smith, Lead. Cas. 595, note to Cumber v. Wane; Wildes v. Fessenden, 4 Metc. [Mass.] 12, and cases cited; Smith v. Bartholomew, 1 Metc. [Mass.] 277; Edwards v. Chapman, 1 Mees. & W. 231. Even in cases where there has not been a completed performance there must be proof of an intention to abandon and a deliberate act sufficient to carry out that intention. McCormick v. Seymour [Case No. 8,726]; Flagg v. Mann [Id. 4,847]; Kendall v. Winsor, 21 How. [62 U. S.] 331; Shaw v. Cooper, 7 Pet. [32 U. S.] 320; Mowry v. Sheldon, 2 R. I. 378; Brewer v. Boston & W. R. R., 5 Metc. [Mass.] 483; Rich v. Atwater, 16 Conn. 416, and cases cited. When the act is without anything which the law deems a consideration, it may be revoked. Pierrepont v. Barnard, 2 Seld. [6 N. Y.] 289; Mumford v. Whitney, 15 Wend. 387; Holmes v. Fisher, 13 N. H. 12; Brewer v. Boston & W. R. R., 5 Metc. [Mass.] 478; McKay v. Holland, 4 Metc. [Mass.] 73; 2 Smith, Lead. Cas. 753, 767. The correspondence relied on as constituting the alleged waiver does not contain language which can fairly bear the construction contended for. If it even left the complainant's

actual intention in doubt, the respondents were bound to make inquiry of him specifically before assuming that he meant to abandon any thing. Mowry v. Sheldon, 2 R. I. 378. See, also, Shaw v. Cooper, 7 Pet. [32 U. S.] 320. Whatever might be the legal effect of the language used, yet if in fact they knew that the complainant did not intend it to be and did not believe it to be an abandonment, they cannot be heard to set it up as an abandonment. It is clear that this was the case: he proceeded with his work under the agreement, at great labor and expense to himself, and they never offered to relieve him of it, or to cancel his obligations to to Mr. Brockhaüs. The explicit directions they gave to Mr. Dana, not to make any use of Mr. Lawrence's notes, and the idea Mr. Dana derived from them of his duty in the premises, exactly conform to the memorandum; and one avowed reason for these instructions was to guard against any complaint from Mr. Lawrence, and because they felt embarrassed by their relations growing out of the Brockhaüs matter. After receiving the letter they rely on, in which Mr. Lawrence returned the formal instrument as not satisfying the memorandum, Miss Wheaton wrote, "He declined it, and preferred none beyond the one signed in June by M. B. W." This is conclusive that their understanding was that he meant to decline the further paper and to stand on and not abandon the memorandum of June. Such an estoppel could operate to give even to a valid instrument an effect contrary to the legal interpretation of its language. Hawes v. Marchant [Case No. 6,240]; Erwin v. Lowry, 7 How. [48 U. S.] 183; Philadelphia, W. & B. R. Co. v. Howard, 13 How. [54 U. S.] 336. Neither Mr. Lawrence's letter, nor his conduct, nor any acts of his give rise to any estoppel against him. Hawes v. Marchant [supra]; Van Rensselaer ·v. Kearney, 11 How. [52 U. S.] 326; Pickard v. Sears, 6 Adol. & E. 469; Freeman v. Cooke, 2 Exch. 661; Andrews v. Lyons, 11 Allen, 351; Turner v. Coffin, 12 Allen, 401; Lawrence v. Dole, 11 Vt. 555; Brewer v. Boston & W. R. R., 5 Metc. [Mass.] 483; Heane v. Rogers, 9 Barn. & C. 585; Cambridge Sav. Bank v. Littlefield, 6 Cush. 214; Wallis v. Truesdell, 6 Pick. 456; Dunnell M. Co. v. Pawtucket, 7 Gray, 277; 2 Smith, Lead. Cas. (Am. Ed.) 704, 742, 745, 747, 767, 768; Am. Lead. Cas. 750, 764, 768, 772, 775, 776. The evidence negatives the existence of all the essential elements of an estoppel. They had full and express notice of Mr. Lawrence's rights, before the acts complained of.

Miss Wheaton and the other respondents are estopped to set up the invalidity of those copyrights. Eicoltz v. Bannister, 1 Barnard. 77; Cairncross v. Lorimer, 3 Law T. [N. S.] 130; Hull Flax & Cotton Mill Co. v. Wellesley, 2 Law T. [N. S.] 728; Simms v. Marryat, 7 Eng. Law & Eq. 337; Sherman v. Champlain T. Co., 31 Vt. 175; Beckman v. Bormann, 3 E. D. Smith, 409; Random v. Tobey, 11 How. [52 U. S.] 521; Coolidge v. Brigham, 1 Metc. [Mass.] 551; Pierpont v. Fowle [Case No. 11,152]; Smith, Lead. Cas.704. The agreement amounts to an express covenant "to make no use of Lawrence's notes without his written consent;" and this is binding on all the respondents, and its violation will be restrained by the court. Barfield v. Kelly, 4 Russ. 355; Farina v. Silverlock, 1 Kay & J. 509, 39 Eng. Law & Eq. 516; Longman v. Oxberry, Gods. Pat. 314. The agreement of June covers not only the foot-notes, but all that Mr. Lawrence, as editor and annotator, did to the book to make it different from Mr. Wheaton's last edition of 1845. Mr. Parsons describes the agreement as intended to give to Mrs. Lawrence "any thing he had done for her husband's book;" the memorandum which Mr. Parsons drew to express that agreement and the term "notes," the same gentleman's letter of June 19, 1863, which is part of the agreement, describes the agreement as covering "matter which you have written;" the formal instruments which Mr. Parsons drafted convey the "notes and other matter of his (Lawrence's) own composition." "Notes for references" have been held not to be restricted to foot-notes. Little v. Gould [Case No. 8,395]. Mr. Lawrence prepared the text with great care, labor, and judgment, from the different English and French editions, so that it differed from any previous edition to the extent of sixty pages: this was stated in his preface as long ago as 1855. Mr. Dana's preface states that "this edition contains nothing but the text of Mr. Wheaton according to his last revision, his notes, and the original matter contributed by the editor." yet he has exactly reprinted the text according to Mr. Lawrence's revision.

T. K. Lothrop, for respondents.[2]

The bill is founded on copyright. The prayer for relief determines the construction of the bill, and shows this. 1 Daniell, Ch. Prac. 334, 383, 386, and cases cited; Adams, Eq. 309. The claim is rested on two grounds: First, a trust arising from the fact that the complainant's annotations were gratuitous, and an agreement and understanding at the outset that the copyright should be held on such a trust; second, upon a contract alleged to have been made between Mrs. Wheaton and the complainant, and to be contained in the memorandum dated June 14, 1863, a copy of which is set out in the bill. No trust arises by intendment of law from the fact that the complainant's labors were gratuitous. Hill, Trust. 107; Cook v. Fountain, 3 Swanst. 591; Young v. Peachy, 2 Atk. 256. The alleged "understanding" is denied, and is not made out by the evidence. Even as stated by the complainant, it is too vague for a court to act

[2] In this case four counsel were allowed to argue for the respondents, each counsel taking separate points. but the court declared that this should not be a precedent for allowing more than two counsel to speak on a side.

upon. The making the agreement in June, 1863, and the correspondence at and prior to that time, show that he considered that he had neither claim nor interest prior to June, 1863, and that his desire to have any rights about his notes first arose in his mind in 1863. The memorandum of June 14, 1863, includes only the notes, and not the text, nor the memoir, nor the index, nor the arrangement by which the notes are connected with the text. The memorandum does not provide for a transfer of the copyright, as prayed for, but only for a license. The memorandum was not a perfected contract, but a mere note of some of the general stipulations of a proposed agreement between the parties; as to which they never actually agreed, and their minds never in fact met. It was one step towards a conclusion, but was not a conclusion. It is clear on the evidence that this was the understanding of the parties. If the complainant's account of his pre-existing rights is true, this memorandum only operated to restrict them, and therefore could have been only one stipulation to form part of a complete agreement. The circumstances and the correspondence show that Mr. Lawrence's purpose and desire was for something far beyond this memorandum, and towards which this memorandum and all that was done was only one element. When the formal agreement came to be made after the money was received from Brockhaüs, the correspondence shows that each party understood that it was to embrace not only the memorandum, but points covered by subsequent negotiations. But the hoped-for agreement was never reached, and all these steps were fruitless. If there is any doubt on this point, the court will not decree a specific performance. Carr v. Duval, 14 Pet. [39 U. S.] 77. The memorandum was only a note of some general stipulations, but did not cover many points which both parties expected would be included in the proposed agreement. Among other things, it contained no provision as to whether it should or should not interfere with the edition already sold to Little, Brown, & Co. The only right conferred by that memorandum was a right to call for a formal conveyance, and that right the complainant abandoned by "declining to accept any paper whatever from Mrs. Wheaton" (letter of Nov. 2, 1863). He believed that he already had all that he now claims under the memorandum; he was ready to give it up; and the terms in which he alludes to "the decision at which I have arrived" show that his intention was to abandon all claims under that memorandum.

The respondents understood that he intended so to abandon; they prepared a new edition, and then, after the publication of it, and after a lapse of nearly three years, he, for the first time, attempts to obtain specific performance of it. He is too late. Seton v. Slade, 3 White & T. Lead. Cas. Eq. 78–84; Fry, Spec. Perf. p. 413, § 709; Id. p. 422, note; argument of Sir S. Romilly, 13 Ves. 226; Price v. Dyer, 17 Ves. 356; Stevens v. Cooper, 1 Johns.

Ch. 430; Schmidt v. Livingston, 3 Edw. Ch. 213; Boyce v. McCulloch, 3 Watts & S. 429; King v. Morford, Saxt. [1 N. J. Eq.] 281. Where there is such delay, it is not necessary that the other party should have changed his position. Lautour v. Attorney General, 11 Law T. [N. S.] 563. The memorandum professes only to touch the right to the notes; if, as alleged in the bill, the complainant believed that it would practically give him the control of all future editions of Wheaton's Elements, and expected by it to secure that control, and did not disclose this to Mr. Parsons or Miss Wheaton, a court of equity will not decree a specific performance. Cathcart v. Robinson, 5 Pet. [30 U. S.] 265; Fry, Spec. Perf. (Ed. 1861) pp. 192, 368.

Causten Browne, for respondents.

The alleged agreement of June, 1863, is void, because Mrs. Wheaton was induced to enter into it by the fraudulent misrepresentations and concealments of the complainant. It is not necessary to show that if Mrs. Wheaton had known the facts of the case as they were known to the complainant, she would not have entered into the agreement; for it is an established principle of equity jurisprudence that a court of equity will not decree the specific execution of an agreement when the party asking the decree has been himself guilty of any fraud, deception, or unfairness towards the party agreeing, which operated in any way to mislead him in reference to the agreement. 1 Story, Eq. Jur. §§ 200, 769. It is enough, if the misrepresentation be upon a matter in any way material, that it be incorrect and tending to mislead (though not made in bad faith, and though the respondents may not have exercised a wise judgment with regard to its value), and that it be in reference to any matter inducing the execution of the contract, though not touching the direct subject of the contract. Clermont v. Tasburgh, 1 Jac. & W. 112; Cadman v. Horner, 18 Ves. 10; West v. Habgood, 6 Law J. Ch. 369; Day v. Newman, 2 Cox, 79; Shirley v. Stratton, 1 Brown. Ch. 440; Bowles v. Round, 5 Ves. 508; Higginson v. Clowes, 15 Ves. 516; Twining v. Morrice, 2 Brown, Ch. 326; Rodman v. Zilley, Saxt. [1 N. J. Eq.] 323; Thompson v. Tod [Case No. 13,978]; Phillips v. Duke of Bucks, 1 Vern. 229; Cathcart v. Robinson, 5 Pet. [30 U. S.] 264, 270, 277; Miller v. Chetwood, 1 Green. Ch. [2 N. J. Eq.] 199. The evidence sustains these propositions: that, prior to his letter of April 29, 1863, Mr. Brockhaüs had made no absolute offer to pay the Wheatons any money; that he did make such an offer by that letter, to wit: to pay six thousand francs without requiring from Mr. Lawrence either revision or translation for the European edition; that Mr. Lawrence, having received this letter, concealed from the Wheatons Mr. Brockhaüs's positive offer to pay, therein contained; or, what is as good for our purposes, if he communicated that letter to them, he

added a positive statement that certain things were required of him before Mr. Brockhaus would pay the money; that, as a consideration for complying with that pretended requisition, he demanded the agreement of June, 1863, which he now seeks to enforce; lastly, that the Wheatons, believing those representations, and induced thereby, did make that agreement. Little, Brown, & Co. are not affected by that memorandum: at most, Mr. Little only knew, or heard, that some negotiations were going on, and understood and believed that they were only steps towards an agreement never concluded, and that the whole matter was abandoned. The other partners had no personal knowledge whatever of the transactions.

W. G. Russell, for respondents.

The memorandum and the negotiations from which it resulted were entered into by both parties in the belief that there was a valid subsisting copyright (the property of Mrs. Wheaton) in the notes of the complainant contributed to the editions of 1855 and 1863. The existence of this supposed copyright formed the basis of these negotiations and this memorandum, and this supposed copyright was the subject-matter with which they dealt. These copyrights were taken out in the name of Mrs. Wheaton as "proprietor," and were void because no written assignment of the author's inchoate right was ever made to her, so as to constitute her the "proprietor" or "legal assignee" entitled to take out a copyright under the act of congress. Prior to Stat. 5 & 6 Vict. 45, no positive enactment of English law provided that transfers of copyright or of the author's inchoate right thereto must be in writing. The statutes 8 Anne and 41 Geo. III. contained language almost identical with our own in their description of the person entitled to copyright. It was settled in England that to constitute a person a "proprietor," either by a transfer of the copyright or of the inchoate right thereto, the transfer must be in writing. Power v. Walker, 4 Camp. 8, 3 Maule & S. 7; Latour v. Bland, 2 Starkie, 384; Clementi v. Walker, 2 Barn. & C. 861; De Pinna v. Polhill, 8 Car. & P. 78; Barnett v. Glossop, 1 Bing. N. C. 633; Rundell v. Murray, Jac. 311; Morris v. Kelly, 1 Jac. & W. 481. The same rule seems to have been adopted here in the only case in which the question has arisen. Nelson, J., in Gould v. Banks, 8 Wend. 562. No distinction has been or can be made in this regard between assignments before and after copyright. Gayler v. Wilder, 10 How. [51 U. S.] 477. It is admitted that notice of the copyright of 1836 was not published in the editions of 1855 and 1863. The complainant contends that this destroys the copyright of 1836, and leaves those of 1855 and 1863 valid only as to the new matter then added, namely, the contributions of the complainant. But this omission destroys the copyrights of 1855 and 1863, because the act provides that no

person shall be entitled to its benefit unless he gives notice in each and every edition, &c. The requirement about notice must be strictly complied with. Ewer v. Coxe [Case No. 4,584]; Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 663–665; Baker v. Taylor [Case No. 782]; Jollie v. Jaques [Id. 7,437]; Struve v. Schwedler [Id. 13,551]. It ought to be complied with in this respect; otherwise the public would be misled into the belief that this copyright expired in 1891, whereas it expired in part in 1864.

If the complainant's claim, that those copyrights were taken out in trust for his benefit, is sustained, then they are void, because in that case Mrs. Wheaton was not the "proprietor." Shepherd v. Conquest, 17 C. B. 427; Pierpont v. Fowle [Case No. 11,152]; Binns v. Woodruff [Id. 1,424]; Atwill v. Ferrett [Id. 640]; De Witt v. Brooks [Id. 3,851], by Judge Nelson, in 1861. See, also, Brown v. Cooke, 11 Jur. 77; Richardson v. Gilbert, 1 Sim. (N. S.) 336. Upon the facts alleged by the complainant in his bill and testified to by him, and upon which he relies to establish a trust in Mrs. Wheaton in his favor for the copyrights of 1855 and 1863, subject to a right in her to use them in those editions, the copyrights are wholly void, because they should have been taken out by Mr. Lawrence in the district where he resided, and not by Mrs. Wheaton in the district where she resided. These copyrights apply only to his contributions; of these he certainly claims to be the "author," and upon his own showing he never ceased to be the "proprietor." If he had composed them entirely for her sole and perpetual use, she would not be the "legal assign" of the author (even if a parol assignment were sufficient), because the case supposed does not constitute such assignment of the legal title. Shepherd v. Conquest, 17 C. B. 427; Pierpont v. Fowle [Case No. 11,152]; Binns v. Woodruff [supra]; Atwill v. Ferrett [supra]; De Witt v. Brooks [supra], by Judge Nelson, in 1861, cited in Law on Copyright. Under the English statutes 5 & 6 Vict. c. 45, § 18, allowing the publisher of a magazine, &c., to copyright in his own name articles which he has procured to be written for a compensation, actual payment is essential. Brown v. Cooke, 11 Jur. 77; Richardson v. Gilbert, 1 Sim. (N. S.) 336. He also alleges and testifies that it was agreed and understood that Mrs. Wheaton's only title or interest in the annotations consisted in a right to print two editions. She was therefore a mere licensee and not the "proprietor." Roberts v. Myers [Case No. 11,906]; Little v. Gould [Id. 8,394]. A partial or limited assignment of a partial or limited interest cannot constitute a person the "legal assign" of the author, or entitle her to take out the copyright as "proprietor." It is true that an equitable title may be sufficient to maintain a bill, but it is because it presupposes a valid copyright and a legal title in some one. See Little v. Gould [Id. 8,395]; Mawman v. Tegg, 2 Russ. 385;

Sweet v. Cater, 11 Sim. 572. As the supposed subject-matter and basis of the negotiation and memorandum did not exist, the court, for this reason, will refuse to enforce the alleged agreement. Hitchcock v. Giddings, 4 Price, 135; Dale v. Roosevelt, 5 Johns. Ch. 174. If complainant has suffered any wrong, which we deny, his remedy must be sought by another process or in another court. Adams, Eq. 81; 1 Daniell, Ch. Prac. 386; Stevens v. Guppy, 3 Russ. 171; English v. Foxall, 2 Pet. [27 U. S.] 595–612. The respondent, Mr. Dana, is not affected with notice of the alleged trust or agreement.

S. Bartlett, for respondents.

The defence presents five points. (1.) The complainant is not in a position to ask the aid of a court of equity, for in the negotiation which led to the agreement on which the bill is founded, he asserted that Brockhaüs required him to undertake some new work, which was not a true assertion. (2.) The parties' minds never came to a common consent as to what were to be the details of the agreement of June, 1863. When they came to make the formal agreement, new details came up, e. g. Mr. Lawrence claimed the "Histoire," which was not in the memorandum of June; the Wheatons claimed an exception in favor of Little, Brown, & Co. for the copies of the edition of 1863; Mr. Parsons yielded the one, Mr. Lawrence would not yield the other. (3.) The memorandum professed to be an agreement about a copyright; both parties were mistaken, and no valid copyright existed; this avoids the agreement, at least so far that this court can give no relief. That the subject-matter was wanting proves that their minds did not meet. These points have been sufficiently discussed. I now submit (4.) that in no view of the case—even upon his own exposition of it—can the complainant maintain his bill upon any ground. The bill is founded entirely on the ground that the entire and exclusive copyright is held in trust by the Wheatons, and that Mr. Lawrence is entitled to a conveyance of it: no other relief can be given under the bill; it is framed for nothing else. The special prayers are only appropriate to such a case; the case stated by the bill is an entire equitable title in a copyright alleged to have been violated. The claim of a trust prior to June, 1863, has been disposed of by Mr. Russell, and if there had been such a trust, the agreement of June absorbed it. The whole case rests on the memorandum. This is not an agreement transferring or providing for a transfer of the entire exclusive copyright; as matter of construction, from its language and also from the circumstances, it excepted the copies of the edition of 1863. It provides for a mere license, and the papers drawn in pursuance of it were agreements and not conveyances. It was not in fact, and Mrs. Wheaton had not the power to make it, an agreement to transfer an exclusive license. If the bill is founded on an exclusive title and this is not proved, there is a fatal variance, and the bill cannot be maintained. It, at most, amounts to a mere license, and not an agreement to hold in trust: Mrs. Wheaton was not bound to sue and protect him by means of the copyright. That this is not implied appears from the express stipulation that she herself shall not sue. It is not an agreement for a trust; for if it were, this covenant would be superfluous. The whole jurisdiction over the case made by the bill, rests upon a trust; if no trust is established, then the bill fails. Looked upon as a contract, it is not the subject of equity jurisdiction. In proper cases there may be an injunction upon a threat to violate a contract, but there is no jurisdiction in equity to compensate for breach of a covenant, except as ancillary to the main relief. The act complained of is not the act of selling: Little, Brown, & Co. cannot be charged with notice as to this thing; the breach alleged is the use of the notes, and not the sale of each copy. There was not even an agreement to hold the entire copyright for complainant's exclusive benefit. Mrs. Wheaton could not do this; she did not agree to do it. (5.) Mr. Lawrence has abandoned whatever right he may have had, or so conducted himself with regard to it that he cannot ask a court of equity to enforce it. The complainant's authorities apply to common-law estoppel; but any thing that shows that he has waived, or leaves it doubtful whether he has or not waived his claim, disentitles him to ask the aid of a court of equity. Equity does not require a consideration, but only a consensus animorum, to constitute a waiver. Its only strictness in such cases is with regard to trusting to oral evidence; but here we have a letter. If there ever was a trust, we have changed our position and incurred expense, though this is not necessary to our case, as complainant has been guilty of laches. A clear abandonment has been made. The letter of Nov. 2, 1863, implies a gift; during two years he made no claim. His own testimony as to his own intention is not important; the question turns on the construction of the letter, and the belief of the defendants. The letter which he wrote and did not send is quite different from the one he did send. The indorsement said to have been made by Miss Wheaton is not evidence. The testimony does not prove her handwriting. She is not a party to the contract; it is only her construction of a writing now before the court, and her opinion is not important.

B. R. Curtis, for complainant.

This is not a bill for specific performance. It is a bill for an injunction and account, founded on an equitable title to a copyright in the first place, and founded on a covenant not to use Mr. Lawrence's notes in the second place. Upon this bill an injunction and an account will be decreed, not only against

Mrs. Wheaton, the maker of that covenant, but against those who aided and abetted her, and profited by aiding and abetting her, in the breach of that covenant. Barfield v. Nicholson, 2 Sim. & S. 4, 4 Russ. 355. The bill sets out the facts and the written agreement, and contains a prayer for general relief: it is, therefore, properly framed to entitle us to all the relief that can be given on those facts and that agreement; it is not material whether we have or have not alleged, as the legal conclusion therefrom, more than they entitle us to. A perfected agreement, covering the whole matter, was concluded between the parties and is expressed in the memorandum and accompanying letters; it contained all the stipulations that were necessary to be expressed: the correspondence proves this. It is clear, from the correspondence, that the money procured from Brockhaüs was entirely due to Mr. Lawrence's exertions, to the use of his annotations, and to the new work he undertook in connection with the French edition; that he never delayed the result, but pushed the negotiations with vigor; and that all these negotiations were duly communicated to the Wheatons and their advisers. In weighing the testimony and the motives of the parties, the court will take into consideration that the injurious charges in this behalf, distinctly contradicted by all the correspondence, are made by or on behalf of persons who are under great obligations to the complainant.

The defence of abandonment of rights, overlooks the fact, that this contract was not executory, but was fully executed on Mr. Lawrence's part, so that, for a valuable consideration, actually parted with by him, and enjoyed by the other side, he had purchased and acquired a vested equitable right; to wit, the exclusive control over his own notes. There can be no forfeiture of a right or valuable interest thus acquired and paid for, without a new contract upon consideration, or without conduct, on his side, leading the other parties so to change their condition, upon the belief that he had parted with his right, that a court of law would treat it as an equitable estoppel, and a court of equity may treat it as a new contract. Moore v. Crofton, 3 Jones & L. 438. No new contract, and no consideration moving to Mr. Lawrence, is pretended: his letter of Nov. 2 is all that is relied on. The presumption is, that nobody abandons a vested right without a consideration; that presumption is to be overcome; it is to be overcome by the use of language so clear that the party cannot even be left in any doubt for which he could ask an explanation. It is apparent that, finding they would not give him the formal paper without new and onerous restrictions which he had never agreed to, he intended simply to give up any further contention with regard to that formal paper, and to retain the rights already acquired. This is the natural meaning of his language;

this is the meaning which the respondents put upon it, as shown by Miss Wheaton's writing on the paper returned. That writing was made, at the time of the transaction, by Miss Wheaton, who then represented her mother, and who is now a defendant and the only person interested in the copyright, and it is part of an exhibit produced by the respondents; it is, therefore, evidence for all purposes. Before any thing was really done in reference to the act now complained of, all the defendants were expressly notified of Mr. Lawrence's claims. So far from acting in reliance on any abandonment, all the answers state that they intended and took pains to respect Mr. Lawrence's notes just as if he owned them, and their instructions to Mr. Dana were explicit on this point. It was at their peril if they published without taking pains to ascertain that Mr. Dana had not obeyed his instructions. There has been no laches; no such defence is set up in the answers; the complainant moved upon his right to control his notes the moment it was violated. The defence that the copyright is invalid for want of a formal assignment of the inchoate right is founded on some English decisions which almost amount to legislation, even under the English copyright act. But our statute, unlike the English, makes special provision for recording assignments after copyright, and the court cannot enact a new section concerning assignments before copyright.

Objection is taken that our copyrights are invalid on the ground that the copyrights of the former editions are not noticed on the back of the title-page. This defence is not set up in the answers; no valid copyright of the former editions existed to be noticed; that of 1846 was taken out in the Eastern district of Pennsylvania, where Mr. Wheaton had never resided; that of 1836 was taken out by Lea & Blanchard as proprietors; and both were also void because the notice of those copyrights has not since been inserted in "each and every edition published during the term." None of these respondents are entitled to take advantage of any flaws in these copyrights. The parties had acted under them, and received profits under them, supposing them to be valid; they were thus in possession of personal property with a concealed flaw in the title, if it was a flaw. When they sold to Mr. Lawrence and received the consideration, they impliedly warranted the right, and cannot now say that none existed. Randon v. Tobey, 11 How. [52 U. S.] 521; Coolidge v. Brigham, 1 Metc. [Mass.] 551; Sherman v. Champlain T. Co., 31 Vt. 175, and cases cited in the opening. The memorandum was a promise to confer a right on the complainant; it therefore amounts to an express warranty. Simms v. Marryat, 7 Eng. Law & Eq. 337. The respondent Dana is employed by the Wheatons, and the publishers, who act under them, stand in no better position. The memorandum contains a negative covenant not to use, as well as a grant of right. A court of equity will

not only restrain the covenantor from violating it, but will restrain any one who has notice from aiding her in a breach of it. Farina v. Silverlock, 1 Kay & J. 509.

Argument for respondent Mr. Dana: [8]

Copyright is not the title of the author to his production. It is the statute monopoly to multiply copies of the book. Stephens v. Cady, 14 How. [55 U. S.] 529; Stowe v. Thomas [Case No. 13,514]. It attaches only to the book deposited. Mrs. Wheaton's copyright is the right to multiply copies of that complex work, consisting of the text, the notes of Wheaton, the notes of Lawrence, in their character of notes to Wheaton, with their connections and attachments thereto. Lawrence's work was attaching addenda and corrigenda to such portion of the text as he thought proper, so that they should perform the function of a note to that text, and nothing further. They are not intended to and cannot stand alone. Lawrence has nothing which can be multiplied by printed copies. The agreements alleged do not give him any right so to multiply them. He does not own the text, nor do the agreements profess to give him any right to use it in any way, but quite the contrary. The memorandum, professing to place the control of the text and notes in different persons, severed them forever, and forbade either to be used in connection with the other. The memorandum, at most, gives him a right to multiply copies of the notes as dissevered from Wheaton; that is, practically the right to use them as material in some new work which will of necessity differ essentially from any thing now existing, and which will not be protected by any existing copyright, but will require a new copyright to give him the exclusive right to multiply copies of it. The true

[8] On Nov. 11, 1867, and succeeding days, the complainant filed the usual brief, and opened his case at length on the question of title and on the question of piracy. The respondent's counsel stated that they were not prepared to argue the latter point, and thereupon the court ordered that the argument on the question of title should be completed orally on both sides, but that the further argument on the question of piracy should be presented in print in the order in which the case would have been argued had the argument proceeded orally, as was expected. The respective arguments on this point, covering upwards of two hundred printed pages on each side, were filed in the following spring and summer. Motions were afterwards made by the defendant for leave to present, as further argument, a pamphlet of about one hundred pages, entitled a reply to the complainant's argument; but, after a hearing, the court declined to receive it, upon the ground that there was nothing in the complainant's argument which the respondent was entitled to reply to, and that the pamphlet offered by him appeared on examination to be a re-argument of the case, and not a reply to the complainant; and that the allegations as to the introduction of new matter into the complainant's closing argument were not well founded in point of fact, some of the longest passages thus complained of, being literal reprints of the brief and of the short-hand report of the opening oral argument.

test, therefore, is not whether the notes of 1866 interfere with the notes of 1863, in the function for which they were designed, namely, to act as notes to Wheaton, but whether the notes of Mr. Dana, as they stand in the edition of 1866, do so interfere with or impair the right of Mr. Lawrence to use the materials of his notes of 1863, in some new mode or combination, as to require the intervention of a court of equity. All questions as to use of Mr. Lawrence's combination and arrangement, or of his connection of the new matter with the text, are, therefore, immaterial: whatever value may exist in this is lost to every one. The court may also throw aside any mere literary and personal question, how far Mr. Dana is indebted to Mr. Lawrence.

Mr. Dana's finished work is very different from Mr. Lawrence's. Mr. Dana prepared complete essays upon the whole subject of the notes, often going over the same ground as the text, and capable of standing alone and being published as monographs. Mr. Lawrence merely supplements Wheaton, by adding more recent authorities, &c. Mr. Dana gives events, the substance of opinions, diplomatic letters, &c., in his own language; Mr. Lawrence generally gives long quotations, his merit being in selecting and collecting rather than digesting; e. g. Mr. Dana's note 36, on the "Monroe Doctrine;" note 215, "Neutrality Acts;" note 228, "Carrying Hostile Persons or Papers," and others. The term "piracy" or "infringement" is not appropriate to this case; "interference" is more proper. It is important to consider that, before undertaking this work, Mr. Dana held, by birth, association, and still more by his own labors and merits, a rank among the leading men of his day. He had a reputation as a writer, early established, and had already for years held a place among the leaders of the bar, both state and national, and had, especially in practice, devoted himself to admiralty, maritime, constitutional, and public law, while his position as United States district attorney all through the war, gave him a particular knowledge of prize law. When he undertook this work, international law was receiving great study; materials were never more abundant, and all writers used the works of their predecessors with great freedom. The motives of the literary pirate and plagiarist are usually mercenary. Mr. Dana's relations with this undertaking were those of large pecuniary sacrifice, and he had a reputation at risk. He did, in fact, employ upon this work a great deal of time and severe intellectual labor, and that of the highest quality. Careful study and preparation, original thought, and a style entirely free from any thing like copying, characterize these notes. The work is much shorter than Mr. Lawrence's, yet no omission is complained of; this is due to a clear and condensed treatment, differing in this respect very much from Mr. Lawrence's. Mr. Dana resectioned the text, and

added marginal titles; a work of much labor, not called for by his contract, and performed solely for the good of the book.

Mr. Dana has voluntarily produced the manuscript from which his book was printed, and it is all in the handwriting of himself or his amanuensis. His longer notes were written on large foolscap sheets. His shorter notes were written in this manner: he had Lawrence's edition of 1863 interleaved and loosely bound in two parts, for the greater convenience of making memoranda while studying Wheaton and Lawrence's notes, preparatory to entering upon the work of writing his own notes. He studied this book, reading at the same time, upon each topic, the other principal writers, making memoranda upon these interleaves and upon loose paper. Afterwards, he wrote his shorter notes on these interleaves. It is proved that, at great personal sacrifices, he devoted nearly two years to his work to the utmost of his capacity, and placed himself in communication with prominent gentlemen who were in a position to afford him aid in the way of new information, recent books, &c., and that he had access to many valuable libraries. Thus he bestowed great original labor upon this work. An examination of the testimony of Mr. Lawrence and of his expert shows that their conclusions are not to be relied on, but that the court must examine and compare the books for itself. The analysis, criticisms, digestings, comparisons, and distinctions, the thoughts, ideas, reflections, and general principles elicited, go for nothing with these gentlemen, if the facts, documents, and authorities—that is, the raw materials—of the two notes are the same. (The argument then proceeded to examine in detail a large number of the notes, respondent denying the correctness of many of the facts alleged about them, criticising the inferences the complainant had drawn from the facts, explaining the character of the notes, and wherein each resembled, if at all, and wherein each differed from, the note of Mr. Lawrence to which it was said to correspond.)

The result of this examination may be fairly stated thus. It is demonstrated, as to most of these notes, that they are not taken from Lawrence. It is shown that the object of the notes, the points presented, the analyses, the suggestions, the positions, are the independent work of Mr. Dana, of which there is no counterpart in the work of Mr. Lawrence. As to many of these notes it is shown affirmatively that they not only were not taken, but could not have been taken, from Lawrence; that not only the mental processes, but the materials, are not to be found in Lawrence's book. There is no evidence to show as to any one note that it was taken, as alleged, "wholly from Lawrence." There is no evidence to show, as to any one note, that it was taken in any part from Lawrence. All that is shown is that, as to

a few of the notes, the quotations and citations are nearly the same; but this applies to a few only: and as to these there is almost always some difference in the authorities, tending to show independent research. The utmost that can be said is that many of the materials found in respondent's work may have been taken from Lawrence. But this is absolutely nothing. Lawrence has no monopoly in authorities. Dana is not to decline using one because Lawrence has used it, even though Dana had derived his first knowledge of it, or his notion of using it, from Lawrence's note. And it may be that he derived this from some other work; for authors on this subject necessarily use the same materials. The complainant has not even made out a prima facie case that any thing was in fact taken from Lawrence. With this result from the detailed examination of sixty-eight of the accused notes, we do not care to waste time over the remainder. It appears also that those classed as chief offenders are mostly the short notes, and that but few of the principle ones, on which the character and credit and usefulness of Dana's edition depend, are even accused. It is clear that there is nothing to sustain the charge of copying Lawrence's original matter; the only question presented is, how far has Mr. Dana used the materials collected and selected by Mr. Lawrence. Doubtless Mr. Lawrence did not originate these, but derived them from other works, and doubtless Mr. Dana went to the same sources. For this reason, and from the nature of the case, the coincidences in authorities between Lawrence and Dana would be numerous, and for this reason such coincidences do not prove copying from Lawrence. The burden of proof is not on Mr. Dana to show where he got them. He makes oath that he got them all from somewhere, and discloses his numerous sources, including Lawrence. He swears that he cannot now tell from which source he derived any one authority, and that he cannot ascertain except by examining all those sources to see in which it is found, and this would involve so much labor that it cannot be required of him.

Mr. Dana's deposition states how he obtained his authorities, how he used his materials when collected, and what labor, thought, and study he bestowed upon them, and proves great original research and independent examination. It states what use he made of Mr. Lawrence's notes; all that he did was to use the materials found in the work of Lawrence as he did the materials found in other writers, intending to let nothing valuable escape him wherever found, and this use is proper. It is not proved by any reliable evidence that Mr. Dana did not examine the originals of all the authorities to which Mr. Lawrence's notes directed him. The repetition of some erroneous citations is pointed out, but it may well be that in

studying Lawrence's notes and other books he made memoranda of the authorities cited therein, then took his memoranda to a library, examined the originals, and forgot to correct the errors or did not notice them. Again it may be that the error crept into Lawrence's notes because he copied from a predecessor, and that Dana copied it from the same source, or from some later writer who took it from that source. This disposes of all the alleged typographical errors, and typographical peculiarities. Moreover some of them will be found not to be worthy to be put into such lists. The same argument disposes of several other classes of alleged identity in the form of dates, of citations, &c. If Mr. Lawrence made citations from original documents in the department of state or elsewhere, he has given them to the world, and a subsequent writer may use them.

Not only is it true that the burden is not on Mr. Dana to show whence he derived his citations, but the burden is on Mr. Lawrence to show that they were derived from his notes and not elsewhere. The very difficulty of proving this suggests that where this is all that is relied on, a strong case must be made out of continuous and large transfers, and then they go for nothing in themselves, the use being different, but are only evidence of an animus furandi. Cary v. Kearsley, 4 Esp. 168. Undoubtedly Story and Parsons and Redfield are directly indebted to their predecessors for large quantities of citations, and properly so. Now so far from making out a strong case, the complainant has hardly even attempted to make out any case of this sort against Mr. Dana. Mr. Dana's testimony and the evidence show that whatever assistance he may have derived from any source, he made an original and independent examination of the authorities and of the whole matter. Mr. Dana has voluntarily put into the case his whole manuscript, which would certainly be unusual in a plagiarist conscious of fault. (The complainant's inferences from the MS. were commented on at length, and several other matters of detail were gone into. Some personal charges against Mr. Dana generally and as a witness, were commented upon and declared to be unfounded.)

### Points of Law Applicable to this Case.

The court will not exercise its equity powers unless something more than a mere technical case of infringement is made out. All prior editions of Wheaton have been sold, and are out of the market. The only chance to procure the text of Wheaton is by the purchase of Mr. Dana's edition. No publisher would undertake an edition of Wheaton's text simply. The twenty years since his death has wrought great changes in the science in which he dealt, as well as in the events to which that science is applied. An injunction, though confined to the notes, would in effect suppress the text for several years, until a new edition could be prepared. All the copies of Dana's edition, owned by Little, Brown, & Co., would be lost. The suppression of Mr. Dana's notes would be a public loss, and the court cannot pick out and suppress a few references and leave the rest standing. No injunction has ever been granted in copyright cases, except upon the ground of protecting a pecuniary and existing interest in an existing book. There must be damnum as well as injuria, and one of the strongest grounds for issuing the writ is to prevent damages from competition, the extent of which a jury cannot accurately estimate. Tinsley v. Lacy, 1 Hem. & M. 747; Hogg v. Kirby, 8 Ves. 224; Geary v. Norton, 1 De Gex & S. 9; Phil. Copyr. 146; Curt. Copyr. 314.

It is not enough even that a book is in preparation; it must be actually on sale. Maxwell v. Hogg, 16 Law T. [N. S.] 130; Correspondent N. P. Co. v. Saunders, 12 Law T. [N. S.] 541. In this case nothing exists, or is even directly contemplated; there is only the bare possibility of a new book entirely different from any thing now existing, not only because it must be in a different form, but because, before Mr. Lawrence could write it, so much would have happened that he would desire to change the whole, and it may be would leave out, as then having no value, the only materials which Mr. Dana is charged with having used. And the evidence shows that it is hardly possible that Mr. Lawrence can ever find time for such a work. There is no subject in existence, and no pecuniary interest to be protected by the use of this extraordinary power of a court of equity: therefore it will not be exercised. On the contrary, courts require a grave and serious injury or threatened pecuniary loss before they interfere in this manner. Lewis v. Fullarton, 2 Beav. 6; Webb v. Powers [Case No. 17,323]; Whittingham v. Wooler, 2 Swanst. 428; Bell v. Whitehead, 8 Law J. Ch. 141; Curt. Copyr. 324, 326. In this case there has not been even a bare violation of right. In works of pure imagination or invention there should be no traces of a predecessor; if there is borrowing, it is clear plagiarism, and if enough in extent to injure the first work in the market, a court will interfere. There is a class of works, such as catalogues, which are mere compilations in the simplest form, and can hardly have any standing under copyright laws, which are intended to favor science and learning and not mere industry. Clayton v. Stone [Case No. 2,872]. Some works, such as modern dictionaries, are mainly mere compilations, yet require learning and intellectual labor. In the lowest form of compilations, which only set down ultimate facts, any identity due to copying is piracy. And in these the subsequent verification of the matters copied does not excuse the copying. This is because in these works there is little or nothing that can really be called authorship. Lewis v. Ful-

larton, 2 Beav. 8; Longman v. Winchester, 16 Ves. 269; Scott v. Stanford, L. R. 3 Eq. 723; Murray v. Bogue, 1 Drew. 353; Cornish v. Upton, 4 Law T. [N. S.] 862. There is a middle kind of works, partly compilations and partly original, consisting sometimes of simple facts ascertained and collected with great care and skill, sometimes of well-known facts arranged on a meritorious and valuable plan, sometimes of references not ultimate facts, but matters whose value chiefly consists in the rule or principle lying behind them. Kelly v. Morris, L. R. 1 Eq. 697. Maps are of the first class: they ought to be identical if correct, and there is no middle ground between a copy of the first and independent labor leading to the same result. Even here the second maker may use the former chart for example, to be sure that he has omitted nothing. Jarrold v. Houlston, 3 Kay & J. 708. See, also, Sayre v. Moore, 1 East, 361, note; Lewis v. Fullarton, 2 Beav. 6; Wilkins v. Aiken, 17 Ves. 423; Blunt v. Patten [Case No. 1,580]; Murray v. Bogue, 1 Drew. 353; Cary v. Kearsley, 4 Esp. 168. The question is whether there has been a legitimate use, in the fair exercise of a mental operation, deserving the character of an original work, or whether matter has been taken colorably, animo furandi. Gray v. Russell [Case No. 5,728]; Emerson v. Davies [Id. 4,436]; Campbell v. Scott, 11 Sim. 31; Wilkins v. Aiken, 17 Ves. 423; Hodges v. Welsh, 2 Ir. Eq. 266; Scott v. Stanford, L. R. 3 Eq. 722; Murray v. Bogue, 1 Drew. 353; Jarrold v. Houlston, 3 Kay & J. 708; Reade v. Lacy, 1 Johns. & H. 524; Whittingham v. Wooler, 2 Swanst. 428; Bell v. Whitehead, 8 Law J. Ch. 141; Webb v. Powers [Case No. 17,323]; Tinsley v. Lacy, 1 Hem. & M. 747; Reed v. Carusi [Case No. 11,642]. In considering this case, care must be taken to distinguish the subject-matter, with the view to ascertain whether it is mainly of simple, ultimate facts, the merit of which consists mostly in the labor of ascertaining them; or whether there is a large merit in their classification and arrangement; or, lastly, whether the great merit is in thought and expression, and in the rules and principles derived from the facts cited. Spiers v. Brown, 6 Wkly. Rep. 352.

Another class, quite by themselves, are law books, or books which are both elementary and commentaries on rules and principles, and compilations of authorities. This case rests on an alleged use by Dana of the mere materials—citations and authorities—that are in Lawrence's book. These are not like the ultimate facts in directories; a reference to a commentator, treaty, or despatch is not to an ultimate fact, but to a place where some rule or principle is, or is thought to be, contained. International law is the practice of nations, gathered from decisions, diplomatic and governmental acts, and the opinions of jurists who have acquired the confidence of nations. Every law-writer must and should study his predecessors; his merit consists in his knowledge of the force of the authorities separately, and what they prove when combined. In this case it is not proved that Dana used the language or thoughts of Lawrence, or used an authority in the same connection or to the same purpose. The reproduction of clerical errors merely proves copying the citation, not that it is used in the same way. In spite of the attempt of the complainant to degrade his work to the level of a mere compilation of ultimate facts, so as to bring it within certain decisions, and although it may come near to that level, neither of these books is of that character. A writer has no exclusive title to any particular citation. He has only a right to multiply copies of the book copyrighted, and to be secured against such a reproduction of this matter, as a whole, in all its relations, and upon all the above considerations, as will seriously injure it as a commodity for sale in the market. The court will not interfere unless there has been both a violation of right and a great damage; it must be made to appear that the defendant has, taking the whole book together, so far made a mere servile copy of it, without the requisite labor and thought of his own, as to make a work which not only competes with the plaintiff's in the market, but competes with it by reason of an unfair use made of it.

### Argument for the Complainant on the Question of Piracy.

Since Mr. Wheaton wrote, the science of international law has made great progress, and new events and new authorities and new questions to be discussed in the light of old and new events and authorities have arisen. Mr. Wheaton's book did not contain all that existed, or even all that he knew, when he wrote, but presented what, at that time, he thought it most important to present, having regard to the size of his book. By reason of knowledge which the author did not possess, and which the annotator has acquired, he discerns that certain passages of the text admit or require annotation: the acquisition of this additional knowledge, the selection of so much of it as the annotator's judgment determines him to present, the arrangement of it, its reduction to the form of notes and the connecting them with the appropriate passages, constitute his work. It is obvious that when the annotator has thus selected a passage to be annotated, and has supplied, in the form of a note, the new and additional matter to illustrate, supplement, correct, or qualify the text, he has performed the work of an author, and his note is the subject of a copyright. And it is equally obvious that when a subsequent annotator, having the work of the first before him, by means of his use of that work, and not by independent knowledge, thought, and study of his own, selects the same passage of the text as a sub-

ject for a note, and uses for it the matter which the first had collected, selected, and arranged in the form of a note to that passage, the second avails himself of the labors of the first unlawfully, and in violation of the rights of the first. It is not material that the second adds new matter not given by the first, or that he does not copy the very language of the first, for it is too clear to require argument, that one man cannot lawfully appropriate the property of another by adding something of his own, or by using his ingenuity to disguise what he has taken. Greene v. Bishop [Case No. 5,763]; Folsom v. Marsh [Id. 4,901]; Gray v. Russell [Id. 5,728]; Emerson v. Davies [Id. 4,-436]; Kelly v. Morris, L. R. 1 Eq. 697; Scott v. Stanford, L. R. 3 Eq. 718; Lewis v. Fullarton, 2 Beav. 6; Longman v. Winchester, 16 Ves. 269; Wilkins v. Aiken, 17 Ves. 424; Cary v. Faden, 5 Ves. 23, note; Hodges v. Welsh, 2 Ir. Eq. 266; Blunt v. Patten [Case No. 1,580]; Curt. Copyr. cc. 5, 9, pp. 263, 277–284, and cases cited; 2 Kent, Comm. 383; 4 Campbell v. Scott, 11 Sim. 31.4

These are law-books. Their object is not to promulgate the theories of the writer, but to state the law. This is drawn from the practice of nations, the decisions of tribunals, the opinions of jurists and thinkers; these are not used to illustrate the views of the writer nor as reasons for the law: they are facts proving the law, and the work of the writer is to learn them accurately, to understand their legal aspect and the principle proved by each, to determine, by a critical analysis of everything bearing upon the subject, which are to be accepted as sound proof of principles, which are to be rejected entirely, and which are to be taken as contradicting or as introducing qualifications or exceptions to commonly received rules. This requires not only study and knowledge of each fact, but knowledge of the principles of international law, careful thought as to the topic of each note and the bearing of each fact or authority upon it, and the exercise of an enlightened judgment upon the whole. The result of all this the annotator presents in such a form, with so much brevity or fulness, and with so much of his own explanation or comment as he thinks is required to enable the reader to understand and correctly appreciate the bearing and value of these matters. Accordingly the essential and valuable part of his note is what is presented, and not the form or manner in which the writer undertakes to convey it to the reader. The respondents' expert and witness says correctly, "The original notes in both editions are either statements of historical events, accounts of legislative debates, narratives of

diplomatic discussions, negotiations, or correspondence, abstracts of cases in the courts or judicial tribunals of different countries, summaries of the views of other text-writers or essayists on International Law and kindred topics." 7 Direct Ans. p. 401. The field from which these are to be drawn is practically unlimited, for the materials are to be found not only in judicial reports and text-books, but in treaties, state papers, parliamentary debates, state archives, histories, memoirs of prominent men, annuaires, reviews, periodicals, and newspapers. This is a fact proved in the case. It appears that Mr. Lawrence has a library of over 5,000 volumes on this special subject, and the number of volumes of English, French, and American public documents, debates, &c., is enormous; that Mr. Phillimore cites (being only his selection) 650 works, not including law reports; Kluber, by Ott (1861 Ed.) has a list of over 1,000 separate works. There are no careful digests, as in the case of law reports, but, especially for all diplomatic and historical authorities, by far the most numerous and important, the writer must rely chiefly on his own study, and on a knowledge which can only come of a lifetime of intelligent and observant attention to the matter, such as the complainant has bestowed upon it; and there is positive evidence as to the great labor, study, and expense which he in fact bestowed upon this portion of his work, and of the great and recognized value of what he accomplished in this respect. The mere collection of such authorities as are in the complainant's notes, is therefore highly meritorious, as well as the thought and judgment displayed in his "selection, arrangement, and combination." The nature of the work to be done, and the enormous field open to the writers, show the occasion for intellectual exertion, the opportunity for originality, and the certainty that, if originality is employed, the results will exhibit those differences which always follow independent thought. And also substantial differences between different writers on the same general subject show that it requires original thought, and that such thought produces differences of result wherever applied. The a priori certainty of such differences, and the actual existence of such differences—as in the facts and authorities cited by authors—are facts proved in this case. Identity between Lawrence and Dana in these respects proves, therefore, that their two books have but one intellectual authorship.

This entire want of identity between writers is fully proved by our witness, Judge Potter. Indeed a presumption arises from the similitude between Lawrence's and Dana's books, which the law requires the respondent to explain. Emerson v. Davies [supra], and opinion of Lord Ellenborough there quoted. Accordingly the respondent announced at the outset that he proposed to

---

4 Before the master, the complainant also cited the late cases of Pike v. Nicholas, 17 Wkly. Rep. 842; Morris v. Ashbee, L. R. 7 Eq. 40; Wood v. Boosey, L. R. 2 Q. B. 340; 37 Law J. Exch. pt. 2, p. 86.

show that the matter charged to have been obtained only by copying from Lawrence was common to other writers on the subject, and on one occasion his counsel obtained a continuance or delay, granted expressly for this purpose. His expert testified that his examination was particularly directed to this point (Record, pp. 407, 428), and their utter failure to establish any such identity between Dana and other writers is entirely conclusive. Almost the only instances produced turn out to be cases where some other recent writer had quoted from Lawrence, giving credit for the matter which Mr. Dana had copied and presented as his own, giving no credit. Among many other illustrations it appears that only about two-fifths of the works cited by Mr. Dana are in Phillimore's list of 650. President Woolsey's "brief selection" contains 48 works of an historical and diplomatic character, not including public documents, debates, &c., which he says are very valuable but difficult of access. Mr. Dana, writing at the same time with Woolsey, cites 72 works of the same character, but only ten of them are common to the two writers. Every difference which can ever exist should exist between these two books. Mr. Dana testified: "Mr. Lawrence's entire organization, as far as it affects him as an author or annotator, as well as his mental habits for a lifetime, are probably as unlike my own as it is well possible to conceive."

When an annotator has performed the work of an author in the manner described, whether he presents the substance of the authorities in his own language, or in the words of those authorities themselves, whether he states the rule which his judgment informs him is correct in his own phraseology, or in that of a writer of authority, does not make his work any the more or the less original and thoughtful. Nor does the use of the language of "generalization" or "philosophic deduction" vary the matter, for the real merit is that the facts stated should (1) support the results they are adduced to prove, and (2) correctly represent the whole field. Now Mr. Dana has not even selected and combined for himself facts scattered at hap-hazard through Lawrence's notes, or used them in connection with different topics, or to support new principles or rules different from those which Lawrence had employed them to prove or illustrate, but he has made each note by taking what Lawrence had presented as his annotation to the same passage of the text. In other words, he has not merely unduly availed himself of a collection due to Lawrence's learning and industry, but he has copied the "selection, arrangement, and combination" which is the result of Lawrence's thought, study, and critical judgment. This "selection, arrangement, and combination" consists of two parts: one is the selection, arrangement, and combination of the matters contained in the note inter sese, as bearing in a certain way upon a certain principle of international law, and the other consists in perceiving that a particular passage of the text so states or refers to that principle that it admits of or requires the annotation to be attached to it. To reproduce the matter of the annotation in a new and different book, having no reference to Wheaton's text, copies the first and more meritorious part; to reproduce it as an annotation to the same passage of Wheaton's text is to copy both parts, and all that gives value of any kind to the annotation. Our evidence charges and shows that the notes copied embrace rather more than their fair numerical proportion of Mr. Dana's large and more important notes; the suggestion to the contrary rests on a misreading of the testimony.

The suggestion that Lawrence's work was merely to add authorities since Wheaton is entirely unfounded in fact. Lawrence takes up the matter from the beginning quite as much as Dana, and a full proportion of the matter in Dana, before Wheaton's time, is copied from Lawrence.

### Proof of the Piracy.

First, Mr. Dana's confessions. If he really intended to annotate Mr. Wheaton's text with original notes of his own, as if it had never before been annotated (as he pretends), he should have taken Mr. Wheaton's last edition. If he wanted to use merely Mr. Lawrence's revision of the text, he should have taken the edition of 1855, which has the same text as that of 1863, and is more convenient as being smaller, a copy of which, it appears, he had. Instead of that, he began by having his copy of Lawrence's Wheaton of 1863 interleaved with writing-paper, and then carefully studied the text, Mr. Lawrence's notes, and certain other books. "When I began reading upon a topic," he testifies, "in addition to what I may call memoranda of mental suggestions, my general course was, on important points, to copy directly from the author the citations he made," putting them on sheets of paper. "As to Mr. Lawrence, I felt at liberty to examine his notes as I did the writing of other persons, whether copyrighted or not. I entered his citations on my rough sheets as I did those from other writers." "In reading Mr. Lawrence's notes, as in reading other authors, I intended to let no important fact or authority escape me, and in all alike I took some mode of securing that end by note, memoranda, or otherwise." "In some cases I may have afterwards written out a memorandum of what I considered to be the substance of the note, and placed it among my materials upon the subject. In other cases I may have trusted to re-reading." Having pursued this course, he undertook "to make it known to the public" that he had "built up a new and original body of notes on this basis of the text of Wheaton, and had detached Mr. Lawrence altogether from the book." One way in which he made this known was by printing in his preface that his "edition contains nothing but the text of Mr.

Wheaton according to his last revision, his notes, and the original matter contributed by the present editor," and that "the notes of Mr. Lawrence do not form any part of this edition. It is confined, as has been said, to the text and notes of the author and the notes of the present editor," making no other allusion to Mr. Lawrence's work in any part of his book.

### Internal Evidence of Copying.

After the notes have been examined, to ascertain their resemblance and identity in accordance with the principles already explained, we come to what is called physical proof of copying. This depends upon bringing together many details. It may be done by collecting in one list all the instances of typographical errors reproduced which are scattered through the whole book; then making lists of all other details in appropriate classes. The weight of this evidence increases not by addition, but by multiplication. One instance of one class might be by accident, ten cannot be. And when various instances of different classes occur in the same sentence, the presumptions are no longer one to ten, but one to a hundred. Add to this the fact that there is no such identity between Dana and other writers, and that Dana wrote with Lawrence before his eyes, and it is no longer a question of weighing evidence,—it is infinity to nothing. We have collected such lists, classified according to the character of the instances, and have also examined each note separately, to see how many of these instances concur in one note, and what other special proof there is applicable to each note. The reproduction of typographical errors and peculiarities is not only absolute proof that the passages containing them are copied, but requires the court to presume, prima facie, that all other passages, which are the same as passages in the original book, are copied, though no blunders occur in them. Jeremy, Eq. Jur. p. 322; Curt. Copyr. 254; Mawman v. Tegg, 2 Russ. 393. There are fifty-four of these instances. These not only prove copying in the first instance, but they prove copying without ever going to the originals. If he went to the authorities for substance, he would have brought from them something not in Lawrence's book, and he has not done it in any one of these cases. If he went to verify the references he would have corrected them, and he has not done it in a single instance except one, where there was a very special reason requiring him to go to it,—and then he corrected a date. Some of these errors are so serious—vol. viii. instead of ix., p. 249 instead of 429, 354 instead of 255— that he could not have looked at the authorities without noticing them. In several cases Lawrence has cited the same despatch, &c., twice, giving the wrong date once, and the right date once, and Dana, in his corresponding notes, has precisely reproduced this. Sometimes in different notes, and sometimes in the same note (because his book was writ-

ten in 1855, and added to in 1863), Lawrence has cited from different editions of the same book: nine of these instances have been reproduced by Dana, and none corrected. He has literally reproduced translations made by Lawrence, differing from all other known translations. Besides these fifty-four there are lists of fifty-nine other typographical and clerical peculiarities reproduced. In some cases Lawrence has mentioned several matters, and given references for each. Dana has reproduced some of them, omitting others, and attached to such as he has copied the citations or dates for those which he omitted. There are a very large number of cases where differences have been pointed out between Lawrence and Dana, and on examination it appears that these differences are just as a shrewd person would be likely to make, by guessing and trying to change while copying, and such as one who studied the matter would not make, for they are errors. And in some of them we find that Dana's original MSS. were exactly like Lawrence, and the change made afterwards.

There are many books and authorities to which Dana has constant references, but never any except such as are found, in substance and form, in the corresponding note of Lawrence. Among them are Twiss, Westlake, Annuaire des Deux Mondes, Almanach de Gotha, Le Nord, Hansard, &c. He has quoted or cited from twenty-five despatches, &c., procured by Lawrence from department of state, or other MSS., and cited by Lawrence as from "Dep't of State," "MSS.," &c., and never printed elsewhere. He has long lists of authorities found in the same order in which they are found in the corresponding note of Lawrence. Mr. Dana confesses that he studied Lawrence with care, for the purpose of taking from it, and that he did take from it, all that he thought sufficiently valuable, and he cannot tell from recollection or memoranda, in any instance, what he did take. Every similitude in the two works is necessarily presumed to arise from copying, unless that presumption is rebutted. The burden is on the respondent. Curtis on Copyright, 255, and opinion of Lord Ellenborough there quoted. Emerson v. Davies [Case No. 4,436]. It is moreover proved, as matter of fact in this case, as already stated, that the identity between Lawrence and Dana can only have arisen by copying Lawrence. Most of Dana's notes were re-written one or more times. We have the final MSS. that went to the printer; all the intervening writings, the memoranda made while studying Lawrence's notes being no longer in existence, except in a few cases where they happened to be on the same sheet as a finished note, and except also such marks as were made in the margin of his interleaved copy of Lawrence. It is natural that he should put this MSS. into the case, to avoid the conclusive presumption that would arise from withholding it. In the margin of his copy of Lawrence's appendix on naturaliza-

tion there are many of his pencil-marks, made, he says, to show that these were matters which he ought to "recur to when at work upon his notes." The matters thus marked embody four typographical errors, and every one of these matters, in almost exactly the same order, and with all these errors, is reproduced in Dana's long note 49, of which, with trifling exceptions, they constitute the whole. There are many other similar instances. His shorter notes were written on the interleaves, so that, his note being attached to the same word with Lawrence's, he actually wrote with Lawrence's note under his eyes, and, in some cases, the erasures and interlineations show that he kept his eyes on Lawrence's note while writing, copying first the phrases found in Lawrence, and then changing them while writing. He testifies that "the interleaving was very convenient." In two of his notes, which were entirely copied from Lawrence, he had cited Lawrence's notes as his authority. Afterwards he struck out Lawrence's name, but retained the copied matter. He says he did this "after reflection," apparently being satisfied to draw the line between the existence of indebtedness and the acknowledgment of it. These and other instances of his care to avoid all allusion to Lawrence, coupled with his disclaimer in the preface, show an animus inconsistent with even a belief that he was making a fair and legitimate use of complainant's book.

Going to the other line of proof suggested, we shall now show that note after note reproduces, in whole or in part, matters from the note which Lawrence has attached to the same passage, that, except in a few peculiar cases forming a class by themselves, Dana has derived nothing from the authorities, either in form or substance, which requires or indicates the use of any thing except Lawrence's note from which he was copying, and that he has made no use of the matters thus copied in any way different from the use made by Lawrence, in the note from which they are copied, with such additions and changes of form as could readily be made by a lawyer of respectable intelligence and attainments.

The defence of "a fair use" is not tenable in this case. The use made far exceeds anything which the law of copyright has ever been held to allow. As already shown, Dana did not merely use Lawrence's work as a storehouse of facts, but he reproduced Lawrence's selection, combination, and arrangement. The agreement provided that Mrs. Wheaton should make no use of Mr. Lawrence's notes, and one avowed object of it was to secure to Mr. Lawrence the exclusive use of the "great amount of valuable learning which he had gathered with great labor from a wide variety of sources." This defence is not open to Mr. Dana. To present copied matter as original is not a fair use in the opinion of literary men. 1 White, Shakespeare, p. 22; Gold-

smith's Life of Parnell, p. 39, of Little, Brown, & Co.'s edition of Parnell; Worcest. Dict., Preface, p. 6. Courts take the same view. The want of acknowledgment or denial of indebtedness is a very strong indication of an animus furandi, and excludes the question of a fair use, or lawful abridgment. Tinsley v. Lacy, 1 Hem. & M. 754; Sweet v. Shaw, 3 Jur. 217; Wilkins v. Aiken, 17 Ves. 426; Jarrold v. Houlston, 3 Kay & J. 715, 716, 722. The cases put by courts as illustrating what is a fair use are quotations and extracts for the bona fide and avowed purpose of comment or criticism, or for the purpose of presenting the views of the writer as an authority. Bell v. Whitehead, 8 Law J. Ch. 142; Cary v. Kearsley, 4 Esp. 168; Story's Ex'rs v. Holcomb [Case No. 13,497]. "The insertion of such extracts in reviews, moreover, tends to extend the sale of the works reviewed." Bell v. Whitehead, supra.

The act of congress does not require the complainant to keep copies on sale. It appears that the fact that the edition of 1863 was exhausted, and a new one in preparation, was concealed from Mr. Lawrence until too late for him to publish, and he is entitled to settle the question of copyright before undertaking a new publication. The French edition is in press, and it can be sold here or translated. The memorandum does not require him to use his notes. Mr. Lawrence may reprint Lawrence's Wheaton, for there are no valid copyrights except his. He may connect his notes with the "History," for it appears that a third party owns that copyright, and that the respondents knew that Mr. Lawrence had commenced negotiations to that end. He may embody them in a new work. He may treat with the Wheatons, if they have any rights in the text. In whatever way or in whatever form he uses them, the book will be in demand, because it contains the matters found in the notes of 1863; its sale will be injured just so far as the public are able to find the same matters in the defendants' book; and the defendants' book besides, or in spite of the merits or demerits due to Mr. Dana, will compete with it by reason of an unfair use made of the results of Mr. Lawrence's learning, research, and judgment.

The closing arguments had been made in the case about ten months. A motion was made by the respondent to file a new printed argument of ninety-eight pages, upon the ground that the plaintiff, in his closing argument, had introduced new matters. The plaintiff denied this, and showed that what was claimed as new matter was largely from the opening argument of the plaintiff and from the printed brief; the extracts being mere reprints.

CLIFFORD, Circuit Justice, said that the court had given the matter very careful consideration, and that he concurred with Judge

LOWELL. He wished to add, the twenty-second additional rule of this court provides that "counsel will not be heard unless a written or printed abstract of the case be first filed, together with the points intended to be made and the authorities intended to be cited, in support of them arranged under the respective points." The construction of that rule has never been that the party must state his whole argument, but his "points" and authorities. The practice varies with different counsel, and with their own convenience and the circumstances of each case, whether the brief shall be short or extensive. Also, counsel sometimes interchange new authorities at the argument, and this is allowed if it is done in season for the other side to reply to them. Cases frequently arise, where arguments are oral, where the respondents will suggest that the complainant has used new authorities, and will ask leave to reply to them orally or in writing, which is generally allowed. Sometimes, where they are important, a week has been allowed for such a reply. Where arguments are oral, no practical difficulties arise, because every thing is in the presence of the court, and can be settled at once. Where the argument is in writing, the application of the rule is more difficult, but the rule itself is the same.

The court remembers no cases in this circuit, and few in the supreme court, where controversies like this have arisen; yet the court does not see any serious difficulty in determining what ought to be done. If new authorities or new propositions touching the merits had been introduced, the obvious course would have been, reasonably, to cite legal authorities responsive to them, or to reply to particular propositions. That would have presented no difficulty, because at a glance we would have verified whether these were new cases; if so, the court would desire to hear suggestions about them, and to know whether there were other cases which would control them. This is to be taken in connection with the twenty-second rule of the supreme court, binding on this court, and which provides that the plaintiff or appellant shall be entitled to open and close. These, being settled rules of practice, are the rights of the parties, and the court must follow them. The complainant was entitled to open and close. The respondent had a right to expect a brief, and one was furnished. The case was argued under the order already read. According to it, the respondent replied upon the point of title upon which he was ready, and the complainant closed upon that branch of the case. Under it, time was given to the respondent to reply in writing upon the point of piracy, upon which he was not then ready, and that time was enlarged by a proper agreement of counsel, owing to the engagements of the respondent. Time was also given to the complainant to close on the question of piracy,

and that time was enlarged by an agreement of counsel, for their convenience. The arguments came in on the 1st of August, and the court has had the case under consideration for seven or eight months, not devoting all its time to it, but taking it up from time to time, as its other engagements permitted. At this stage of the case there can be no further argument, unless the court should reach some point where they desire a re-argument. In other words, a proposition for re-argument must come from the court, and not from the party.

Questions of intrinsic importance and of great difficulty are presented for decision in respect to the title of the complainant, and as they are in their nature preliminary, they will be first considered. Briefly stated, his claim of title, considered broadly, is to the additions to and emendations of the text of the two editions as published under his supervision, to the memoir of the author, as contained in those editions, to the annotations prepared by him and published in those editions, and to the arrangement of the same, and the mode in which they are therein combined and connected with the text, and to the indices as published in those editions. He rests his claim upon the following grounds, as substantially stated in the bill of complaint: First, upon a contract or agreement between Catharine Wheaton and himself, that she should make no use of his notes aforesaid in any new edition of the work without his written consent; and that she would convey to him by a formal instrument, the right to make any use he might see fit to make of his own notes. Secondly, upon the ground that in the consideration of a court of equity he is taken and deemed to be the owner and proprietor of the copyrights, in and as to all the matters contributed by him and published in those two editions. Evidently, both claims, as presented, have respect to the agreement as expressed in the memorandum of June 14, 1863, and the subsequent correspondence upon that subject, as the first is founded in covenant or contract, and the second in an equitable title to the copyright, derived from the original arrangement and by virtue of the agreement expressed in that written paper. Confirmation of that proposition is not needed, because the language employed in the stating part of the bill of complaint is too plain for controversy; but if it were not so, every vestige of ambiguity is removed by the principal prayers of the bill of complaint, which are for an injunction, and for an account, and for a good and sufficient deed conveying the legal title to the copyrights.

The respondents contend that the complainant is not entitled to any relief for several reasons: 1. Because the memorandum, as they contend, is not a perfected contract, but merely a note or memorandum of the stipulations of a proposed agreement, as to the true

understanding and definite terms of which the parties never actually agreed, and on which their minds never in fact met. 2. Because, the parties having failed to agree as to the true understanding of the memorandum and the terms of the formal agreement which it contemplated, the complainant relinquished and abandoned the whole subject-matter of the instrument, and so notified the respondents. 3. They also contend that the agreement cannot be enforced, because the same was procured by fraudulent misrepresentations and concealments of the complainant. 4. That the agreement cannot be enforced, because the memorandum is without consideration. 5. Because the basis of the memorandum and the negotiations which led to it were the supposed legal copyrights held by the said Catharine; and they insist that those copyrights are void, and consequently that the agreement is inoperative, inasmuch as the parties entered into the same through mutual mistake. 6. Because the memorandum containing the agreement does not transfer nor assign any copyright to the complainant, or provide for or contemplate any such transfer or assignment.

Search is made in vain for any support to the first proposition of the defence, as applied to the terms or execution of the memorandum. Interviews took place between the complainant and Professor Parsons, and they conferred together upon the subject-matter embraced in that memorandum, as suggested by the said Catharine; and the proofs show that they came to a perfectly amicable result; that the memorandum was drawn by the latter and delivered to the complainant, to be transmitted to the said Martha B. for her examination, and that she afterwards, on behalf of her mother and herself, and to signify their approval, signed the memorandum and wrote the date thereon, and caused the same to be delivered to the complainant. Expressed in intelligible terms as the memorandum is, the construction and effect of the language are questions of law, which cannot be controlled or influenced by the opinion of any witness, not even by that of the person employed to prepare the draft for the consideration of the parties. He may not at the time have regarded it as a contract, but they were at liberty to adopt it as such; and if they did so, and it was duly and understandingly executed as such, their rights under it must be ascertained from the language employed, as applied, in view of the surrounding circumstances, to the subject-matter of the negotiation.

They subsequently differed, as the correspondence shows, as to the proper terms of the formal agreement for which the memorandum provides; but it was not denied, throughout that period, that the said Catharine had agreed "to make no use of Mr. Lawrence's notes in a new edition, without his written consent," nor that she had also agreed to give him "the right to make any use he wishes to

of his own notes." Attempt was made, it is true, to ingraft the qualification into the latter branch of the stipulation, that the complainant should not publish in the United States a new edition of the notes and other matter of his own composition, "which he had added to the said two editions of said book, until the last edition is sold;" but it is clear to a demonstration that the agreement, as expressed in the memorandum, contains no such qualification. Properly considered, it is equally clear, also, that there is nothing in the correspondence to sustain the theory of the respondents as presented in their first proposition. "On reflection," said the complainant in his letter to Mr. Parsons, dated June 14, 1863, "the suggestion you made yesterday offers many advantages over my proposed plan . . . as is settles at once and for ever all questions in regard to the book." Influenced by those considerations, as he represents, he wrote a second letter of that date as a substitute, if preferred by the other party, for the one previously prepared to be forwarded to Mr. Brockhaüs, and submitted it to the approval of Mr. Parsons, as the friend of the said Catharine; but he expressly stated therein, that, in sending it, he did not wish to recede from the former arrangement. On the contrary, he stated in the enclosed letter that, having made an arrangement with the said Catharine, which gave him the entire control over his notes as published in English, and any claim she might have to the editions published by his correspondent, he had advised her to the effect that she might draw for the whole 6,000 francs. He proposed, in that letter to Mr. Parsons, that the said Catharine might retain the copyright to the text, and to relinquish all claim for the expenses of the stipulated translation; but he did not propose to vary the agreement, as expressed in the memorandum, as to his own notes, and he also made claim to the right, if any, that the said Catharine had to the text and notes of the foreign editions.

Full consultation took place between Mr. Parsons and the said Martha, as the agent of the said Catharine; and Mr. Parsons, under date of June 16, 1863, wrote to the complainant that: "1. Mrs. Wheaton will send your last letter to Mr. Brockhaüs, and returns you your former letter. 2. Mrs. Wheaton will draw at once on Mr. Brockhaüs, at twenty days, for 6,000 francs. 3. When Mrs. Wheaton learns that the bill is paid, she will execute instruments satisfactory to you, which shall, in the first place, bind her not to use your notes without your written consent, and, in the next place, give you all her claims and interests in respect to the whole book, text, and notes, for continental Europe in future." Inadvertently, Mr. Parsons omitted to re-state the second clause of the agreement as expressed in the memorandum, that Mrs. Wheaton would give to the complainant the right to make any use he wished of his own notes; but his attention having been called to the

omission, by the complainant, on the following day, he replied, on the 19th of the same month, that the complainant was certainly right in his construction of their arrangement, that the complainant, under it, could make any use he saw fit of the matter which he had contributed. Appended to that letter is a note in the nature of a postscript, dated four days later, in which the writer suggests that Mrs. Wheaton was bound by her contract with Little, Brown, & Company, as the publishers of the then current edition of the work, and that she could not convey to him any thing covered by her copyright in any way detrimental to that edition; but he proposed no alterations of the agreement, and confirmed the same by his two letters, and none was made or proposed by the parties. Prior to the 31st of August, 1863, the complainant received intelligence that the bill of exchange drawn by the said Catharine had been duly honored; and on that day he wrote to Mr. Parsons, requesting him to cause the agreement of June 14, 1863, to be carried into effect. Delay ensued before any response was received to that request; but when it came, October 17, 1863, it brought with it a draft for the formal agreement, as stipulated in the memorandum. As originally prepared, the draft contained three several stipulations. First, that the said Catharine should retain unimpaired the full legal exclusive copyright in the text of the book. Second, that she should in all ways respect the rights of the complainant to all the notes and other matter of his own composition, which he had added to the book, in the same manner and to the same extent as if he had a full legal copyright of the same. Third, that she thereby transferred and assigned to him thereafter the whole title, text, and notes to the editions published in continental Europe.

Besides these several stipulations, there were interlined in pencil at the close of the second stipulation the words following: to wit, "But the said W. B. Lawrence shall not publish a new edition thereof until the last edition is sold." Beyond doubt the draft was prepared without the words in pencil, and the explanations of Mr. Parsons upon the subject are, that he probably exhibited the paper after it was drawn to the said Martha B., or to the respondent, Charles C. Little, and that he made the interpolation at their suggestion. Dissatisfied with the draft as prepared, the complainant returned it to Mr. Parsons. His objections were twofold, as expressed in the letter returning the paper. First, because it made no reference to the "Histoire du Droit des Gens"; but, chiefly, on account of the stipulation that he should not publish a new edition until the last edition was sold, which he declared to be wholly inadmissible, as it would lead to new embarrassments. Alterations were subsequently made in the form of the draft, obviating the first objection, and limiting the restriction constituting the second and principal one, so that the complain-

ant might publish a new edition before the last was sold anywhere except in the United States; but he declined to adopt it, insisting that the agreement as expressed in the memorandum contained no such stipulation. Determined not to involve himself in new complications, the complainant returned the last draft, as amended, to Mr. Parsons, stating to him, at the same time, that he had concluded, on reflection, to decline accepting any paper from Mrs. Wheaton. He had previously given him to understand that no such arrangement could be accepted, and more than intimated that if Mrs. Wheaton did not accede to his views in that behalf, matters must rest as they were in the original agreement. Contention, however, arose by some means between the parties in respect to what was quite unimportant, and what was not probably thought of by them or by Mr. Parsons when the memorandum was framed and executed. Stipulations for the protection of the contract with the publishers of the prior editions were unnecessary, as their remaining interests, if any, were vested, and, being antecedent to the negotiations between these parties, could not be impaired by the agreement contained in the memorandum, for the reason, as clearly stated by the complainant, that Mrs. Wheaton could not convey what she did not own.

Viewed in any light, the correspondence shows nothing more than that the parties disagreed as to the extent of the obligation imposed by the memorandum, which is a question of construction; but it was never even suggested that it did not contain a complete valid agreement. Conclusive proof that neither Mr. Parsons nor Mrs. Wheaton entertained any such views during that period, is found in the drafts for the formal instrument as prepared by the former, executed by the latter, and forwarded to the complainant for his acceptance. Both were prepared and signed, as therein recited, "in execution of an agreement heretofore made by and between" Mrs. Wheaton and the complainant, which is plenary evidence that up to that time the agreement expressed in the memorandum as to the notes was regarded as complete and obligatory.

Abandonment is the next defence to be considered; but the proposition must be examined in view of the conclusion announced, that the stipulations contained in the memorandum, as to the notes contributed by the complainant, are a perfected agreement, and not a mere proposal, as suggested by the respondents. Mere proposals may in general be withdrawn at any time before they are accepted by the party to whom they are made; and ordinary contracts, executory on both sides, may in certain cases be regarded as forfeited, as where the reciprocal stipulations are dependent, and where a party seeking to enforce performance has himself omitted to do something which he was required to perform as a condition precedent to his right of action. Cases may arise also where

a party is estopped to set up a particular contract, as where he has subsequently agreed in due form of law and for a valuable consideration to relinquish its benefits, or not to enforce its provisions, or where he has, by his representations and conduct, designedly caused the other party to believe that the contract had been discharged or that it would not be enforced, and has intentionally induced that party to act on that belief, to his pecuniary prejudice; if the belief so induced is unfounded, the party in fault in such a case is estopped to allege or prove the falsity of his representations as evidenced by his words and conduct. Pickard v. Sears, 6 Adol. & E. 471; Freeman v. Cooke, 2 Exch. 654; Van Rensselaer v. Kearney, 11 How. [52 U. S.] 326; Hawes v. Marchant [Case No. 6,240]; Moore v. Crofton, 3 Jones & L. 446.

Argument to show that the case is not one of forfeiture is unnecessary, as the proposition finds no support whatever in the evidence. Contracts executed on one side and unperformed on the other stand upon a very different principle from those where nothing has been done by either, so far as respects the party who has fulfilled his obligation and paid the stipulated consideration. Rights and obligations secured or imposed under such circumstances have become vested and absolute; and if the delinquent party seeks to avoid the obligation imposed on him, he must allege and prove a new contract, for a valuable consideration, amounting to a valid release, or that the other party is estopped to enforce the obligation by virtue of some operative binding agreement to relinquish the benefits from the same, or not to enforce the stipulation; or he must allege and prove that he has been deceived and designedly misled by the admissions and representations of the other party, as before explained. Foster v. Dawber, 6 Exch. 839; Edwards v. Chapman, 1 Mees. & W. 231; Wildes v. Fessenden, 4 Metc. [Mass.] 12; 1 Smith, Lead. Cas. (5th Am. Ed.) 462; Bank of Virginia v. Groves, 12 How. [53 U. S.] 51.

None of the elements of estoppel exist in this branch of the case, as the complainant did not agree that he would discharge the memorandum or that he would not enforce its provisions. Nothing approximating to such an agreement is exhibited in the record, nor do the respondents in fact set up any such defence. What they do set up is, that the complainant relinquished and abandoned any agreement in the premises, and so notified the respondents, by which it is understood they refer to the letter of the complainant, addressed to Mr. Parsons, of the 2d of November, 1863, in which he says: "On reflection, I have determined to decline accepting any paper whatever from Mrs. Wheaton, and therefore return the enclosed," meaning the amended draft for the formal agreement. Disconnected from the circumstances and the other correspondence, it might be possible to misunderstand the meaning of the writer of that letter; but it must be construed in view of what preceded it, and of the subject-matter to which it related. After the 31st of August preceding the date of that letter, the complainant had been more or less engaged in efforts to procure the formal agreement in respect to the notes as stipulated in the memorandum; but all his efforts proved fruitless. Only eight days before, he prepared the draft of the letter exhibited in the record as one intended for the same correspondent, in which he stated to the effect that his sole object in asking for the formal agreement was to prevent any further litigation, saying that he was satisfied that without it he could restrain any attempt to use these notes by Mrs. Wheaton, or any one else, in a future edition, adding, at the same time, that if she "does not sign the paper as now suggested," meaning one of the drafts for the formal agreement, without any restriction as to the use of the notes, then "matters can rest as they are." Although never sent to his correspondent, the exhibit may well be referred to as tending to show the real intent of the complainant at the time it was written.

Weighed in view of the antecedent correspondence and the surrounding circumstances, it certainly would be a perversion of the language of the complainant to regard what he wrote on that occasion, either as an agreement to relinquish or not to enforce that stipulation; and, even when separately considered, the language falls far short of what is necessary to justify any such conclusion. He made no admission by that statement inconsistent with the claim he now sets up; nor did he say any thing to induce the said Catharine, or any one of the respondents, so to act that either she or they will be injured if the agreement expressed in the memorandum is held valid and enforced. Howard v. Hudson, 2 El. & Bl. 1; Audenried v. Betteley, 5 Allen, 385; Pierrepont v. Barnard, 2 Seld. [6 N. Y.] 291; Rich v. Atwater, 16 Conn. 416; Plumer v. Lord, 9 Allen, 458. Expressions of a doubtful character are not sufficient to support such a defence as against a contract fully executed on the part of the complainant; but the meaning of the language employed must be clearly such that a man of ordinary prudence would take the representation to be true, and believe that it was meant that he should act upon it; and it must also appear that he did act upon it as true, so that he will be pecuniarily injured if it be allowed to be disproved. Rich v. Atwater, 16 Conn. 415; Mowry v. Sheldon, 2 R. I. 379; Flagg v. Mann [Case No. 4,847]; Langdon v. Doud, 10 Allen, 435; Moore v. Crofton, 3 Jones & L. 446.

Estoppels are allowed to shut out the truth only when it is necessary to protect a party setting up such a claim or defence,

against an injury or liability to which he is exposed without his own fault, and by reason of having trusted to the statements designedly made by the other party to expose him to such injury or liability, and which were of such a character that a man of ordinary prudence would take the representations to be true, and believe it was meant that he should act upon them as presenting the true state of the case. They must be proved, and will not be extended by implication beyond the plain import of the deceptive act, admission, agreement, or representation. When the request was made by the complainant for the formal agreement, he doubtless expected that it would include the "Histoire," as well as the notes specified in the memorandum, and perhaps the memoir of the author and the indices; but the better opinion is, that, when he wrote the letter of June 14, 1863, he surrendered all claim to every thing mentioned in the antecedent negotiations, except the claim to the notes as already secured, including of course the arrangement of the same, and the mode in which they are therein combined and connected with the text. All claim to the copyright of the text was abandoned by the complainant at a very early period of the negotiations, and it does not appear that it was ever after renewed.

Abundant evidence exists in the record to show that Mrs. Wheaton, as well as Mr. Parsons and Miss Wheaton, was willing to concede the claim of the complainant as to the History; but inasmuch as it was not included in the memorandum, the conclusion of the court is, that the complainant, when he elected to stand upon the original agreement, relinquished that claim. He had previously described it as a matter of little or no value; and when he gave notice that he had determined not to accept any paper whatever from Mrs. Wheaton, it must be understood that he was content with what was secured to him in the memorandum. His right to the notes is therein plainly expressed, and there is no evidence in the record which shows that Mrs. Wheaton, or any one of the respondents, was ever misled by the language of the letter giving that notice. Conclusive evidence to the contrary is found in the several answers of the respondents, and their subsequent conduct confirms that conclusion.

Grant that the memorandum was regarded by the parties thereto as a contract, still the respondents contend that it cannot be enforced, because, as they alleged, it was procured by the fraudulent misrepresentations and concealments of the complainant. They submit that general proposition, and under it they make the following specific accusations: 1. That, when the negotiation as to the notes was commenced, there was not in fact any understanding between the complainant and Mr. Brockhaüs that the former should per-

form for the latter any editorial labor, either of revision or of translation. 2. That the foreign publisher was ready, at that time, to pay the 6,000 francs to Mrs. Wheaton, without requiring any such labor from the complainant. 3. That the said publisher had not then made a final proposal to the complainant to pay any thing to any one in that behalf, as appears by his letters addressed to the complainant. 4. That the complainant concealed the contents of those letters from Mrs. Wheaton, and those acting in her behalf. 5. That he falsely represented to her and those acting for her, that the said publisher would not pay the sum specified except upon his undertaking to revise his annotations and make such additions to the same as would adapt them to a new edition to be sold in Europe, and the general charge is, that she was induced to assent to the memorandum by reason of those false representations.

Accusations of fraud amount to nothing as a defence to a contract otherwise legal and binding, unless they are satisfactorily proved; and the burden of proof to establish such a defence is upon the party who makes such a charge. Attwood v. Small, 6 Clark & F. 447; 1 Story, Eq. Jur. § 200; Park v. Johnson, 4 Allen, 266; Jennings v. Broughton, 5 De Gex, M. & G. 132; Campbell v. Fleming, 1 Adol. & E. 41. Apart from the inferences attempted to be drawn from the correspondence between the complainant and the foreign publisher, it is scarcely pretended that those accusations find any substantial support in the record; and the court is of the opinion that the several letters, when properly construed, and considered in their proper connection, show that every one of the specific suggestions of fraud is unfounded. Correspondence between the complainant and the foreign publisher, in relation to a new edition of the work for the foreign market, commenced more than three years before the date of the memorandum; and in the first letter written by the complainant he stated, that he did not expect any compensation for his services, but that he should desire to obtain what he could for the widow of the author; and it is a mistake to suppose that the negotiation as to the notes commenced before there was any understanding upon that subject between those parties. Enough certainly had been learned to satisfy any reasonable person that the arrangement could be made if desired, and that was sufficient to justify the complainant in ascertaining what would be conceded as to the notes. Equally unfounded also is the charge that Mr. Brockhaüs was ready, at that time, or at any time before or afterwards, to pay the 6,000 francs without any stipulation from the complainant to revise the notes and superintend their publication. His letter of the 20th of April, 1863, is a complete refutation of both those charges,

and shows to a demonstration that the services to be rendered by the complainant really constituted the chief inducement to the arrangement. Convinced that the "rich emendations" made to the work by the complainant would, if adapted to his proposed new edition, be of great value, he was desirous to secure his services to accomplish that object, and, in order to do that, he was willing to pay the described amount. By his letter of June 12, 1860, Mr. Brockhaüs called for a definite proposal; and the complainant, in his letter of August 25, 1862, complied with that request, and made the proposal which, with slight modifications, was subsequently accepted; but whether before or after the commencement of the negotiation as to the notes, is wholly immaterial. The charge that the letter of the 29th of April, 1863, or any of the others, was concealed from Mrs. Wheaton or those acting in her behalf, is disproved by the correspondence from which the inference is attempted to be drawn. Taken as a whole, the correspondence satisfies the court that the foreign publisher never did agree to pay the 6,000 francs except upon the undertaking of the complainant to revise his annotations, and to adapt the same to the proposed new edition for the foreign market, and that the respondents have failed to prove that the complainant was guilty of any fraudulent misrepresentation or concealment.

Any extended argument to show that the fourth proposition of the respondents cannot be sustained is unnecessary, as it finds no support in the evidence. Founded [as the proposition is] [5] upon the theory that the foreign publisher was willing to pay the money for antecedent obligations, or as a gratuity to the family of the author, it is a sufficient answer to it, to refer to what is said in response to the preceding proposition, without entering into details.

The next proposition of the respondents is, that the copyrights of the editions of 1855 and 1863 are void, and consequently that the agreement expressed in the memorandum is inoperative, inasmuch as the parties entered into the same through mutual mistake. They insist that the copyrights are void for several reasons, which will be separately considered. 1. "Because no written assignment of copyright, or of the inchoate right of the complainant thereto, as the author, was ever made to Mrs. Wheaton." 2. Because the "notice of copyright inserted in the several copies published of said editions" is defective, "in the omission to give notice in said editions of the copyright secured in the" original edition of the work. 3. Because, upon the facts alleged and proved by the complainant, the copyrights of the editions in question were not taken out by the proper person, nor in the proper district.

Copyright may be granted under the copyright act to the author of any book falling within the classes described in section 1 of the act, if the author is a citizen of the United States or permanently resident therein; and section 1 also provides that such author shall have "the sole right and liberty of printing, reprinting, publishing, and vending such book," for the term of twenty-eight years from the time of recording the title of the same as therein required. Executors, administrators, and legal assigns of the author are also included in the purview of the section; but section 4 provides that no person shall be entitled to the benefit of the act unless he shall, before publication, deposit a printed copy of the title of such book in the clerk's office of the district court of the district where the author or proprietor shall reside; and the provision is, that the clerk of such court shall record such printed copy forthwith, in a book to be kept for that purpose, and in the form therein prescribed. 4 Stat. 437. Where the author continues to be the owner, he is entitled to a copy of the title; but if he has parted with the ownership, the requirement is, that the clerk of such district shall give a copy of the title under the seal of the court to the proprietor. Id. 437. Proprietors of any such book, though not authors, are also recognized as entitled to the benefits of the act in another provision of section 4, in which they are required within three months from the publication of said book to deliver, or cause to be delivered, a copy of the same to the clerk of said district. Legal proprietors, though not authors, may also recover, of persons who print or publish any manuscript, the property of which is in them, without their consent, all damages occasioned by such injury. Stevens v. Gladding, 17 How. [58 U. S.] 447. See, also, 4 Stat. 437, 439, §§ 6, 15.

Left in moderate circumstances, Mrs. Wheaton very properly desired to obtain something from the literary publications of her late husband; and, with that view, she sought the advice of the complainant, as the intimate friend of the author and of his family. Consultations accordingly took place between them upon the subject. Suggestion was first made that his reports of the decisions of the supreme court might be re-published; but their attention was soon directed to a new edition of the Elements of International Law, as affording more promise of profit beyond mere remuneration. Editorial labors were necessary to such an undertaking, and the complainant tendered his services, and the same were gladly accepted by Mrs. Wheaton and her children.

Pursuant to that arrangement, the complainant edited in succession the two editions in question; that is, he made some

---

[5] [From 7 O. G. 81, and 2 Am. Law T. Rep. (N. S.) 402.]

additions to and emendations of the text, prepared the notes, composed the memoir, and made the indices. Alterations were made in the arrangement as first concluded; but it is unnecessary to enter into details, as the proofs are clear that the complainant acted throughout that entire period with the distinct understanding, that his services in editing those editions were to be gratuitous and without any charge. Speaking of the first annotated edition, the agreement was distinct that the contributions were to be furnished without charge, and the edition of 1863 was prepared with the same explicit understanding between the parties. Although the services were gratuitous, the contributions of the complainant became the property of the proprietor of the book, as the work was done, just as effectually as they would if the complainant had been paid daily an agreed price for his labor. He gave the contributions to the proprietor for those two editions of the work, and the title to the same vested in the proprietor, as the work was done, to the extent of the gift, and subject to the trust in favor of the donor, as necessarily implied by the terms of the arrangement. Sweet v. Benning, 16 C. B. 480; Mayhew v. Maxwell, 1 Johns. & H. 315. Delivery was made as the work was done; and the proprietor of the book needed no other muniment of title than what was acquired when the agreement was executed. Sweet v. Cater, 11 Sim. 572; Simms v. Marryat, 7 Eng. Law & Eq. 337; Woods v. Russell, 5 Barn. & Ald. 942; Atkinson v. Bell, 8 Barn. & C. 277. The title and property of the contributions being vested in Mrs. Wheaton, she would not acquire any thing by an assignment from the contributor, as he had neither the immediate title to the contributions nor any inchoate right of copyright in those editions. He could not assign any thing, because he owned nothing in praesenti, as the title to his contributions and the inchoate right of copyright for those editions, had become vested in Mrs. Wheaton as proprietor of the book. Clarke v. Spence, 4 Adol. & E. 448; Laidler v. Burlinson, 2 Mees. & W. 602. Guided by these views, the court is of the opinion that none of the authorities cited by the respondents to show that a written assignment from the complainant to Mrs. Wheaton was necessary have any proper application to the question under consideration; because the complainant never acquired any right to demand a copyright in his contributions to those two editions, but the contributions, as they were made and composed or put in form, became vested in the proprietor. Shepherd v. Conquest, 17 C. B. 427; Chit. Cont. (10th Am. Ed.) 401; Tonson v. Walker, 3 Swanst. 672. Certain remarks are found in the opinion of the court in the case of Pierpont v. Fowle [Case No. 11,152], apparently inconsistent with the

views here expressed; but the decision of the court in that case is a sufficient answer to those remarks. Contrary views, it is sometimes supposed, are also expressed in the case of Atwill v. Ferrett [Id. 640]; but the learned judge admits that an equitable title may vest in one person to the labors of another, where the relations of the parties are such that the former is entitled to an assignment of the production, which is the precise point involved in the case before the court; and many other authorities than those cited in that case, sustain the same principle. Sweet v. Shaw, 3 Jur. 217; Colburn v. Duncombe, 9 Sim. 155; Little v. Gould [Case No. 8,395]; Sweet v. Cater, 11 Sim. 572; Mawman v. Tegg, 2 Russ. 385; Nicol v. Stockdale, 3 Swanst. 687; Cary v. Longman, 3 Esp. 273.

The second defect in the copyrights, as alleged in argument by the respondent, "consists in the omission to give notice in said editions of the copyright secured in the original edition." Persons desirous of securing a copyright must comply with the conditions of the copyright act, and if they fail to do so, they are not entitled to the benefit of its provisions. Authorities to support that proposition are not necessary, as those conditions are prescribed by an act of congress. Deposit must be made before publication, if the subject-matter is a book, of a copy of such book in the clerk's office of the district court, as before explained; and the applicant must give information of copyright being secured, by causing to be inserted, in the several copies of each and every edition published during the term secured, on the title-page or the page succeeding, the following words, viz., "Entered according to act of congress in the year ——, by A. B., in the clerk's office of the district court of ——," (as the case may be). Beyond doubt, the omission to comply with those requirements renders the copyright invalid, as the act provides that no person shall be entitled to the benefit of the act unless he fulfills those conditions; but the important inquiry arises, what are those conditions? Wheaton v. Peters, 8 Pet. [33 U. S.] 591; Ewer v. Coxe [Case No. 4,584].

Full compliance with the conditions prescribed in section 4 of the act is conceded; but the theory of the respondents is, that section 5 of the act requires that the same notice in totidem verbis must be inserted in the several copies of each and every edition published during the term secured, so that the second, and every subsequent edition, shall correctly specify the date of the original entry. They cite no authorities which support the proposition, and they assign no reasons in support of it, except that the act makes no provision for a change of the date in the successive notices to be given, and that the omission to give notice of the original copyright in subsequent editions tends

to mislead the public. Acts of congress are to be construed by the rules of the common law, and the construction should be such as will carry into effect the true intent and meaning of the legislature; but the province of construction can never extend beyond the language employed as applied to the subject-matter and the surrounding circumstances. Rice v. Railroad, 1 Black [66 U. S.] 359; Binney v. Canal Co., 8 Pet. [33 U. S.] 201. Change of date in the notice required in case of successive editions of the same book, it may be conceded, is not contemplated by section 5 of the copyright act; but the meaning of the provision is, that a new notice in the same prescribed form shall be given in every improved edition published during the term. Compliance with that requirement, when the original edition is published, is a full protection for that edition throughout the term; but it is no protection to a second edition with notes, nor to any succeeding edition with improvements; because the requirement is, that the "information of copyright secured" shall be "inserted in the several copies of each and every edition." Neglect to comply with that condition in a second edition will not vitiate the copyright of the original edition if it was regularly secured, nor will a valid copyright of a second edition cure material defects in the copyright of the original edition. Copyrights of the editions of a work, other than the original edition, are granted for additions to, emendations of, or improvements in the work, and every copyright should bear date of the day when it was secured.

Authors or proprietors of a book for which a copyright is secured are required, by section 2 of the act of the 3d of March, 1865, "within one month of the date of publication," to transmit, free of postage or other expense, a printed copy of the book to the library of congress at Washington, for the use of said library, and section 4 provides, that in the construction of that act the word "book" shall be construed to mean every volume and part of a volume, together with all maps, prints, or other engravings belonging thereto, and shall include a copy of any second or subsequent edition which shall be published with any additions; but the proviso enacts that the author or proprietor shall not be required to deliver to the said library any copy of the second or any subsequent edition of any book, unless the same shall contain additions as aforesaid, nor of any book not the subject of copyright. 13 Stat. 540.

Prior to the passage of that act, the courts had decided that the "information of copyright being secured," if duly entered in the first volume of a work of several volumes, was sufficient; but all the residue of the provision is merely in affirmance of the true intent and meaning of the copyright act. Dwight v. Appleton [Case No. 4,215]. Subsequent editions without alterations or addi-

tions should have the same entry, because they find their only protection in the original copyright; but second or subsequent editions, with notes or other improvements, are new books, within the meaning of the copyright acts, and the authors or proprietors of the same are required to "deposit a printed copy of such book," and "give information of copyright being secured," as if no prior edition of the work had ever been published; and the term of the copyright as to the notes or improvements, is computed from the time of recording the title thereof, and not from the time of recording the title of the original work. Copyrights, like letters-patent, afford no protection to what was not in existence at the time when they were granted. Improvements in an invention not made when the original letters-patent were issued, are not protected by the letters-patent, nor are the improvements in a book not made or composed when the printed copy of the book was deposited and the title thereof recorded as required in section 4 of the copyright act. Protection is afforded by virtue of a copyright of a book, if duly granted, to all the matter which the book contained when the printed copy of the same was deposited in the office of the clerk of the district court, as required by section 4 of the copyright act; but new matter made or composed afterwards, requires a new copyright, and if none is taken out, the matter becomes public property, just as the original book would have become if a copyright for it had never been secured. Publishers may be in the habit of inserting more than one notice in new editions, but there is no act of congress prescribing any such condition.

Whenever a renewal is obtained under section 2 of the copyright act, the requirement is, that the title of the work so secured shall be a second time recorded, and that the applicant must comply with all the other regulations in regard to original copyrights; but there is nothing in any act of congress to show that each successive edition must specify the date of the original copyright, as contended by the respondents. Any tendency to mislead the public cannot be successfully predicated of a copyright in due form of law, where it appears that the party who secured it complied with all the conditions prescribed in the copyright act. This is all that need be remarked in reply to the suggestion of the respondents upon that subject.

Special examination of the third objection made by the respondents to the copyrights in question is unnecessary, as it is clear that if the property and title of the matter contributed by the complainant vested in Mrs. Wheaton as the work was done, she was the proper person to take out the copyright; and it is not controverted that, if she was the proper person, she took it out in the proper district.

The objections to the validity of the copy-

rights being based upon an assumed construction of section 5 of the copyright act, the court thought it right to examine the several questions presented upon their merits; but it would be a sufficient answer to the entire proposition to say that no such defence is set up in the answer. Foster v. Goddard, 1 Black [66 U. S.] 506. Other answers are made by the complainant to the proposition; but the court, having come to the conclusion that it is founded in a misconstruction of the copyright act, do not find it necessary to give the other suggestions much consideration. Stated in brief words, the conclusions of the court are, that the copyrights are valid, and that the agreement set forth in the memorandum is binding.

Not being executed, however, the agreement does not transfer nor assign the copyrights in question to the complainant. Both parties agree to that proposition; but the respondents err in supposing that the agreement does not provide for, nor contemplate any such transfer or assignment as is plainly shown by the very terms of the memorandum. A copyright of a book, when taken out in due form, secures to the author or proprietor the sole right and liberty of printing, reprinting, publishing, and vending such book, during the term for which it is granted; but it secures nothing more; and the agreement was, that Mrs. Wheaton, who held the legal title of the copyrights, should make no use of the notes in a new edition without the written consent of the complainant, and that she would give him the right to make any use of the same he might see fit, which was in all respects equivalent to a contract to transfer and assign to him the legal title to the copyrights. Equity would have compelled the execution of the formal instrument therein stipulated, if the right to demand it had not been waived by the complainant. His claim as now presented is twofold, and in the judgment of the court it may be sustained upon both grounds. Curt. Copyr. 315; Mawman v. Tegg, 2 Russ. 385; Sweet v. Shaw, 3 Jur. 217; Colburn v. Duncombe, 9 Sim. 155. The legal title to the copyrights is in Mrs. Wheaton or her legal representative; that the complainant claims in the first place that the same is held in trust for him as the equitable owner of the notes, by virtue of the original arrangement under which the same were prepared. Secondly, the complainant claims that the negative as well as the affirmative promise contained in the agreement, in regard to the use of the notes, was binding upon Mrs. Wheaton, and that both are obligatory upon her legal representative, and all others having notice of the existence of those covenants. Barfield v. Kelly, 4 Russ. 355.

Two principal objections are taken by the respondents to the claim of the complainant that he is the equitable owner of the notes under the original arrangement. 1. They deny that the proofs in the case warrant any such finding, especially as the theory is denied in the answer. 2. They contend that Mrs. Wheaton, if such was the agreement, could not legally copyright the notes, as it would show that she was but a mere licensee, and that the copyrights in that state of the case would be void on that account.

1. Conclusive proof to show what was the original understanding between the parties, is found in the correspondence upon the subject. Unaided by any one, the complainant prepared the notes, but with the express understanding that he would do so without any charge, and that the property of the same, so far as respected the new edition, should vest in the proprietor of the book, and that she should take out the copyright and remain, as she was, the sole and exclusive owner of the entire book. Liberal, however, as the agreement was towards the proprietor of the book, yet it did not include any thing except that edition; and when the second annotated edition was prepared under a similar arrangement, as conceded by both parties, the agreement was not extended beyond that publication. Confirmation of those propositions is unnecessary, as they are not controverted by the respondents. They deny that it was agreed between the parties that the notes should ever afterwards become the property of the complainant, but they do not allege nor offer any proof tending to show that his agreement with Mrs. Wheaton extended beyond the annotated editions. Tested by these indubitable facts, the rights of the parties are plain and easy to be understood. As the proprietor of the book, Mrs. Wheaton, by virtue of that arrangement, became the absolute owner of the notes as they were prepared, so far as respects the editions in question; and she also acquired therewith the right to copyright the same for the protection of the property; but she did not acquire thereby any right or title, legal or equitable, to use the notes in a third edition of the annotated work, without the consent of the complainant. Proof to support any such right or title is entirely wanting in the record, and no such right or title is set up in the answer. Sweet v. Cater, 11 Sim. 572. Such omission confirms the view that no such right or title was intended to be conveyed, and the subsequent conduct of the parties in executing the memorandum tends strongly to the same conclusion.

2. Suppose the facts to be so, then the respondents contend that the copyrights are void, because, as they insist, the applicant for the same was a mere licensee of the author of the notes; but the court is of a different opinion, for the reasons already given, as well as for others yet to be mentioned. Literary property, even when secured by copyright, differs in many respects from property in personal chattels, and the tenure of the property is governed by somewhat different rules; but the difference in

the nature and tenure of the property is much greater before copyright is taken out, and while the right to that protection for the same remains entirely inchoate. Title to the notes or improvements prepared for a new edition of a book previously copyrighted may, in certain cases, be acquired by the proprietor of a book from an employé, by virtue of the contract of employment, without any written assignment; and, when so acquired, the tenure of the property depends upon the terms of the contract, but it cannot be held to be a mere license where, as in this case, the contract was that the proprietor of the book should take the exclusive right to the contributions for two successive editions, together with the right to copyright the same for the protection of the property, as the inchoate right of copyright unquestionably passed to the proprietor of the book by the same arrangement. Agawam Co. v. Jordan, 7 Wall. [74 U. S.] 603; Fletcher v. Morey [Case No. 4,864]. Such inchoate right is incapable of any other limitation than that prescribed by the copyright act, so that the proprietor of the book necessarily took out the copyright in the usual form. Beyond controversy, she took it out by the consent of the complainant; and it is equally clear, in the judgment of the court, that she took it out for the protection of her own property in the notes, and in trust for the complainant when her property in the notes should cease. Mawman v. Tegg, 2 Russ. 385; Little v. Gould [Case No. 8,395]. Arrangements of the kind, it is believed, are frequently made between the proprietors of books and editors employed to prepare notes or other improvements to successive editions; and it is not perceived that there is any legal difficulty in upholding such a contract where, as in this case, it violates the rights of no one, and is entirely consistent with the public right. Fletcher v. Morey [supra]. Having been entered into in good faith, and with a full knowledge of all the facts, it was not void; and neither the representative of the proprietor of the book, nor any other person having notice of the same, is at liberty to repudiate it, as it appears that it was knowingly acted upon in a way that the complainant would suffer serious pecuniary injury to allow it to be disproved. Farina v. Silverlock, 39 Eng. Law & Eq. 516; Eichholz v. Bannister, 17 C. B. (N. S.) 708; Sherman v. Champlain T. Co., 31 Vt. 175; Cairncross v. Lorimer, 3 Law T. [N. S.] 130.

Covenant is the second ground of claim as set forth in the bill of complainant; and it is undoubtedly true, as contended by the respondents, that the theory of the claim as presented in allegation and in proof is, that the legal title to the copyrights vested in the proprietor of the book. The respondents in argument deny that proposition, and insist that the copyrights are void; but the objections they make to their validity have already been examined and overruled, and the reasons assigned for the conclusions need not be repeated. Expressed as the promises are, both the negative and affirmative, in plain and unambiguous language, they require neither construction nor explanation; and it is clear that they are binding upon the legal representative of the proprietor of the book, and all others having notice of the rights of the complainant. Colburn v. Duncombe, 9 Sim. 155. Mrs. Wheaton died March 5, 1866, leaving two children; but it is alleged and conceded that the respondent, Martha B. Wheaton, is the administratrix of her estate, and, so far as respects the book in question, her sole heir. Controlled by these reasons, the court is of the opinion that the complainant, in the view of a court of equity, is the equitable owner of the notes, including the arrangement of the same, and the mode in which they are therein combined and connected with the text, and of the copyrights taken out by the proprietor of the book for the protection of the property, including the equitable ownership of the complainant. Fletcher v. Morey [supra]; Parker v. Muggridge [Case No. 10,743]; Clarke v. Southwick [Id. 2,863]; Rerick v. Kern, 14 Serg. & R. 271; Simms v. Marryat, 7 Eng. Law & Eq. 337; Curt. Copyr. 315; Mayhew v. Maxwell, 1 Johns. & H. 315.

Brief examination will next be made of the special defence set up by the respondents who published the edition of the work which is the subject of complaint, and also by the respondent who edited the same, that they cannot be adjudged liable to any decree because they had no notice of the alleged trust or agreement. Plenary proof is exhibited in the record that the senior partner of the publishing firm had full knowledge of all the circumstances attending the preparation of the notes and the publication of the two annotated editions, and also full knowledge of the memorandum at the time it was executed, and of all the subsequent negotiations in respect to the formal agreement. Reference need only be made to the correspondence in the record, and to his own answer and deposition in the case in support of that proposition; and the circumstances as disclosed in the correspondence show, to the entire satisfaction of the court, that the other members of the firm knew, or might have known, what the claim of the complainant was to the notes, long before the contract for publishing the edition in question was executed, and all the facts and circumstances connected with the claim, as fully as they were known to their senior partner. Proof beyond what already appears is certainly unnecessary to show that the proprietor of the book, and the respondent, Martha B. Wheaton, were repeatedly appriseu of the claim of the complainant in terms which could not be misunderstood. Their friend and legal adviser knew all that had transpired, and, in view of the circum-

stances, and the acknowledged intimacy of the respondent who edited the edition, the conclusion of the court is, without hesitation, that he knew enough of the claim of the complainant to put him upon inquiry. His answer tends strongly to support that proposition, and the same inference is fully justified by his deposition. He admits that the proprietor of the book, when the agreement that he should edit the edition in question was made between them, expressed the wish that he should not make any use of the notes prepared by the complainant; and in his cross-examination he states to the effect that the respondent, Martha B. Wheaton, proposed to read to him all that had passed between her mother and herself, Mr. Parsons and Mr. Lawrence, but that he declined to hear it, wishing to confine himself as much as possible to the position of an editor. Some of the remarks made by the same respondent, in the interview which took place between him and the complainant, and his conduct in refusing to read the letter of the complainant when it was handed to him for that purpose, tend strongly in the same direction. Nothing is better settled than the rule, that whatever puts a party upon inquiry is sufficient notice in equity.

Ordinary prudence is required of every person dealing with trust property; and if he fails to investigate when put upon inquiry, he is chargeable with all the knowledge it is reasonable to suppose he would have acquired if he had performed his duty. Hill v. Simpson, 7 Ves. 152; Kennedy v. Green, 3 Mylne & K. 722; 2 Com. Dig. tit. "Chancery," 4, C, 2; Smith v. Low, 1 Atk. 490; 3 Sugd. Vend. (10th Ed.) 471; Jones v. Smith, 1 Hare, 43; Booth v. Barnum, 9 Conn. 286; Pitney v. Leonard, 1 Paige, 461; Carr v. Hilton [Case No. 2,436].

Constructive notice is held sufficient, upon the ground that when a party is about to perform an act by which he has reason to believe that the rights of a third person may be affected, an inquiry as to the facts is a moral duty, and diligence an act of justice. Hence, says Judge Duer, in the case of Pringle v. Phillips, 5 Sandf. 157, he proceeds at his peril when he omits to inquire, and is then chargeable with all the knowledge of the facts that by a proper inquiry he might have ascertained. Hawley v. Cramer, 4 Cow. 717; Williamson v. Brown, 20 Law Rep. 397; Fulton Bank v. New York & S. Canal Co., 4 Paige, 127; Bank of Alexandria v. Seton, 1 Pet. [26 U. S.] 309. Inquiry is a moral duty whenever the circumstances are such that a person of ordinary prudence would refuse to act; but if a party under those circumstances shuts his eyes to the means of knowledge which he knows is at hand, he then forfeits every pretence of defence, as such conduct is equivalent to actual notice of all the facts he might have ascertained by a performance of his duty. May v. Chapman, 16 Mees. & W. 355.

Grant that the several conclusions announced by the court are correct, still the respondents insist that the complainant is not entitled to a decree; because they contend that they have not infringed the equitable right of the complainant to the exclusive use of the notes in question, nor violated the terms of the agreement as expressed in the memorandum.

Before proceeding to examine the question of infringement, it will be necessary to reproduce, as concisely as possible, some of the principal issues upon the subject as presented in the pleadings.

The statement of the complainant is that, prior to the last edition annotated by him, there was no book of international law in which all the authorities bearing upon the different questions discussed or referred to in the original work of the author, or in his antecedent annotations, were collected and presented in a convenient form for reference. Such authorities, as he represents, consisted of judicial decisions, diplomatic discussions by distinguished diplomatists, and dissertations, treatises, and lectures of learned publicists and writers upon the law of nations; that he undertook to collect and present, and by a considerable amount of labor and intellectual exertion, did collect and present, in his notes and in a convenient form, with reference to each question so discussed, the discussions and opinions as aforesaid, translating such as were in any foreign language, and giving them in full where they seemed sufficiently important to be so presented, and in other cases referring to them, giving the name of the book and the page where the passage could be found; that many of the authorities so collected, and particularly those relating to diplomatic discussions and negotiations, and those showing the way in which cases involving principles of international law have arisen between different nations and been determined, are to be found in newspapers, gazettes, legislative debates, the series of books such as the Annual Register, and others named or referred to in the bill of complaint, not treatises on international law; that there is no book which can serve as an index or digest to assist an author in any material respect, in collecting such authorities; that the number of books and papers of that nature examined by him in searching for the authorities and matters cited by him is so great, that it is only possible to make such collection by devoting much attention to the subject for many years, and by making and preserving memoranda of such matters bearing upon the subject, as from time to time they come to the knowledge of a person giving a large share of his attention to such matters, and reading all such books as relate to the subject, and availing himself of much intercourse with persons conversant with such matters. The corresponding statement of the respondent is, that the plan of work he adopted was to take the text of the author of the book with his notes, and annotate the

same with original notes of his own, in the same manner as if they had never before been annotated; that it was no part of his plan to revise, reduce, or alter the complainant's notes, even in such manner as the law of copyright would have permitted if the complainant had had a copyright therein; but that his course was, after reading a topic in the text, if he thought it required annotation, to examine all the works to which he had access bearing upon the topic, and, among others, but not more or differently than others, the contributions of the complainant. When he had made all the examination he thought necessary, the allegation is, that he then gave the subject the best reflection he could, and subsequently wrote out a new and original note in every instance, in manuscript throughout, in his own hand or that of an amanuensis, and without other reference to, or assistance from, any notes of the complainant than as above stated.

The complainant also alleges, that in preparing the text of his edition he exercised a considerable amount of skill and judgment in the arrangement of his annotations, and in combining and connecting them with the text, and that he prepared a complete index to the same; and he charges that the respondents, in their book, have copied, conformed to, and pirated the said annotated book and the annotations of the same which he prepared; and that they have used and availed themselves of the said book and annotations and the said labors of the complainant. Responsive to the charge that his notes are in a great part taken and copied from those of the complainant, and that he has pirated and unduly used the contributions of the complainant, the respondent totally denies the same and every part thereof. Evidence to show that the notes in the two annotated editions of Wheaton's Elements of International Law, as prepared by the complainant, involved great research and labor, beyond what appears in those two works, is unnecessary, especially as the allegations in the bill of complaint to that effect are not directly denied in the answer; and it is equally obvious and clear that the results of the research and labor there exhibited could not well have been accomplished by any person other than one of great learning, reading, and experience in such studies and investigations. Such a comprehensive collection of authorities, explanations, and well-considered suggestions, is nowhere, in the judgment of the court, to be found in our language, unless it be in the text and notes of the author of the original work. Uncontradicted as these propositions are, it is unnecessary to add any thing further in their support. Much, also, has been accomplished by the last editor of the work in the same direction, and in the collection and presentation of similar matters wholly distinct and separate from what was antecedently collected and presented by the complainant. But the review and comparison of the merits of the respective books are not matters within the province of the court, except so far as the same become necessary in order to decide the issues involved in the pleadings. Stripped of all mere form, the charge against the respondent is, that he has infringed the rights of the complainant; and that question is the only one of much importance which remains to be considered.

Apart from the testimony of the parties themselves, and the comparison of the books, the evidence in the case consists mainly of the testimony of the two experts, and the result of the respective comparisons made by them, of the notes and citations of authorities contained in one of the books, with those of a corresponding character contained in the other, together with the opinion of each expert witness, whether the several notes and citations so examined and compared are or are not of the same character. Though admissible in all such cases, the opinion of experts are nevertheless in their nature secondary evidence; but the comparisons made by them in this case have very much facilitated the investigations made by the court. Considerable aid has been derived from that source, and from the testimony of the parties; but the court has found it necessary to reexamine the comparisons made by the witnesses, and to make others for themselves, in order to come to a satisfactory conclusion. Regarded as a basis to enable the court to compare one book with the other, the results given by the experts, as exhibited in their depositions, have proved to be of great service to the court in estimating the weight to be given to their respective opinions. Complicated as the facts are, the examination of the case has imposed much labor upon the judges; but the investigation has been made with care, and continued from time to time until both are satisfied that the court is prepared to render a just decision.

Like other controversies of a similar character, the issue upon the merits presents two questions, one of fact and the other of law. Stated in brief terms, the question of fact is, what use did the respondent who edited the edition in question make of the complainant's notes? And the question of law presented, inasmuch as it is conceded that he used the same to some extent, is, was that use allowable, or was it of a character and to such an extent that it infringed the complainant's rights. Direct evidence upon the subject is unattainable, because the respondent states that he cannot remember nor undertake to give the authors from whom he derived any particular class of citations. Difficult though it be to make proof, still the complainant is not entitled to any decree, unless he proves infringement, as alleged, to the satisfaction of the court, as the burden in that issue is always upon the party making the charge. Except that the burden is upon the complainant, the same difficulty is experienced by the re-

spondents in their efforts to prove the affirmative allegations of the answer, and consequently both parties are obliged to rely chiefly upon a comparison of the contents of the respective books, as the best evidence which either party is able to produce. Examination of the notes contained in the respective books will show that the description given of them by one of the respondents' witnesses is quite accurate. He states to the effect, that they are either statements of historical events, accounts of legislative debates, narratives of diplomatic discussions, negotiations or correspondence, abstracts of cases in the courts or judicial tribunals of different countries, or summaries of other text-writers or essayists on international law, and other kindred topics, accompanied with references to the books and documents where the matters are to be found. Such authorities and references of the kind mentioned are very numerous in the edition containing the notes of the complainant, and he contends that the respondent has made a much larger use of such notes, references and authorities, including those collected and presented by him to illustrate particular topics of international law, than the law of copyright or the agreement between him and Mrs. Wheaton, as expressed in the memorandum, will permit. Numerous instances are given where the same topics are illustrated in the two works by reference to the same historical facts or diplomatic negotiations, and where the views expressed are supported by the citation of the same books, pamphlets, debates and newspapers; and the complainant contends that these coincidences occur in instances so numerous that it is past belief that they could be accidental; and he insists that the just inferences to be drawn from these coincidences, when taken in connection with the admission of the respondent that he did make some use of the complainant's book, for the purposes of reference, fully sustain the burden of proof on his part, and justify the conclusion that, in each particular instance in which the citations and authorities are the same, they were in fact taken from his book, unless the respondent can explain these coincidences, or show that the citations and authorities were derived from some other quarter. Weighed as required by the rules of circumstantial evidence, the complainant contends that these coincidences of fact, as exhibited in the two books, are not only consistent with the charge of infringement, but that they, taken as a whole, are absolutely inconsistent with any other theory, which is the test usually applied in cases where proof is required beyond any reasonable doubt. Great latitude is justly allowed by the law to the reception of indirect or circumstantial evidence, the aid of which is constantly required in the administration of justice; and whenever the necessity for a resort to such

evidence arises, either from the nature of the inquiry or the failure of direct proof, objections to testimony on the ground of irrelevancy, even in common-law suits, are not favored, for the reason that the force and effect of circumstantial facts usually and almost necessarily depend upon their connection with each other. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially if corroborated by moral coincidences, be sufficient to constitute full and conclusive proof. Castle v. Bullard, 23 How. [64 U. S.] 187; 1 Starkie, Ev. 58, 862.

Instances quite numerous are also given where clerical and typographical errors and peculiarities, including special translations, are reproduced in the edition prepared by the respondent; and the court is reminded in argument that cases have arisen where the strongest proof of copying consisted "in the coincidence of errors." Jeremy, Eq. Jur. 322. Where the question is whether the defendant, in preparing his book, had before him and copied or imitated the book of the plaintiff, it is manifest, says Mr. Curtis, that this kind of evidence is the strongest proof, short of direct evidence, of which the fact is capable. Curt. Copyr. 255; Murray v. Bogue, 1 Drew. 367; Spiers v. Brown, 6 Wkly. Rep. 353. Other authorities may be cited where the presumption arising from the identity of inaccuracies is carried much further, and where it is held that when a considerable number of passages are proved to have been copied by the copying of the blunders in them, other passages which are the same with passages in the original book must be presumed, prima facie, to be likewise copied, though no blunders occur in them. Mawman v. Tegg, 2 Russ. 394; Longman v. Winchester, 16 Ves. 269.

Coincidence of citation is also invoked by the complainant as evidence of copying; and the instances given as examples are many where the authorities are cited in the same way; that is, by volume and page, or by chapter and section, as the case may be, and from the same edition of the work, and from the same place.

Identity in the plan and arrangement of the notes, and in the mode of combining and connecting the same with the text, is also invoked by the complainant, as strongly supporting the charge of infringement; and it is quite apparent, on a comparison of the two books, that the instances of identity in that respect are numerous and pervading. Copyright may justly be claimed by an author of a book who has taken existing materials from sources common to all writers, and arranged and combined them in a new form, and given them an application unknown before, for the reason that, in so doing, he has exercised skill and discretion in making the selections, arrangement, and combination, and, having presented something that is new and useful, he is entitled

to the exclusive enjoyment of his improvement, as provided in the copyright act. Gray v. Russell [Case No. 5,728]; Lewis v. Fullarton, 2 Beav. 6; Greene v. Bishop [Case No. 5,763]; Emerson v. Davies [Id. 4,436]; Story v. Holcombe [Id. 13,497]. Books "made and composed" in that manner are the proper subjects of copyright; and the author of such a book has as much right in his plan, arrangement, and combination of the materials collected and presented, as he has in his thoughts, sentiments, reflections, and opinions, or in the modes in which they are therein expressed and illustrated; but he cannot prevent others from using the old material for a different purpose. All he acquires by virtue of the copyright is "the sole right and liberty of printing, reprinting, publishing, and vending such book" for the period prescribed by law. Others may use the old materials for a different purpose, but they cannot copy and use his improvement, which includes his plan, arrangement, and combination of the materials, as well as the materials themselves, of which the book is made and composed. Emerson v. Davies [supra]; Curt. Copyr. 180; Gray v. Russell [supra].

Many other facts and circumstances are adduced by the complainant in support of the charge of infringement; but the classes mentioned will be sufficient for the present investigation, as it is not the purpose of the court to enter into the details of the evidence. Infringement in any and every form, as alleged in the bill of complaint, is denied in the answer; and the respondent, in addition to such denials, has presented in proof and in argument very elaborate and minute explanations of all the principal facts and instances adduced by the complainant in support of the charge of infringement. Separate examination at this time of each one of the explanations so given would be impracticable, and any partial review of them in the opinion would necessarily be unsatisfactory, as it would afford ground for inference that the residue had been overlooked, or that they had not been duly considered. Suffice it to say, that they have all been read, studied, and made the subject of careful comparison with the facts and circumstances adduced by the complainant; but the conclusion of the court is, that they are not of a character, speaking generally, to rebut the particular proofs of the complainant, to which it was intended they should be applied. But the respondent contends that, even if it be true that matters of fact, citations, and authorities have been borrowed to a considerable extent, he had a right to take them, as the use he made of them was substantially new, and different from that made by the complainant in the two prior annotated editions of the work, because they were used by him in illustration of new and original propositions. Secondly, he contends that the complainant is not entitled

to any decree on account of any use he has made of the matters of fact, citations, and authorities exhibited in those editions, because, as he insists, the use he so made amounts to no more than a fair and original abridgment of the former editions. The doctrine of new and different use in the law of copyright applies more particularly to the old materials, and not the materials of a work like that of the last annotated edition of the complainant, where the materials collected are much abridged, and sometimes paraphrased and newly arranged, and combined with the text of the original work.

Beyond all doubt, he might take the old materials, as found in the sources from which the matters of fact, citations, and authorities of the complainant were drawn, and use them as he pleased, in illustration of new and original propositions, or for any other purpose not substantially the same as that to which they are applied in the annotated editions edited by the complainant; but he could not borrow the materials as therein collected and furnished, nor could he rightfully use the plan and arrangement, or the mode by which they are combined with the text, beyond the extent falling within the definition of fair use, which rule is only applicable to the materials, and not to the plan, arrangement, and mode of operation. Proper attention to the nature of the charge in the bill of complaint, will show that the doctrine of new and different use is wholly inapplicable to the matter in issue between the parties, because the charge is, that the respondent has borrowed the matters of fact, citations, and authorities collected and presented in the notes of the complainant, and not that he has made the same use of the old materials. On the contrary, the charge is, that he has not consulted the old materials at all, but that he has borrowed the matters of fact, citations, and authorities exhibited in his book, from the matters of fact, citations, and authorities as collected, arranged, and combined with the text in thost two annotated editions. Even supposing the rule to be otherwise, and that a second writer may take bodily the matters of fact, citations, and authorities collected, arranged, and combined, as in the two annotated editions before the court, if the use he makes of the materials is substantially new and different, still the concession will not benefit the respondent, as his edition of the work, except the new materials collected and presented, occupies the same field and was designed for the same class of readers, and was "made and composed" for the same general purpose. Unsupported by the evidence, as the theory of fact involved in the proposition is, it is quite clear that it cannot furnish any defence for the respondent, even if the principle is correct. Argument to show that an author may have a copyright in his notes to an older work, though the materials collected are not

new, is unnecessary, as the proposition is elementary, if it appear that they have never before been collected and embodied. Gray v. Russell [Case No. 5,728].

The respondent's second proposition deserves more consideration, as it presents a defence applicable to the main issue involved in the pleadings. Concisely stated, the proposition is, that, even conceding that he borrowed materials from the prior annotated editions to a considerable extent, still the quantity so taken and used did not amount to more than a fair and original abridgment of the former annotated editions. Third persons cannot make any use of a patented invention, without the consent or license of the patentee, because he acquires, by virtue of his letters-patent issued under the patent act, the full and exclusive right and liberty of making and using his invention, as well as of vending it to others to be used, for the term allowed by law; but the right secured to the author or proprietor of a book is only "the sole right and liberty of printing, reprinting, publishing, and vending such book," which, as construed by the courts, means the exclusive right to multiply copies for the benefit of the author or his assigns. Stephens v. Cady, 14 How. [55 U. S.] 529; Reade v. Lacy, 1 Johns. & H. 526; Millar v. Taylor, 4 Burrows, 2311; [Stowe v. Thomas, Case No. 13,514.] [6] Courts have sometimes supposed that the same rule of decision should be applied to a copyright as to a patent for a machine, and consequently that an abridgment of an original work, made and condensed by another person without the consent of the author of the original work, ought to be regarded as an infringement; but the language of the respective acts of congress making provision for the protection of such rights is different; and the opposite doctrine has been too long established to be considered at the present time as open to controversy. Story v. Holcombe [Id. 13,497]. Whatever might be thought if the question was an open one, it is too late to agitate it at the present time, as the rule is settled that the publication of an unauthorized but bona fide abridgment or digest of a published literary copyright, in a certain class of cases at least, is no infringement of the original. Phil. Copyr. 171; Newbery's Case, Lofft, 775; Dodsley v. Kinnersley, 1 Amb. 403; Whittingham v. Wooler, 2 Swanst. 428; Gyles v. Wilcox, 2 Atk. 142.

Strong doubts are expressed by Mr. Curtis, whether the definition of an allowable abridgment, as given in the earlier cases, can be sustained, except as applied to such works as histories, or works composed of translations, and others of like kind; but it was decided in this court in the case of Folsom v. Marsh [Case No. 4.901], that an

---

[6] [From 7 O. G. 81, and 2 Am. Law T. Rep. (N. S.) 402.]

abridgment in which there is a substantial condensation of the materials of the original work, and which required intellectual labor and judgment to make the same, does not constitute an infringement of the copyright of the original author; and the court, as now constituted, is inclined to adopt that rule in cases where it also appears that the abridgment was made bona fide as such, and that it is not of a character to supersede the copyrighted publication. Unless it be denied that a legal copyright secures to the author "the sole right and liberty of printing, reprinting, publishing, and vending the book" copyrighted, it cannot be held that an abridgment, or digest of any kind, of the contents of the copyrighted publication, which is of a character to supersede the original work, is not an infringement of the franchise secured by the copyright. What constitutes a fair and bona fide abridgment in the sense of the law is, or may be, under particular circumstances, one of the most difficult questions which can well arise for judicial consideration; but it is well settled that a mere selection or different arrangement of parts of the original work into a smaller compass will not be held to be such an abridgment. Campbell v. Scott, 11 Sim. 38, and note; Gyles v. Wilcox, 2 Atk. 142; Folsom v. Marsh [supra]. Substantially the same views are expressed in the case of Tinsley v. Lacy, 1 Hem. & M. 753; and the vice-chancellor in that case, in speaking of the authorities by which fair abridgments have been sustained, goes on to say, that the courts have gone far enough in that direction, and adds that it is difficult to acquiesce in the reason sometimes given, that the compiler of an abridgment is a benefactor to mankind, by assisting in the diffusion of knowledge.

Viewed in the light of these principles, it is quite clear that the book of the respondent, even if it could be regarded as an abridgment of the prior editions, must still be held to be an infringement of the same; but the court is of the opinion that it is not an abridgment of those editions, in any sense known to the law of copyright. Instead of being an abridgment of the prior editions, it is precisely what it purports to be, a reprint of the text of the author, with notes by a new editor; and the proofs are full to the point that he was employed to edit a new edition of the work, to supersede the antecedent editions annotated by the complainant. Instructed as he was to make no use of the complainant's notes, his principal defence still is, that he complied with those instructions, and that he did not make any use of the notes in his edition, beyond what is allowable as fair quotations from the published work of a prior author, treating upon the same subject. Copying is not confined to literal repetition, but includes also the various modes in which the matter of any publication may be adopted, imitated, or

transferred, with more or less colorable alterations to disguise the source from which the material was derived; nor is it necessary that the whole or even the larger portion of the work should be taken, in order to constitute an invasion of a copyright. Some use may be made by a subsequent writer of the contents of a book or treatise antecedently made, composed and copyrighted by another person, in making and composing a new book upon the same subject, whether the contents of the antecedent book or treatise were wholly original, or were partly original and partly made up of selections from other authors. Copyright differs in this respect from patent right, which admits of no use of the patented thing without the consent or license of the patentee. Persons making, using, or vending to others to be used, the patented article are guilty of infringing the letters-patent, even though they may have subsequently invented the same thing without any knowledge of the existence of the letters-patent; but the recomposition of the same book without copying, though not likely to occur, would not be an infringement. Coincidence, if perfect, is sufficient to prove the infringement of a patent, as the charge is that the defendant, if it be a machine, has made machines in the similitude of the patented machine, and with the same mode of operation. Copying is essential to constitute an infringement of copyright, but identity of contents, arrangement, and combination, is strong evidence that the second book was borrowed from the first, because it is highly improbable that two authors would express their thoughts and sentiments in the same language, throughout a book or treatise of any considerable size, or adopt the same arrangement or combination in their publication. Reade v. Lacy, 1 Johns. & H. 526.

Great difficulty attends every attempt to define in precise terms the privilege allowed by law to a subsequent writer to use without consent or license the contents of a book or treatise antecedently made, composed, and copyrighted by another author; or to mark the boundaries of the privilege of such subsequent writer to borrow the materials in a book like the annotated editions of the complainant, where the materials have been selected from such a variety of sources, and where the materials so selected are arranged and combined with certain chosen passages of the text of the original work, and in a manner showing the exercise of discretion, skill, learning, experience, and judgment. Decided cases are referred to where the principal criterion of determination is held to be the intent with which the person acted who is charged with infringement. Remarks to that effect are to be found in the opinion of the court in the case of Cary v. Kearsley, 4 Esp. 170, and the decision in the case of Spiers v. Brown, 6 Wkly. Rep. 353, refusing the application for an injunction, turned to

some extent upon the same consideration; but the vice-chancellor (now chancellor) refused to apply that doctrine in the subsequent case of Scott v. Stanford, L. R. 3 Eq. 722, and explained the grounds of his ruling in the former case, which show that he would not sanction that rule in any case unless it appeared that the defendant had bestowed such mental labor upon what he had taken as to produce an original result.

Evidence of innocent intention may have a bearing upon the question of "fair use;" and where it appeared that the amount taken was small, it would doubtless have some probative force in a court of equity in determining whether an application for an injunction should be granted or refused: but it cannot be admitted that it is a legal defence where it appears that the party setting it up has invaded a copyright. Cary v. Faden, 5 Ves. 23; Reade v. Lacy, 1 Johns. & H. 526; Bramwell v. Halcomb, 3 Mylne & C. 738. Few judges have devised safer rules upon the subject than Judge Story. He held that, to constitute an invasion of copyright, it was not necessary that the whole of a work should be copied, nor even a large portion of it, in form or substance; that if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient in point of law to constitute an infringement; that, in deciding questions of this sort, courts must "look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale or diminish the profits, or supersede the objects of the original work." Folsom v. Marsh [Case No. 4,901]. Mere honest intention on the part of the appropriator will not suffice, said Vice-Chancellor Wood, as the court can only look at the result, and not at the intention in the man's mind at the time of doing the act complained of, and he must be presumed to intend all that the publication of his work effects. Scott v. Stanford, L. R. 3 Eq. 723; Hodges v. Welsh, 2 Ir. Eq. 266. Twenty years before that decision was made, Mr. Curtis, in his valuable work on the law of copyright, expressed the same views, and this court entertains no doubt they are correct. Curtis on Copyright, 240. Recent decisions afford more ample protection to copyright than those of an earlier date, and they also restrict the privilege of the subsequent writer or compiler in respect to the use of the matter protected by the copyright, within narrower limits. The decision in Kelly v. Morris, L. R. 1 Eq. 697, is, that in the case of a map guide-book, or directory, or the like, where there are certain common objects of information which must, if described correctly, be described in the same words, a subsequent compiler is bound to do for himself that which was done by the first compiler; that he is not

entitled to take one word of the information published without independently working out the matter for himself, so as to arrive at the same result from the same common sources of information, and that the only use he can make of a previous publication of that kind is to verify his own calculations and results when obtained. Rights secured by copyright are property within the meaning of the law of copyright, and whoever invades that property beyond the privilege conceded to subsequent authors commits a tort, and is liable to an action. None of these rules of decision are inconsistent with the privilege of a subsequent writer to make what is called a fair use of a prior publication; but their effect undoubtedly is, to limit that privilege so that it shall not be exercised to an extent to work substantial injury to the property which is under the legal protection of copyright. Reviewers may make extracts sufficient to show the merits or demerits of the work, but they cannot so exercise the privilege as to supersede the original book. Sufficient may be taken to give a correct view of the whole; but the privilege of making extracts is limited to those objects, and cannot be exercised to such an extent that the review shall become a substitute for the book reviewed. Story v. Holcombe [Case No. 13,497].

Examined as a question of strict law, apart from exceptional cases, the privilege of fair use accorded to a subsequent writer must be such, and such only, as will not cause substantial injury to the proprietor of the first publication; but cases frequently arise in which, though there is some injury, yet equity will not interpose by injunction to prevent the further use, as where the amount copied is small and of little value, if there is no proof of bad motive, or where there is a well-founded doubt as to the legal title, or where there has been long acquiescence in the infringement, or culpable laches and negligence in seeking redress, especially if it appear that the delay has misled the respondent. Sweet v. Cater, 11 Sim. 580; Tinsley v. Lacy, 1 Hem. & M. 752; Spiers v. Brown, 6 Wkly. Rep. 353; Strahan v. Graham, 15 Wkly. Rep. 487; Bramwell v. Halcomb, 3 Mylne & C. 738; Reade v. Lacy, 1 Johns. & H. 527; Jarrold v. Houlston, 3 Kay & J. 717; Lewis v. Fullarton, 2 Beav. 6; Bell v. Whitehead, 8 Law J. Ch. 141; Curt. Copyr. 326; Saunders v. Smith, 3 Mylne & C. 711.

Guided by the rules of law, as already explained, the court, after having examined the whole case with care, is of the opinion that many of the notes presented in the edition edited by the respondent whose case is under consideration do infringe the corresponding notes in the two editions edited and annotated by the complainant, and that the respondent borrowed very largely the arrangement of the antecedent edition, as well as the mode in which the notes in that edi-

tion are combined and connected with the text. Judge Story held, in the case of Emerson v. Davies [Case No. 4,436], that every author had a copyright in the plan, arrangement, and combination of his materials, and in his mode of illustrating his subject, if it be new and original; and it was also held, in Greene v. Bishop [Id. 5,763], that there may be a valid copyright in the plan of a book, as connected with the arrangement and combination of the materials; and no doubt is entertained that both those decisions were correct; but it is a mistake to suppose that a subsequent writer can be held to have infringed a book where he has not borrowed any of the materials of which the book is composed. New materials are certainly the proper objects of copyright; and old materials, when subsequently collected, arranged, and combined in a new and original form, are equally so: and in either case, the plan, arrangement, and combination of the materials are as fully protected by the copyright as the materials embodied in the plan, arrangement, and combination. Damages may be recovered in either of the supposed cases for the infringement of the property protected by the copyright; but the property in the latter case consists chiefly, if not entirely, in the plan, arrangement, and combination of the materials collected and presented in the book, as any other person may collect from the original sources the same materials, and arrange and combine them in any other manner not substantially the same as that of the antecedent author. Barfield v. Nicholson, 2 Sim. & S. 6.

A detailed specification of the instances of infringement, as shown by a comparison of the two books, would be impracticable, and will not be attempted; as the settled practice in equity is, where the works are voluminous and of a complex character, containing, as in this case, much original matter mixed with common property, the cause will, at some stage of the case, be referred to a master, to state the facts, together with his opinion, for the consideration of the court. It is a better course to make the reference before the final hearing; but the parties in this case waived any reference at that stage of the cause, and elected to proceed to final hearing without any such report. Cases arise where the court, under such circumstances, would not order a reference, but would proceed to compare the books and ascertain the details of the infringement; but the case before the court is far too complex to admit of that course of action. Curtis, Copyr. 325; Mawman v. Tegg, 2 Russ. 400; 2 Story, Eq. Jur. § 941. Details have been examined as far as practicable, consistent with the claims of other official duties, but the judges are of the opinion that they should be further examined, and the results classified, before the court proceeds to determine the extent of the infringement, as the danger of injustice cannot well be avoided in any other way. New

matter of value has been collected and presented by the respondent, and he has added much that is valuable in his references to events which have occurred since the publication of the last preceding annotated edition. Whatever may have been the rule in the earlier history of equity jurisprudence, it is now settled law in this court, that a book may in one part of it infringe the copyright of another, while in other parts it may be entirely original and the proper object of a copyright; and in such a case, it was held, in Greene v. Bishop [Case No. 5,763], that the remedy will not be extended beyond the injury. Preceding that decision, the same rule had been adopted in Story v. Halcombe [Id. 13,497], in which the opinion was given by the late Mr. Justice McLean. The modern practice in the chancery courts of England is the same as appears in the case of Jarrold v. Houlston, 3 Kay & J. 721, in which the opinion was given by Vice-Chancellor Wood, since promoted to the office of chancellor. Kelly v. Morris, L. R. 1 Eq. 701; Carnan v. Bowles, 2 Brown, Ch. 80; Curt. Copyr. 325. It is suggested that it will be impossible to separate that which is original from that which was borrowed, and to some extent the suggestion may be of weight; but the court is of the opinion that the difficulties in that behalf, when the matters pass under the searching examination of a master, will be much less than is apprehended by the parties. Should the difficulty in any instance or class prove to be insurmountable, then the rule in equity is, that if the parts which have been copied cannot be separated from those which are original without destroying the use of the original matter, he who made the improper use of that which did not belong to him must suffer the consequences of so doing. If a second writer mixes the literary matter of another, which is under the protection of a copyright, with his own, without the license or consent of the proprietor, he must nevertheless be restrained from publishing what does not belong to him; and if the parts of the work cannot be separated, so that the injunction prevents also the publication of his own literary production, so mixed with that of another, he has only himself to blame. Mawman v. Tegg, 2 Russ. 390; Lewis v. Fullarton, 2 Beav. 11. It is believed that an extended application of that rule will not be required, in view of the proofs exhibited in the record, and of the facilities afforded by the comparison of the notes in the respective editions, to separate what is original from that which has been copied.

Attention is called by the respondent to the fact that some of the notes in the edition edited by him are entirely original, that in others the material copied is much condensed, or the notes reduced to a mere reproduction of the authorities cited in the prior edition, and that other notes have been enlarged and improved by the addition of new matter, and in view of those circumstances, he contends that the edition edited by him should be regarded as a new and original work; but the decisive answer to the first and last suggestion is, that no man is entitled to avail himself of the previous labors of another for the purpose of conveying to the public the same information, even though he may append additional information to that already published. Scott v. Stanford, L. R. 3 Eq. 724; 2 Story, Eq. Jur. § 940; 2 Kent, Comm. 382, 383; Cary v. Faden, 5 Ves. 25. and note; Wheaton v. Peters, 8 Pet. [33 U. S.] 591. Bramwell v. Halcomb, 3 Mylne & C. 737.

Additional remarks in respect to the alleged fact that the contents of the notes copied were condensed are unnecessary, as it is quite clear, as before explained, that the change made in that behalf is not of a character to afford the respondent any defence.

Supported by these reasons, the conclusions of the court are as follows:—1. That the complainant in a court of equity is the equitable owner of the notes in the two annotated editions described in the pleadings as arranged, and the mode in which they are combined and connected with the text. 2. That the title to the entire text, together with the title to the memoir and indices, is in the proprietor of the book, and not in the complainant as alleged in the bill of complaint. 3. That there are notes in the edition edited by the respondent, of substantial importance in point of number, and the value of the materials, which do infringe the equitable rights of the complainant, as explained and defined by the court. 4. That all the respondents had notice of the claim of the complainant, as explained and defined by the court. 5. That there are notes in that edition of substantial importance in point of number and the value of the materials which do not infringe any rights of the complainant. 6. That the notes in that edition consisting wholly of citations found in the corresponding notes of the complainant do infringe his rights, as explained and defined by the court, though many of them are unaccompanied by the extracts collected and presented in the next preceding edition. 7. That notes consisting of authorities or collections of authorities copied in like manner as described in the preceding proposition, and without remarks or comments, do also infringe the complainant's rights, though they are found inserted in, or prefixed or appended to, notes otherwise not objectionable. 8. That notes of which the whole or some substantial and material part is condensed from the corresponding notes in the preceding edition, or from the extracts therein printed and published without any marks of original labor, or of any such labor except the study of the note copied and adopted, do also infringe the complainant's rights, as explained and defined. 9. That notes wholly original do not infringe. 10. That notes partly original and partly copied from the preceding edition do not infringe,

except for the matter copied, if it be practicable to ascertain and define the separate proportions and make the separation of the same; but if not, still the respondent at the proper stage of the case, must be restrained from using the part copied. 11. That the cause must be referred to a master to examine the pleadings and proofs, and report the extent of the infringement as adjudged by the court in this investigation, and also to examine and ascertain what, if any, other instances of the alleged infringements within the principles here explained are proved; and if any to classify the same, and report the details, together with the reasons for his conclusions, for the consideration of the court. 12. That all other matters in the cause will be reserved until the coming in of the master's report. 13. That the cause is referred to Henry W. Paine as master, for his examination and report in the premises, in conformity to the opinion and directions of the court.

Equity suits for the infringement of a copyright are usually referred to a master before the final hearing, to ascertain whether the charge is proved, and, if so, for a report as to the nature and extent of the infringement; and in such cases the general rule is, that the complainant, if he prevails in the suit, is entitled, if at all, to an injunction at the time the decretal order is entered, to restrain the respondent from any further violation of his rights, as the whole case is then before the court. Even when the case is heard before any such reference and report, if the charges of infringement are few and of a character that the extent of the infringement can be conveniently determined by the court without sending the case to a master, the court, if the case be one where an injunction is the proper remedy, will order it at the same time that the decision is announced upon the merits. But where the cause comes to a final hearing without any such report, the court, if the charges of infringement are numerous and of a character to require extended examination before the extent of the infringement can be ascertained, will ordinarily send the case to a master for further examination and report in respect to all matters not previously adjudged by the court; and the general rule in such cases is, that the injunction will not be granted until the nature and extent of the infringement are fully ascertained and determined, as its effect and operation might work great injustice. Obviously the present case falls within the latter rule, and therefore an injunction will not be ordered until the court shall have acted finally upon the report of the master.

[See, for a very interesting account of the history of this case and its attendant circumstances, the Life of Richard Henry Dana by Charles Francis Adams (volume 2, c. 6), published by Houghton, Miflin & Co. In this connection, we herewith reprint the master's report found in the appendix of that volume. We also reprint from the same source an extract from a letter of Thornton K. Lothrop in relation to this matter.]

## THE MASTER'S REPORT.

The manuscript report of the master in the case of Lawrence v. Dana, as filed January 14, 1881, in the United States circuit court, district of Massachusetts, covers 211 quarto pages. It has never been printed. The following extracts therefrom relate solely to those notes in which infringements of the complainant's "equitable rights" were found, according to the rules prescribed by the court to govern the master in his examination. The order in which the master stated the points involved has, for the sake of clearness, been changed so far as to permit his citations from the notes in dispute, of the respective editors, and his remarks concerning them, to be presented in parallel columns. Every case of infringement is here given, also the master's preface to his report and concluding remarks.

Certain variations from the exact text of the notes in the master's citations have been indicated by inserting within brackets, in their proper places, words omitted by him, and by italicising words supplied by him not in the originals.

To the Honorable the Justices of the Circuit Court for the District of Massachusetts.

The undersigned, special master, in the matter of William Beach Lawrence v. Richard H. Dana et al., having duly notified the parties, and having met them and heard their proofs and arguments, respectfully submits the following report:

The complainant claimed that certain notes in the last edition of Wheaton's International Law infringed his equitable rights, within the meaning either of the first, the second, the third, or the fourth rule in the decree of the court, and divided these notes accordingly into four classes. The master has assumed that the honorable court did not mean to be understood as deciding that a citation by the respondent identical with one in a corresponding note of the complainant was necessarily an infringement of the rights of the latter, but that it might be an infringement upon sufficient evidence, although there was no other matter in the respondent's notes besides the citation. It must be remembered that D. was to cover by his notes a period of eighteen years, since Wheaton published his last edition in 1848, fifteen years of which had been covered by the learned and exhaustive notes of the complainant. It is apparent, therefore, that if the second annotator discharged his duty with diligence and fidelity, there must inevitably be a strong resemblance between the two sets of notes, and a large proportion of the citations must be common to both.

Direct and positive proof as to where the second annotator found his citations, or as to how far he traced them back, is not attainable. For he testifies, that if he now had the sheets, on which, as he was reading, he noted references to volumes and pages and sometimes to words, it would be impossible for him to tell to what author he was indebted for them. He further testifies that he does not mean to state, as matter of recollection, that he examined the originals of all the citations which he put in his notes. "Indeed," he swears, "I know I have cited in the sense we have used that word, without quoting language, in a group of citations, at the end of a note or paragraph, works which I had never seen, and which perhaps no living person has ever seen." It was therefore necessary to resort to indirect and circumstantial evidence. The respondent proved that he had referred to sixty-nine works and made two hundred and one citations nowhere found in L., not including adjudged cases, treaties, statutes, speeches, diplomatic letters or transient matter; that he had four hundred and seventy citations to authors not impeached by L., not including adjudged cases, treaties, statutes, diplomatic correspondence, or speeches; that he gives two hundred and four adjudged cases nowhere in L. or in Wheaton, twenty-three of which are re-citations, leaving one hundred and eighty-one new cases; that L. contributes one hundred and sixty-nine citations to adjudged cases not in Wheaton, of which thirty-

one are re-citations, leaving one hundred and thirty-eight new cases contributed by L.,—that D. has sixty-four citations of cases in Wheaton which are not in L., which D. has used for purposes other than as used by Wheaton (of these sixty-four, sixteen are re-citations); that D. has fifty-four (54) adjudged cases, which though in L., are not impeached; that D. has one hundred and twenty-two notes at places where L. has no note; that D. has one hundred and two notes at places where L. has a note, but where Wheaton had placed a note: that of these eighty-seven (87) are at the end of chapters or sections; that of D.'s two hundred and fifty-eight notes all but thirty-four are either where L. has none or where Wheaton as well as L. has a note. It also appears that D. re-sectioned Wheaton's text, increasing the number of sections from two hundred and thirty-four to five hundred and fifty-one. Wheaton's sections were numbered anew for each chapter, while D.'s sections are numbered continuously. As all Wheaton's cross-references were to the sections as numbered by him, D. was obliged to make new cross-references in every instance. Wheaton's sections were numbered anew for each chapter, while D.'s sections are numbered continuously. D. has given new or amended titles to two hundred and two sections. This was outside of D.'s contract. Of D.'s notes, one hundred and twelve are not impeached. There are typographical errors in some of the citations in L. which are repeated in D. This fact is relied on as showing that D. simply transcribed from L., and did not consult the original. Such is undoubtedly the tendency of this fact. But the master has not regarded it as conclusive, for it might well be, that one having taken with him to a library a citation found in L. or any other writer, and having found the place and the doctrine which he was seeking, would omit to correct the erroneous citation. L. in many of his notes has referred to authorities in manuscript, and he testifies that he has never seen them in print. And there has been no attempt to rebut the inference to be drawn from this testimony.

The master has assumed that the burden of proof is on the complainant to show copying by the respondent, and in doubtful or nicely balanced cases he has allowed much weight to the evidences of study and labor on the part of the second annotator where he has found them. The master has endeavored to present, as briefly as possible, the questions raised as to each of the notes assailed dividing them into four classes,—and to state the proofs and counter-proofs relied on. In many cases he has ventured an opinion, after much hesitation.

### Notes of the First Class.

[Eleven of Dana's notes were impeached.]

Sixth. Note 120, p. 291. The author says: "Where an empire is severed by the revolt of a province or a colony declaring and maintaining its independence, foreign states are governed by expediency in determining whether they will commence diplomatic intercourse with the new state, or wait for its recognition by the metropolitan country."

D.'s note is attached to this text. He refers to his note 16, "On Recognition of Independence," and note 41, on, "Intervention in Mexico and Recognition of the Empire." He adds: "See, also, Mr. Buchanan to Mr. Rush, of 31st March, 1848; Mr. Webster to Mr. Rives, of Jan. 12, 1852; Mr. Everett to Mr. Rives of [17th February, 1863] Jany. 12th, 1863."

L. has a note of two pages at same place, note 117, p. 376. He says: "No difficulty [in recognizing a government de facto] can well arise with foreign states [when] where a prince, [though] claiming to be sovereign de jure, voluntarily renounces all attempt to exercise his rights;" quotes from a notification addressed to the foreign courts on the death of the Duke of Angouleme; gives an extract from letter of Mr. Buchanan to Mr. Rush, the 31st March, 1848, citing department of state MSS.; an extract from a letter of the date of Jany. 12, 1852, from the secretary of state to the minister, Mr. Webster to Mr. Rives, Cong. Doc. 1851–2 [Senate], Vol. iv., Doc. 19; and a short extract from instructions of Mr. Everett to Mr. Rives, 17 Feby., 1853, citing department of state MSS. It is observable that the dates are the same in both, save that the date of Mr. Everett's letter as given by D. is 1863.

Two of these letters are by L. quoted from manuscripts. D. does not say where these letters may be found.

Of these eleven notes the master finds that one alone infringes, viz., note the sixth. As it does not appear that the letters of Mr. Everett to Mr. Rives and of Mr. Buchanan to Mr. Rush have been published; L. citing department of state MSS., D. not saying where they may be found.

### Notes of the Second Class.

[Three of Dana's notes of this class were impeached; but the master reported none as infringements of the complainant's equitable rights.]

### Notes of the Third Class.

[Fifty-nine of Dana's notes of this class were impeached. The master reported four as infringing the complainant's equitable rights.]

Thirty-fifth. Note 117, p. 277, is of six lines.

D. says: "The treaty of Paris of 1856 applies the declaration of the freedom of rivers running between or through several states, by the congress of Vienna, to the Danube, and opens it to the trade of all nations, with no duties founded solely on the right to navigate. It makes special provisions respecting police, quarantine, and customs duties, and the removal of physical obstructions to navigation. See, also, art. 17 of treaty of 1857. Martens, Nouveau Recueil, xv. 647, 776; xvii. 75, 622, 632."

L. has a note at the same place of more than a page,—note 113, p. 849. He says: "The free navigation of the Danube had been one of the four points made the basis of the negotiation at the congress of Paris. The principles of the Vienna treaties were applied to it [by the treaty of March 30, 1856], as follows." Then follows what purports to be articles xv., xvi., xvii. and xviii. of the treaty of Paris, citing "Martens, par Samwer, Nouveau Recueil, tom. xv. pp. 647, 776." "The act of navigation of the Danube was concluded between Austria, Bavaria, the Ottoman Porte, and Wurtemburg, in pursuance of the 17th article of the treaty, on the 7th of November, 1857. It recognizes the freedom of navigation for vessels of all nations, which are to be treated in every respect on a footing of perfect equality. Ib. tom. xvi. part ii. p. 75. The European commission established,

under the date of June 27th, and July 25th, 1860, provisional regulations of police for the lower Danube and a tariff of tolls at the mouth of the Soulina, without, however, terminating its labors. Ib. pp. 622, 632."

It is apparent that D. might have written his note without reading more than L.'s.

The 17th article of the treaty of Paris provides for a commission to be composed of delegates of Austria, Bavaria, the Sublime Porte and Wurtemburg—(one of each of the powers), to whom shall be added commissioners from the three Danubian Principalities whose nomination shall be approved by the Porte:

1. To prepare regulations of navigation and river police:

2. To remove the impediments, of whatever nature, which *shall* still prevent the application to the Danube of the arrangements of the treaty of Vienna:

3. To order and cause to be executed the necessary works throughout the whole course of the river:

4. *And* [shall] after the dissolution of the European commission, *to* see to maintaining the mouths of the Danube and the neighboring part of the sea in a navigable state.

D. cites article 17 of the treaty of 1857. There was no treaty of 1857. The act of the navigation of the Danube was concluded in pursuance to the 17th article [of the treaty between Austria, Bavaria, Turkey and Wurtemburg] 7th of November, 1857.

The citation of Martens Nouveau Recueil, xvii. 75, 622, 632, is a mistake, for these citations have no relation to the matter for which they were cited by D.

This has the appearance of a hasty transfer of citations from L.'s note.

*Thirty-seventh.* Note 122, p. 295, is a note of fourteen lines.

The note of D. was written on an interleaf. It might have been written, including the citations, from the three notes of L. D. does not indicate where the letters he mentions are to be found, nor does L. in all instances.

L. has a note of eleven lines, note 120, p. 384; a note of half a page, note 121, p. 385, at the same place as D.'s; and a note of ten lines, note 122, p. 386.

*Forty-first.* Note 131, p. 319, is of sixteen lines.

D. says: "Dr. Twiss (Law of Nations, i., § 203) states the present rule and practice somewhat differently," and then makes a quotation.

L., at same place, has a note of twenty-one lines, note 133, p. 416, in which he says: "The statement in the text does not accord with what we deem the correct rule on principle, nor with what was the usage in England during the editor's official residence in that country." . . . The same extract from Twiss follows—except that the words "the rates" are substituted for the word "them." The first three paragraphs are from the text of Dr. Twiss, the last three from his note on the same page. Though there is no indication of this in either.

D. directed the printer to reprint this ex-

tract from L., which was done, except that the word "*them*" in the quotation as made by Mr. Lawrence was changed for the words "*the rates.*"

"Them" is the word in the original.

D. would hardly have undertaken to correct the author he was citing, he must have supposed that a mistake had been made in copying, as he would not have substituted "*the rates*" for "*them.*" He probably did not take the trouble to compare the quotation of L. with the original.

*Forty-fourth.* Note 138, p. 338, is of twelve lines. The text says: "It is, consequently, an implied condition in negotiating with foreign powers, that the treaties concluded by the executive government shall be subject to ratification in the manner prescribed by the fundamental laws of the state."

D. says: "For this reason, the representatives of the United States are not willing to sign or receive declarations or other notes in connection with a treaty. If such [notes] can possibly affect the treaty, they should be communicated to the senate, as a part of the compact. (Mr. Adams to Earl Russell, Aug. 28, 1861, on the declaration proposed to be attached to the convention on the subject of the declarations of Paris. U. S. Dipl. Corr. 1861, p. 186. See, also, Mr. Cass to Mr. Sandford, Oct. 22, 1859, Sen. Ex. Doc. 36th Cong. 2d Sess. No. 10. President Polk's message of Feby. 8, 1849, Cong. Globe, 1849, p. 486.) This subject was also discussed in connection with the Clayton-Bulwer treaty, where the British Minister, in exchanging ratifications, sent a note of explanation to Mr. Clayton, to which the latter replied. Sen. Ex. Doc. No. 12, 32d Cong. 2d Sess. Also Mr. Wheaton's letter to the state department, of 8th July, 1840, respecting the treaty with Hanover."

L. has a note of a page and a half, note 153, p. 454, and another note at the same place as D.'s of thirteen lines, note 154, p. 456. In the latter L. says: "It is not necessary to submit to the senate, for its formal approval, conventions providing for the adjustment of private claims, unless such a course is indicated in the convention itself," citing "36th Cong. 2d Sess. Senate Ex. Doc. No. 10, p. 472. Mr. Cass to Mr. Sandford, October 22, 1859."

In note 153, L. says, "On occasion of the treaty concluded by Mr. Wheaton with Hanover, it was proposed to declare by a protocol, [ . . . ] that, though the treaty [had been] concluded in English and French, in case of any disagreement [ . . . ] the French [copy] should be deemed the original. It was, however, the opinion of Mr. Wheaton, in which the secretary of state concurred, that no such declaration could be entered into without submitting the treaty anew to the senate." Citing "Mr. Wheaton to secretary of state, 8th July, 1840, department of state MS."

He says: "On the exchange of the ratifications of the treaty of peace between the United States and Mexico, a protocol of the conference between the commissioners, embodying their opinion as to the operation of certain amendments of the sen-

ate to the original treaty, was signed at Queretaro on the 20th of May, [1848]. . . . The president did not send the memorandum of the conference, called a protocol, to congress, when he communicated to them the treaty on the 6th July, 1848, because it was not regarded as in any way material, and had the protocol varied the treaty as amended by the senate, it would have had no binding effect." Citing "Congressional Globe, 1848-9, p. 486."

In the next two paragraphs, he says: "In proceeding to [the] exchange of the ratifications of the convention, signed at Washington, on the 19th of April, 1850, [between her Britannic majesty and the United States of America, relative to the establishment of a communication, by ship-canal, between the Atlantic and Pacific Oceans." Mr. H. L. Bulwer, the British minister, says, he "has received her majesty's instructions to declare that her majesty does not understand the engagements of that convention to apply to her majesty's settlement at Honduras, or to its dependencies. Her majesty's ratification of the said convention is exchanged under the explicit declaration above mentioned. . . It appears from the printed documents that Mr. Clayton filed, on 5th of July, 1850, a memorandum [in the department of state, stating] saying he had received the above declaration on day of its date; that he wrote, in reply, on the 4th July, a note acknowledging [that] he had understood that British Honduras was not embraced in the treaty of the 19th of April, but, at the same time, declining to affirm or deny the British title; and that, after signing the note [of] 4th of July, which he delivered to Sir Henry Bulwer, they immediately proceeded to exchange the ratifications of the treaty." Citing "Cong. Doc. 32d Cong. 2d Sess. Senate Ex. Doc. No. 12, January 4, 1853."

In the next and last paragraph he quotes from a letter from Mr. C. F. Adams to Earl Russell, Aug. 23d, 1861, in which he gives his reasons for declining to attach a declaration to proposed convention of maritime law, citing, "Papers Relating to Foreign Affairs, Accompanying the President's Message, 1861, p. 123."

It is manifest on examination of D.'s note 36, on the Monroe doctrine, p. 97, and his note 215, on the Neutrality and Foreign Enlistment Acts, p. 536, that he had made himself familiar with the Clayton and Bulwer treaty and with the history of its negotiation.

For the correspondence between Mr. C. F. Adams and Earl Russell, D. refers to U. S. Dipl. Correspondence in 1861, p. 126, [136], while L. refers to the papers accompanying the president's message.

For the letter of Mr. Wheaton to secretary of state, 8th July, 1840, L. cites department of state MS.

D. does not say where this letter may be found. L., see Record, p. 125, says he has never seen the letter of Mr. Wheaton to secretary of state in print. And it is not proved on the other side that it had been printed.

Of the notes of this class, the master finds that the *thirty-fifth*, note 117, p. 277; the *thirty-seventh*, note 122, p. 295; the *forty-first*, note 181, p. 319; and the *forty-fourth*, note 160, p. 417, [note 138, p. 388]—do infringe the equitable rights of the complainant. That the *forty-seventh*, note 160, p. 417, in which is cited by the respondent the letter of Mr. Cass to Mr. Clay, minister to Peru, Nov. 26, 1858, which the complainant had quoted and cited in manuscript; and that the *fifty-fifth*, note 232, p. 671, in which is cited by the respondent the letter of Mr. Wheaton to Mr. Buchanan, secretary of state, July 1st, 1846,[7] which the complainant had quoted and cited in manuscript, do generally infringe the complainant's equitable right to the extent of such citations. But the master has not found satisfactory evidence of copying by the respondent in any of the notes in this class, or rather he has not found proof sufficient to overcome the presumption of innocence. There [are] of necessity many matters in common.

### Notes of the Fourth Class.

[*Forty-one of Dana's notes of this class were impeached. The master reported eight as infringing the complainant's equitable rights.*]

*Sixth*. Note 80, p. 77, is of a page. It is claimed that the first five sentences of D.'s first paragraph and his entire second paragraph are taken from L.'s note of six pages at the same place, note 38, p. 91, and his Addenda, 983, 984. Both notes are historical, though unlike, they contain coincidences of phraseology, such as "In 1848 an attempt was made," "Parliament met in May, 1848," "with the approbation of the diet," "Austria, Wurtemburg, Bavaria and Hanover," in the same order.

D. has a cluster of citations at the end of his fifth sentence, "Annual Register, 1848, p. 362; 1848. pp. 347, 364; 1850, pp. 313, 320; 1851, p. 276." These are all at the end of the second paragraph of L.'s note, p. 92, in the same order. with two others not in D. L. encloses the pages of the Register to which he refers in brackets, or rather places a bracket after the pages. The Annual Register is a book, each volume of which is of two parts. One part has the numerals only, the other, the numerals with a bracket after them. D. testifies that he was familiar with the work. Did he obtain these citations from the book or from L.?

D. might have written these five sentences

---

7 [This must be a mistake. The reference is to a letter in the next note 234, p. 674, which is not assailed.]

from L.'s note, and as further proof that D. did not examine the books to which he refers, it is remarked that when he writes of events occurring since the last edition of L. was published, he states facts generally without furnishing any references or any means for verifying his statements. The answer is that when D. wrote, these events were generally too recent to be found in books.

The second and last paragraph of D. is taken from p. 95 of L. and his Addenda, 983, 984, as is contended. But D., p. 78, says: "The states of the second order began the movement in 1859, countenanced by Austria, Saxony taking the lead. Their proposition, known as the Dresden project, was declined by Prussia." I do not find any authority in L. for the statement that this proposition was known as the Dresden project.

At the end of his note D. cites "Le Nord, Aug. 15, Aug. 31, Oct. 18, Nov. 1 and 21, 1862." But L. cites Le Nord as authority for each of his several statements of fact, and he makes many which D. does not, and it is proved that D. has cited Le Nord only where it had been cited in L.

All D.'s citations of Le Nord are found in L. pp. 983, 984, and 985.

In the opinion of the master, the final paragraph of this note of D.'s does infringe the rights of the complainant.

*Seventeenth.* Note 108, p. 258, is of less than three pages on "Municipal Seizures Beyond the Marine League or Cannon-Shot."

L. has a short note at the same place, note 105, p. 323, in which the reader is referred to his note p. 266, note 105, of ten pages. It is claimed that some parts of D.'s note were taken from the two notes of L.

The notes appear to have been written for a different purpose and they have not much in common.

D. cites U. S. Laws 1797, § 27; Rose v. Himely, 4 Cranch [8 U. S.] 241; Hudson v. Guestier, Id. 293; Church v. Hubbard, 2 Cranch [6 U. S.] 187; Hudson v. Guestier, 6 Cranch [10 U. S.] 281. Neither of these is in L.'s notes; D. cites for Lord Stowell's opinion in the Case of The Louis, 2 Dob. 245. L. cites 246 Stowell, begins on p. 245.

Both refer to the opinion of Dr. Twiss, in the Cagliari Case. L. has a long extract from the opinion. D. quotes a part of L.'s extract.

It is in proof that both have omitted one and the same line of the original. D. nowhere indicates where the opinion may be found, nor does L. D. says, p. 260: "This subject was discussed incidentally in the case of the Cagliari which was a seizure on the high seas, not for violation of revenue laws, but on a claim somewhat mixed of piracy and war."

I do not find any authority for this in L.'s note.

Mr. Dana cannot tell where he got his quotation from the opinion of Dr. Twiss. and Mr. Morse had not seen it elsewhere. Mr. Potter (Record 158–159) swears that both omit one whole line of the original and neither notices the omission, that he never saw it printed entire in any book though he had seen a printed copy of it in Mr. Lawrence's library.

The master is of opinion that D. took the third paragraph of his note from L.'s note, and finds that this paragraph infringes the rights of the complainant.

*Twentieth.* Note 128, p. 303, is of more than half a page.

The first sentence is: "Heffter says that a minister in a Christian country has no authority to inflict penalties upon his suite and no jurisdiction to decide controversies of legal rights among them and

L. has a note not at same word of the text, but to a preceding word in the same section, of near a page and a half, note 133, p. 398. In this note he quotes more than a page, citing Mr. Cass to Mr. Fay, minis-

ter at Berne, Nov. 12, 1860, department of state MS.

between his fellow citizens residing in the country." (Europ. Völker. § 216.) De Martens, § 215. To this there is no objection. The next sentence is: "Mr. Cass, secretary of state, in a letter to Mr. Fay, the United States minister at Berne, of Nov. 12, 1860, takes the ground that a minister of the United States has no civil or criminal jurisdiction among his fellow countrymen or over his suite, and that what is called the extra-territoriality of the embassy relates only to what is necessary to the proper discharge of diplomatic functions, and does not make the place of the minister's residence a portion of the United States in such a sense that private persons, by presenting themselves there for purposes of private contracts, whether of marriage or of business, can give to their acts exemption from the law of that country, or the sanction of the law of their own country. If the latter effect is produced it must be by force of statute law. 12 Stat. 72, c. 179.

There can be no doubt that the substance of the foregoing sentence is found in the quotation from Mr. Cass's letter in L. Mr. Lawrence testifies that to the best of his knowledge there has been no printed copy of this manuscript extract, save what was in his note. And there was no attempt to contest this evidence.

D. then devotes four sentences to the views of Dr. Woolsey, citing Woolsey's Introd. § 92. His last sentence is a statement of what the British government claimed and admitted in the case of the coachman of Mr. Gallatin, the United States minister in London. D. does not say where the case may be found.

Mr. Lawrence testifies: "The case of Mr. Gallatin's coachman is also mentioned by D., p. 303. I give it in the addenda, p. 1006. I have never known of its being stated elsewhere. It occurred while I was secretary of the legation, and the discussion with the foreign office was carried on by me. Gallatin's despatch and my private memoranda." Record, p. 124.

L., p. 1006, gives a brief history of the coachman's case, p. 1006, and from this D. might have written the last sentence of his note.

The master finds that the second and last sentences do infringe the rights of the complainant.

*Twenty-second.* Note 135, p. 324, is of more than half a page, in two paragraphs. The text speaks of consuls in civil cases being subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state.

The author has a note at the same point, citing several authorities.

D. says: "As to the status of consuls, and the privileges usually accorded to them in the practice of nations, for further authorities see Twiss's Law of Nations, i. 318; Woolsey's Introd. §§ 95, 96; Phillimore's Intern. Law, 240–275; Heffter's Europ. Volker, § 244, a. 249; Hallock's Intern. Law, 239–267; Opinions of Attorneys General (U. S.) vii. 22, viii. 16; Martens, Guide Dipl. ch. XII. §§ 72, 79; Guide des Consulats (De Clercq et De Vallat), i. 6–16; Davis v. Packard, Peters's Rep. vii. 276; Valarino v. Thompson, 7 Selden's Rep. (N. Y.) 576.

He then gives a short history of the case of Mr. Dillon, the French consul at San Francisco. "After a long correspondence," he says, "the point was settled by instructions from the French government to its consuls to obey the subpœna in future cases." Citing Mr. Marcy to Mr. Mason, Sept. 11, 1854, and 18 January, 1855; notes of Mr. Mason and M. Walewski, Aug. 3 and 7, 1855; Annuaire des Deux Mondes, 1853–4, p. 762; 1854–5, p. 732.

D. does not say where the correspondence may be found. D.'s second paragraph is not assailed.

The master finds that all of the note of D. after the first sentence does infringe the rights of the complainant.

*Twenty-fourth.* Note 143, p. 352, is of more than a page on the "Effect of War on Treaties."

D. undertakes to indicate what treaties are and what treaties are not annulled or suspended by war. He quotes from Halleck (Intern. Law, 371, 862); from Kent (Commentaries, i. 420); from the opinion of the supreme court (in the case of the Society for the Propagation of the Gospel v. New Haven, 8 Wheat. [21 U. S.] 464); from Woolsey (Introd. § 152). Says, "The older textwriters made the survival of treaty rights dependent on the origin of the war" — citing Grotius, liv. 3, ch. 20, §§ 27, 28, and Vattel, liv. iv. ch. 4, § 42. Then follows a short commentary. He adds: "See, also, the debate in the house of commons on the declaration of Paris of 1856;

L. has a note to the same word in the text. Note 143, extending from page 423 to page 437, a storehouse of learning. The citations in D. which are underscored are found in L. The others are not. L. has many citations which are not in D. L. gives a very full account of Dillon's case. For the correspondence between Mr. Marcy and Mr. Mason and between Mr. Mason and M. Walewski, L. cites MS. and Annuaire des deux Mondes, 1853–4, p. 762; 1854–5, p. 732. Mr. Lawrence testifies that this is a correspondence which he has never seen elsewhere in print: and that his attention was directed to it by Mr. Marcy.

L. has a note of some three pages at same place. Note 160, p. 472. He has none of the citations in D., except those which are underscored. He has a quotation from Mr. Marcy's despatch to Mr. Mason, for which he refers the reader to department of state MS. And this is a manuscript which Mr. Lawrence swears he never saw elsewhere in print. The speech of Lord Derby so far as quoted by L. does not bear on any matter set forth in D. Both cite this speech as made Feby. 7th. Hansard gives it as made Feby. 6th.

L. quotes from Sir George Cornwall Lewis, p. 474, and from Mr. Bright. He also quotes from Phillimore, citing International Law, vol. iii. p. 602.

speeches of Sir George Lewis and Mr. Bright of March 11 and 17, 1862, and of the Earl of Derby of Feb. 7, 1862; despatch of Mr. Marcy to Mr. Mason of Dec. 8, 1856; Phillimore's Intern. Law, iii. App. 21."

The high probability is that D. took his references to the speeches of Earl Derby, Sir George Lewis, and Mr. Bright from L.'s note, as also citation of Mr. Marcy's despatch, and in the opinion of the master these citations by D. do infringe the complainant's rights.

*Twenty-sixth.* Note 156, p. 387. is of nearly two pages on "Enemy's Property Found in the Country on the Breaking Out of War." At the same point Mr. Wheaton has this note. "Mr. Chief Justice Marshall, in Brown v. U. S., 8 Cranch [12 U. S.] 123–129."

D. in his first and second paragraphs gives the decision of the court, and states the question upon which they were divided and quotes from Kent. These two paragraphs are not assailed. In the third paragraph he says, "Hautefeuille contends that the law of nations exempts from confiscation property found within the country on the breaking out of war, including vessels and cargoes afloat," citing tom. iv. p. 267; tom. iii. p. 278, and adds: "It does not follow that the learned author considers his view to be sustained by the decisions of courts or practice of nations. He refers rather to treaties securing [the] exemption, and to the opinions of text-writers whom he considers sound and trustworthy."

In the fourth paragraph he says: "The English text-writers, like the American, are of opinion that the law of nations is not settled against the right, but, indeed, admits it. Manning, Law of Nations, 167; Phillimore, Intern. Law, i. 115–135."

The fifth paragraph is devoted to the orders and declarations issued and made by the parties to the Crimean War — France and Great Britain—citing "French Declaration of March 27, and British Declaration of March 29, 1854."

He says: "On her part, Russia allowed French and English vessels six weeks to load and sail from ports in the Black Sea, Baltic [and] sea of Azof, and six weeks from the opening of navigation, to vessels in the White

L. has two notes, neither at the same place as D.'s, but near it,—one, note 172, p. 530, of half a page; the other, note 173, p. 531. In the first of which he gives an extract from Earl Derby's despatch of Dec. 6, 1861, which embraces the quotations of D.—all that D. says of that despatch is found in said note 172. L. cites "Parliamentary Papers, 1862, Correspondence Relating to Civil War in the United States, p. 108." The learning of D.'s paragraphs four and five may be found in L.'s note 173, except the last two sentences of the fourth, and in this note are found all the aforesaid citations by D. which are underscored, and many others not found in D. There is no "Paris Moniteur." It is the "Moniteur Universel"; but L. and Hallech cite it as "Paris Moniteur." The Russian paper is called in Hosack, "Commercial Gazette." But L. and D. call it "Gazette du Commerce."

In L. the last citation is stated to be from second edition. The first citation is reprinted by L. from his edition of 1855, p. 871.

Sea." At the end of this paragraph are cited "*Paris Moniteur, March 28, 1854; London Gazette, 18th April, 1854; Gazette du Commerce, 19th April, 1854; Hosack's Law of Neutrals, 57; App. 112; Ortolan, ii. 443-448.*"

In his next and last paragraph, after a short commentary, D. quotes from a despatch from Earl Russell of 6th of December, 1861, to the British consul at Richmond, Va., and closes by citing Parliamentary Papers, 1862, p. 108. He refers to his notes 157 and 169 *infra*.

D. in his third paragraph has two citations of Hautefeuille, tom. iv. p. 267; tom. iii. p. 278. He does not say which edition he refers to. It is in evidence (Record, 219) that tom. iv. p. 267 of the four volume edition is the same as tom. iii. p. 278 of the second edition.

The last two sentences of D.'s fourth paragraph are not found in L.

The master finds that the third paragraph infringes the complainant's rights, and that the others do not.

*Thirty-seventh.* Note 228, p. 637, is of twenty-four pages. Five paragraphs (p. 639) only are assailed.

### First.

D. says, p. 639: "At the beginning of the Crimean War, the declaration of Great Britain, of 28 March, 1854 (and that of France was to the same effect), was in these words: 'It is impossible [for her majesty] to forego the exercise of her right of seizing articles contraband of war, and of *preventing neutrals from bearing the enemy's despatches.*' "

L. has a note at the same word of the text, note 230, p. 805. He says, p. 771: "The preventing of neutrals bearing enemy's despatches was included with the seizing of articles of contraband, as an exception to the otherwise unrestricted freedom of commerce, conceded to them by the 'declarations' of England and France, and by the order in council, of the 15th of April, 1854." The language of the declaration is not there given, but in the note of L. 228, p. 771, he says: "The ministers of England and France communicated to the secretary of state of the United States on the 21st of April, the declaration made on the 28th March." He then quotes from the declaration, and a part of L.'s quotation is the quotation of D.

### Second.

D. says (p. 639): "At the beginning of the Civil War in the United States, the royal proclamation of neutrality

L. says (p. 805): "The queen of England's declaration of neutrality, in the present war between the United States

of 13th May, 1861, warns British subjects against carrying officers, soldiers, despatches, *arms, military stores,* . . . for the use of either of the contending parties," as "acts in derogation of their duty as subjects of a neutral sovereign."

and the Confederate States, includes in the same category with articles of contraband, "carrying of officers, soldiers, despatches, &c., for the use or service of either of the [said] contending parties." The words in D. underscored, viz: "arms and military stores" are not found in L. nor is the date of the declaration. But on page 698 of L. the date is given and words underscored are found.

### Third.

D. (p. 639) says: "The decree of the emperor of the French was more general," and gives a quotation from it.

L. (p. 699) says: "The French decree, as published in the Moniteur, June, 1861, was as follows." Then follows an extract of which the quotation of D. is a part.

### Fourth.

D. (p. 639) says: "The Spanish decree of June 17, 1861, says: 'The transportation of munitions of war is forbidden, as well as the carrying of papers or communications for the belligerents.' "

L. (p. 699) gives the same date and the same quotation and more.

### Fifth.

D. (p. 699) says: "The declaration of Paris is silent on this subject. The proposed International Code of Spanish America, of 1862, in connection with its recognition of the declaration of Paris, had this provision: 'Besides the articles qualified as such, are to be deemed contraband of war commissioners of every description sent by belligerents, and the despatches of which they are the bearers.' " D. does not indicate where any of these papers from which he quotes are to be found.

L. (p. 951): "The questions raised by the affair of The Trent did not enter in any manner into the declaration of the congress of Paris. . . . The proposed international code of Spanish America, while recognizing the principles of the declaration of Paris, inserts a provision that." Then follows in *ipsissimis verbis* the quotation of D. L. cites "La Cronica, 6 de Octubre, 1862."

The master finds that the seventh, eighth, ninth and tenth paragraphs do infringe the rights of the complainant.

*Fortieth.* Note 240, p. 688, is of two pages.

D. gives a history of the case of the Cagliari, the opinions in brief of Dr. Twiss and Dr. Phillimore, and finally his own opinion and the reasons therefor at some length. At the end of his note he cites "Martens, Causes Celebres, v. 600." Martens gives a history of the case but does not allude to Dr. Twiss or Dr. Phillimore. D. had Abdy's Kent, in which the history of the case is given, and a short extract from Dr. Twiss's opin-

L. (pp. 267 and 268) gives the opinions of Twiss and Phillimore and in his index under the word Cagliari, refers the reader to p. 267. Neither of the experts has seen these opinions in any other book, and no one intimates where they are to be seen. It is not claimed that D. has taken from L. anything but the two sentences on p. 688 in which appear these opinions.

ion in the case; but it is no authority for the opinions as reported by D. The history of the case as given by D. is not found in L.

The master finds that D. was indebted to L. for his reports of the opinions of Dr. Twiss and Dr. Phillimore, and has, to that extent, infringed the complainant's rights.

The master has indicated such parts of the respondent's notes in the fourth class as he finds to infringe the rights of the complainant, and as to other parts of said notes he finds they do not infringe, either because he is satisfied they do not, or is not satisfied that they do.

He has endeavored to present the facts, the questions raised and the proofs and suggestions relied on by the respective parties, as briefly as is consistent with the proper discharge of his duty to the court.

Respectfully submitted,      H. W. Paine.

### Extract from Letter of Mr. Lothrop.

Hotel Jungfraublick, Interlaken,
August 25, 1890.

My Dear Adams: * * * * * Into the merits of the unfortunate controversy and litigation which followed the publication of his edition of Wheaton I have no wish or purpose to enter. Mr. Dana would never have denied his use of Mr. Lawrence's collections of citations, but these citations—mere lists of other persons' writings,—were in his opinion common property, and the labor and research employed in finding and collecting them he hardly regarded as intellectual work. No original thought or expression of Mr. Lawrence's is anywhere to be found in Mr. Dana's notes; nor does any idea of Mr. Lawrence's anywhere serve as a basis for, or seem to have suggested, any note or part of a note to Mr. Dana. But Mr. Lawrence's collections of citations are constantly reprinted exactly in the order in which they stand in the editions of Wheaton published under his supervision. This is, however, rather a technical illegality than a moral injustice, for had any one on Mr. Dana's behalf verified these lists by referring to the books cited he might then without reproach have reprinted them in the same order, so far as he found them correct. And it is gratifying to know that the report of the master to whom the case was referred, made after a most laborious and exhaustive investigation, reduced to a minimum the invasion of Mr. Lawrence's copyright; if indeed there were any invasion at all. The report was never acted upon, and upon the death of both the parties the litigation practically ceased. The whole controversy is the more unfortunate, as there is reason to believe that, had Mr. Dana thoroughly recognized the value and extent of Mr. Lawrence's labors, and publicly expressed his obligations for Mr. Lawrence's exhaustive researches, there would have been no difficulty and no lawsuit. It is much to be regretted that this was not done, and it must be admitted, I think, by Mr. Dana's best friends, that his failure to perceive and acknowledge the advantage to himself, as well as to all students of international law, of Mr. Lawrence's diligence in research, was unjust as well as unfortunate. In spite of the time devoted to his work on Wheaton, Mr. Dana was able during these years to discharge all the duties his office required, and when he resigned he had the satisfaction of knowing that, though no addition had ever been made to the number of his assistants, the whole work of the office in the busiest times had been done without the employment in a single instance of any additional counsel, or any professional aid from outside. I have now given you, my dear Adams, my best recollections of Dana's district attorneyship, about which you ask me. What I have written is all that I can do here. I wish you

had applied to me before I came away. The whole thing is absolutely yours to treat and use in any way you like. I have only one request, that you will not let me in any way appear in print with any statement where your better knowledge shows my recollection to be inaccurate.

Very truly yours,      Thornton K. Lothrop.

P. S. Did ever a man suffer more than Dana from his mental peculiarities, perversities or obliquities, or whatever you choose to call them? He thought anybody could collect authorities, and that to do this was a day laborer's task; he used Lawrence's collections, and then despised his notes because they were mere collections of authorities, and at last thought himself under no obligation to him, because the notes were what anybody could have done, and so would not say the soft word that might have turned away wrath, but wrote instead what almost rendered a lawsuit inevitable;—and then Lawrence pursued him with a personal and political vindictiveness which ruined Dana's career, lost him his only chance, and was to Lawrence, whatever became of his lawsuit, a perfectly satisfactory vindication. Two hundred and fifty dollars paid ——, or some other equally accurate man would have rendered any suit impossible; and a little harmless and truthful flattery would have removed all desire for a controversy from Lawrence's mind. But the whole thing was very characteristic of one side of Dana's mind.

I may add that my recollection of the Prize Causes is very shaky. If I could have got hold of a brief or a volume of reports, it would all have come back to me; but my endeavors in this direction were in vain, and my recollections are rather of points talked over between Mr. Dana and myself in these and other like cases than of the actual argument of the cases. Dana, as you know, was always absolutely absorbed in the one thing he was doing; and this question of—was there a war?—could there be prize? took absolute possession of him. It had been agreed between us that he should take charge of all such questions, and should not be troubled with the other office work except in cases of emergency, and that I should have charge of and be responsible for the other work, and from the outset the office was managed in this way during all the time I was there.